FILED

2006 Feb-23 PM 04:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# FOSHEE & TURNER COURT REPORTERS

**1**

1   UNITED STATES DISTRICT COURT
2   NORTHERN DISTRICT OF ALABAMA
3       WESTERN DIVISION
4
5   CIVIL ACTION NO.  CV-03-CO-2764-W
6
7   Evelyn Pierce as Administratix for the
8   Estate of Danny Cassady, Deceased,
9   Plaintiff,
10
11  Vs.
12
13  NaphCare, et al.,
14  Defendants.
15
16  DEPOSITION OF CARROLL BELINDA TIDWELL HOGUE
17      In accordance with Rule 5(d) of
18  The Alabama Rules of Civil Procedure, as
19  Amended, effective May 15, 1988, I, LEANN
20  COURINGTON, am hereby delivering to MARY
21  PILCHER, ESQ., the original transcript of
22  the oral testimony taken on the 24th
23  day of June, 2005, along with exhibits.

**2**

1       Please be advised that this is the
2   same and not retained by the Court
3   Reporter, nor filed with the Court.
4
5       S T I P U L A T I O N
6       IT IS STIPULATED AND AGREED, by
7   and between the parties, through their
8   respective counsel, that the deposition of
9   CARROLL BELINDA TIDWELL HOGUE may be taken
10  before LEANN COURINGTON, Commissioner, Court
11  Reporter and Notary Public, State at Large.
12      IT IS FURTHER STIPULATED AND
13  AGREED that the signature to and reading of
14  the deposition by the witness is waived,
15  the deposition to have the same force and
16  effect as if full compliance had been had
17  with all laws and rules of Court relating
18  to the taking of depositions.
19      IT IS FURTHER STIPULATED AND
20  AGREED that it shall not be necessary for
21  any objections to be made by counsel to any
22  questions, except as to form or leading
23  questions, and that counsel for the parties

**3**

1   may make objections and assign grounds at
2   the time of trial, or at the time said
3   deposition is offered in evidence, or prior
4   thereto.
5       IT IS FURTHER STIPULATED AND
6   AGREED that the notice of filing of the
7   deposition by the Commissioner is waived.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**4**

1           I N D E X
2
3   EXAMINATIONS              PAGE:
4   EXAMINATION BY MS. PILCHER      8
5
6
7
8       E X H I B I T S
9
10  PLAINTIFF'S NO.  28          25
11  PLAINTIFF'S NO.  29          43
12  PLAINTIFF'S NO.  30          45
13  PLAINTIFF'S NO.  31          46
14  PLAINTIFF'S NO.  32          58
15  PLAINTIFF'S NO.  33          74
16  PLAINTIFF'S NO.  34          78
17  PLAINTIFF'S NO.  35          82
18  PLAINTIFF'S NO.  36          83
19  PLAINTIFF'S NO.  37          92
20  PLAINTIFF'S NO.  38          94
21  PLAINTIFF'S NO.  40          95
22
23

# FOSHEE & TURNER COURT REPORTERS

17

1    MS. SEGERS: Uh-huh.
2         MS. PILCHER: I've gone one -- I'm
3    just keeping up with additional numbers.
4    And if it's a number that's already been
5    done, it will be the same exhibit.
6         MS. SEGERS: Okay. Then that's
7    fine. Thank you.
8    Q.   Have you received any training
9    with regard to illnesses that are typical
10   or common in the correctional environment?
11        MS. HOLPP: Object to the form.
12        MS. PILCHER: Sorry?
13        MS. HOLPP: I'm just preserving an
14   objection to the form of your question.
15   You may answer it if you understand.
16   A.   Could you elaborate a little bit
17   more, please?
18   Q.   Have you ever received any
19   training with respect to MRSA staph?
20   A.   In my nursing classes and in
21   services that I've attended at hospitals.
22   Q.   Okay. What is your understanding
23   of what is MRSA staph and what are the

18

1    symptoms that you have to look for?
2    A.   With MRSA, you can have it in body
3    fluids or any body part. This is a
4    bacteria that has become resistant to a
5    large number of antibiotics. The person is
6    usually been put on when we're in the
7    hospital setting, if it is in their urine,
8    we would take precautions to protect
9    ourselves like when we dealt with urine to
10   whatever area that is that they have the
11   MRSA in.
12   Q.   Do you as a registered nurse or a
13   nurse practitioner have to take precautions
14   on whether the particular patient is a
15   carrier versus someone who has the active
16   infection? Is there some type of
17   distinction?
18        MS. HOLPP: Object to the form.
19   A.   Yeah. Could you rephrase the
20   question, please?
21   Q.   If there is a distinction between
22   someone who has an active MRSA infection
23   versus someone who only has a MRSA carrier

19

1    status, that they are not exhibiting any
2    active symptoms?
3    A.   I'm not following your question
4    because it sounds -- I'm just not following
5    your question.
6    Q.   Is it possible for someone to have
7    MRSA and carry it and spread it on to other
8    people without exhibiting any active
9    symptoms --
10   A.   Yes.
11   Q.   -- of the disease?
12   A.   Yes.
13   Q.   Was there anything that was done
14   at the Bibb County Correctional Facility
15   during the time that you were there from
16   let's say March 2001 to October -- November
17   2001?
18        MS. HOLPP: Well, let me object to
19   -- she was not there until May.
20   Q.   Okay. Was there anything that was
21   done from May 2001 until November 2001 to
22   test inmates to determine if they had a
23   carrier status or had an inactive infection

20

1    of MRSA?
2    A.   We would do wound cultures if the
3    condition warranted it. If they were
4    presented to the clinic and there was an
5    open wound, we would test the wounds.
6    Q.   If you actually did a wound
7    culture would that be noted in the medical
8    records?
9    A.   It should be.
10   Q.   If you had a patient who had an
11   active MRSA testing with either some type
12   of carrier status or open wound, would you
13   at that point in time do anything to
14   determine if other inmates in that housing
15   facility had been infected?
16        MS. HOLPP: Object to the form.
17   A.   I guess -- could you rephrase the
18   question for me?
19   Q.   Yes. Did NaphCare or you as a
20   nurse practitioner have any knowledge of a
21   practice of testing other inmates assigned
22   to a particular housing unit if someone in
23   that unit had been diagnosed with MRSA?

21

1     MS. HOLPP: I'm sorry, I don't
2  want to object, but I need the to be clear.
3  She was not an employee of NaphCare. But
4  by you including NaphCare in that question,
5  I have to object to the form.
6     Q. Okay.
7     MS. HOLPP: Because she can't
8  answer for NaphCare.
9     A. I don't remember. I personally
10  did not test everyone in the dorms if there
11  was an active breakup of MRSA that
12  occurred.
13     Q. Did you test anyone in the dorms
14  if you were aware that one of the inmates
15  in that housing unit had been infected with
16  an active MRSA virus or infection?
17     A. If they came to the clinic and
18  their condition warranted, their condition
19  they had an open wound or whatever that
20  occurred, then we would test for wound
21  cultures. But I do not remember all the
22  dorms.
23     Q. Is it your understanding that MRSA

22

1  is a communicable disease?
2     A. Yes. Let me clarify a
3  communicable condition.
4     Q. Okay. Is it highly contagious?
5     A. It is contagious. Let me clarify
6  the word "contagious", maybe spreadable is
7  a better word.
8     Q. Was it ever discussed in any in
9  servicing meetings or quality assurance
10  meetings that there should be a need or
11  there might be a need to test inmates in
12  any housing unit where someone had been
13  infected?
14     A. I don't remember.
15     Q. Tell me a little bit about your
16  employment history.
17     A. In 1982 to 1989, I was employed as
18  a registered nurse at DCH Medical Center.
19  And then from 1989 to, I believe, around
20  1991, I was employed at Tallahassee
21  Memorial Hospital in Tallahassee, Florida.
22  And I also did some home care for an agency
23  there part time. In probably 1991 to part

23

1  of 1993, I was employed with HCA Hospital
2  in Panama City, Florida, and I did some
3  part time home health care with an agency
4  there. In 1993 I came back, we moved back
5  to Tuscaloosa, I was employed with DCH
6  Health Care Authority at Northport
7  Hospital. I worked there until 1995.
8     I've been employed by Bevill State
9  Community College from 1995 until the
10  current time. And in 2001, I was employed
11  by NaphCare from May 2001 until the first
12  week of November 2001. In 2002, I was
13  employed also -- while I was still employed
14  at Bevill State, I was employed until
15  September or October 2002 to July -- I'm
16  sorry, June 2000 and -- my dates are all
17  mixed up. 2003 with Contract Medical
18  Services. And 2003 to July 1 of 2004, I
19  was employed with Maude Whatley Health Care
20  Services.
21     MR. PIGGOTT: Maude Whatley?
22     A. Maude Whatley, uh-huh.
23     Q. Where is Maude Whatley located?

24

1     A. They were providing there in
2  Tuscaloosa, but they were providing care in
3  the Tuscaloosa County Jail. And in 2000 --
4  February 2005 to the current time, I'm
5  currently still employed at Bevill State
6  Community College, as well as part time at
7  Med Center South.
8     Q. Are you practicing in each of
9  these since 2000 -- November 2001, have you
10  continued to be employed as a nurse
11  practitioner?
12     A. In every place except for Bevill
13  State Community College.
14     Q. Where you're teaching?
15     A. Yes.
16     Q. What are the classes that you
17  teach at Bevill State?
18     A. I teach mainly associate degree
19  nursing classes, like adult health --
20  excuse me, Adult-Child 1, Adult-Child 2,
21  Adult-Child 3 classes, and the leadership
22  class.
23

# FOSHEE & TURNER COURT REPORTERS

25

1  (Plaintiff's Exhibit Number 28 was marked
2  for identification and attached as an
3  exhibit thereto.)
4
5      Q.  I'm going to show you what's been
6  marked as Plaintiff's Exhibit Number 28 and
7  ask you if you can review that document.
8      A.  Okay.
9      Q.  Does this accurately reflect your
10 contract with NaphCare as a nurse
11 practitioner for the time period of May
12 2001 until you left in November 2001?
13     A.  It does reflect those inmates that
14 were brought up to the infirmary that I did
15 see, yes.
16     Q.  Did you see inmates that were not
17 in the infirmary at any time?
18     A.  Actually, can you rephrase that a
19 little bit?
20     Q.  You indicated that this covered
21 the contract for the inmates you saw until
22 in the infirmary.  Were there other inmates
23 that you saw?

26

1      A.  No, I did not see any inmates that
2  were not brought up to the -- that did not
3  come to the infirmary for either clinic or
4  that were not housed in the infirmary.
5      Q.  So, you weren't responsible for
6  segregation rounds or?
7      A.  No.  I'm sorry.  I interrupted
8  you.
9      Q.  That's okay.  Did you assess the
10 inmates as they came into the facility on
11 any occasion?
12     MS. HOLPP:  Object to the form.
13 Do you mean came as they were brought
14 initially to Bibb County or some that came
15 into the infirmary?
16     Q.  Any time you had a new transfer
17 into the Bibb County Correctional Facility,
18 were you responsible in any way of
19 assessing the inmate upon his arrival, his
20 or her?
21     A.  No.  I guess, too, are you talking
22 about immediately when they got there?
23 Because those kind of things were only

27

1  brought to my attention after the nurse had
2  would assess them as they came in.
3      Q.  Okay.  So, would it be fair to say
4  that you would only see the patients after
5  they had been triaged by a nurse?
6      A.  Triaged as?
7      Q.  There had been some type of an
8  assessment done by a nurse to make a
9  determination of whether it was necessary
10 to see you or not.  Would that be a fair
11 assessment?
12     A.  Yes.
13     Q.  Were there occasions, to your
14 knowledge, that the nurse had requested
15 that a physician review the case and that
16 the case was actually assigned to you in
17 lieu of a physician?
18     A.  I'm not aware of that.
19     Q.  How would you get an assignment of
20 a patient to review his chart and/or to
21 review his medical care?
22     A.  There was an appointment list and
23 those individuals that were on the

28

1  appointment list were to come to the
2  clinic, and the charts were often times
3  they were ready for me in the examining
4  room for me to look at when they came with
5  a clinic visit.
6      Q.  Would you have an opportunity to
7  review the charts before you actually
8  conducted your examination?
9      A.  Often times it was -- it was a
10 very brief review.  It was not the entire
11 chart.  And it was usually done maybe
12 either during the exam flipping through
13 that or maybe to, you know, two to five
14 minutes beforehand.
15     Q.  How long would your examination of
16 the patient take?
17     A.  It varied.
18     Q.  Okay.  Tell me, you know, the
19 approximate times and conditions that might
20 cause it to be longer or shorter.
21     MS. HOLPP:  Object to the form.
22     A.  Can you rephrase that, please?
23     Q.  Uh-huh.  Did you have an average

# FOSHEE & TURNER COURT REPORTERS

29

1 time that you would spend with the patient
2 on a consistent basis with variations
3 either up or down based on certain factors?
4     A.  I took whatever time was needed to
5 address that problem.
6     Q.  Approximately how many patients
7 did you see at any particular week?
8     A.  I don't remember.  I'd have to
9 look at the logs.
10     Q.  But did you keep up with what
11 patients you examined --
12     A.  Yes.
13     Q.  -- and kept up with?
14     A.  There was a log.
15     Q.  Was it your standard procedure or
16 practice to review your chart after your
17 examination of them?
18     A.  Often times I did.
19     Q.  Okay.  And how long would you take
20 to review the chart after an examination?
21     A.  It varied.
22     Q.  What type of information would you
23 be looking for in the chart to determine a

30

1 medical assessment?
2     A.  I would go back and review the
3 history and any physical exams.  I would go
4 back and review the labs.  If they were
5 housed in the infirmary, I might look over
6 some of the notes the nurses had
7 written.  I'd look over x-ray reports and
8 any other sections of the chart that I felt
9 that were pertinent.
10
11 (Plaintiff's Exhibit Number 28 was marked
12     for identification and attached as an
13         exhibit hereto.)
14
15     Q.  Now, if you'll look on Plaintiff's
16 Exhibit Number 28, in Section C, it says
17 the duties under the direction and
18 supervision of the physician.  What type of
19 supervision was required under your
20 licensing for you to prescribe and/or
21 assess patients as a nurse practitioner?
22     A.  The applications had to go in
23 front of the Board of Nursing for

31

1 collaborative practice.  The Board of
2 Nursing, I believe, requires a minimum of
3 10 percent of the time that I worked had to
4 be spent with a physician.
5     Q.  Was the physician required to
6 review your records or review your
7 assessments of a particular patient?
8     A.  Not every -- not every patient,
9 no.
10     Q.  Under what circumstances would a
11 physician be required to review your
12 assessments and/or prescriptions?
13     A.  If there was an ongoing problem,
14 the physician when the innate was seen by
15 the physician might then review my
16 charting.
17     Q.  Did Dr. Ifediba regularly review
18 your charts of patients that you had seen?
19     A.  She did review some, yes.
20     Q.  Did she review your charts on a
21 consistent basis?
22     A.  Yes.
23     Q.  Like if you saw a patient and you

32

1 referred that patient to the physician,
2 whose responsibility was it to insure that
3 the patient got to a physician as ordered?
4     A.  Whoever took the orders off would
5 take the orders off and if there was -- the
6 person needed to see the physician like the
7 next day, when they sent out the list --
8 the list of patients that were going to be
9 seen in the dorm the next day -- excuse me.
10 The list of patients that were going to be
11 seen by the physician the next day, that
12 list was sent out to the dorms.  And it was
13 the inmates responsibility to come up to
14 the infirmary or to the medical clinic as
15 they were assigned.  But it was their
16 responsibility to look at that and come to
17 the clinic.
18     Q.  Did you have any responsibilities
19 or did the health care unit to your
20 knowledge have any responsibilities to
21 notify the Department of Corrections of
22 inmates who didn't show for appointments?
23     A.  I documented it in the record.  I

# FOSHEE & TURNER COURT REPORTERS

33

1  did not notify the Department of
2  Corrections.
3    Q.   If an inmate just didn't show, you
4  would document it in the record that he
5  didn't show, but you were unaware of any
6  policies that required you to notify
7  anyone?
8    A.   That's correct.
9    Q.   Now in Plaintiff's Exhibit Number
10  28C, it says evaluate current health status
11  and risk factors of individual based on a
12  comprehensive health history.  What is the
13  significance of obtaining a health history
14  from a patient?
15    A.   The health history can give you an
16  idea of potential problems that could be
17  occurring, also to help manage some of
18  their chronic problems.
19    Q.   Would it be significant for you --
20  if a patient, let's use Danny Cassady for
21  an example, Danny Cassady came in with
22  recurrent skin infections.  Was it
23  significant for you to determine what types

34

1  of medications he had taken for that
2  condition?
3    MS. HOLPP:  I'm going to object to
4  the form.  Facts that are not in evidence.
5    A.   Could you rephrase that, please,
6  that question?
7    Q.   Well, as a nurse practitioner and
8  as part of the standard of care that you
9  provide all patients, if you are getting a
10  health history, is it also important for
11  you to obtain the types of medications that
12  a patient is taking?
13    A.   Yes.
14    Q.   And why is that?
15    A.   Because that also tells you a
16  little bit about their condition and how
17  well they're responding to that medication.
18  Also, for instance, if a person was on
19  anti-hypertensive drugs, you want to see
20  how well they're doing with that drug or do
21  we need to change something.
22    Q.   So, it would be fair to say as a
23  nurse practitioner reviewing the response

35

1  to treatment to medications that are being
2  prescribed for a particular condition is
3  part of the standard of care that you owe
4  to that patient; is that correct?
5    MS. HOLPP:  Object to the form.
6    MS. SEGERS:  Object to the form.
7    A.   Could you rephrase that, please?
8    Q.   Would it be fair to say that it is
9  part of the standard of care as a nurse
10  practitioner and in the medical community
11  that the response to treatment to
12  medications that are prescribed to patients
13  is important to review to determine if the
14  medication should be changed?
15    MS. SEGERS:  Object to the form.
16    MS. HOLPP:  Object to the form.
17    A.   I'm getting a little confused by
18  the I guess the length of the question
19  because it seems to go around a little bit.
20    Q.   What's the significance of
21  determining a patient's response to
22  medication?
23    A.   We want to know if that condition

36

1  has either improved or gone away, or if we
2  are maintaining that like with
3  anti-hypertensives or is that hypertension
4  under control.
5    Q.   Well, what if a condition isn't
6  going away and is actually getting worse,
7  is there some something that you as a nurse
8  practitioner should consider or review
9  regarding the medications and treatment
10  that's being providing with regard to the
11  treatment protocol?
12    MS. HOLPP:  Object to the form.
13    Q.   Should you review the treatment
14  protocol that's given if the condition is
15  not improving?
16    MS. HOLPP:  Object to the form and
17  that's compound.
18    A.   Could you rephrase the question,
19  please?
20    Q.   Should you as a nurse practitioner
21  review the treatment protocol?
22    A.   Yes.
23    Q.   If you as a nurse practitioner

# FOSHEE & TURNER COURT REPORTERS

37

1   review the record and determine that the
2   treatment protocol is not effective, do you
3   as a nurse practitioner have some duty or
4   responsibility to the patient at that point
5   in time?
6       A.   As in regards to what?
7       Q.   Okay.  To change it, to review it.
8       A.   Yes.
9       Q.   Okay.  What would you do?
10      A.   If the patient had not responded
11  to a medication or if I had lab data to
12  support that the medicine we had ordered
13  was not going to be effective for that
14  organism, I would change it.
15      Q.   So, at that point would it be
16  important to review a comprehensive list of
17  medications that have been provided for
18  that condition?
19          MS. HOLPP:  Object to the form.
20      A.   Could you rephrase that, please?
21      Q.   If you were treating a patient as
22  a nurse practitioner and you realized that
23  the treatment protocol or the medications

38

1   that have been prescribed are not working,
2   at that point in time should you review his
3   treatment history for that condition,
4   including medications that have been
5   prescribed?
6       A.   I would review it.
7       Q.   If you reviewed the treatment
8   history and determined that the condition
9   had not gone away or significantly
10  improved, what, if anything, would you as a
11  nurse practitioner do?
12      A.   I would refer them then to the
13  physician.
14      Q.   How far back do you need to go for
15  a treatment history?
16          MS. HOLPP:  Object to the form,
17  that is broad.
18      Q.   Let's look at your duties.  It
19  says evaluate current health status and
20  risk factors of an individual based on a
21  comprehensive health history.  What is your
22  understanding of a comprehensive health
23  history?

39

1       A.   A comprehensive health history
2   would involve looking at the patient's
3   conditions, looking at injuries that have
4   occurred.  Also, it would involve looking
5   at some of the treatment modalities that
6   we'd used in the past that have been
7   effective, what had not been effective.
8   And it would also look at going through
9   even some of the history that occurred
10  maybe even before the person came to see
11  me, like before they came to that facility
12  that we would get from that patient.  So,
13  we would look at, like I said, like I said
14  the history and all that that went with
15  that.  All the problem lists and everything
16  that was there, as well as some of the
17  treatment modalities, what had been
18  effective.  Also, when I would bring a
19  patient in, often times I would look to see
20  how compliant they had been with
21  medications.  I would often times I would
22  look underneath and I would see if they
23  were give doses of medicine or if it was in

40

1   the chart.  Often times what would happen
2   if it was not in a chart, I would go and
3   get the medication record from the nurses
4   and look to see if they had been compliant
5   for that month.
6          And also, you know, often times I
7   would look at what kind of education had
8   been done for that patient.
9       Q.   How about any counseling for
10  noncompliance?
11      A.   Yes.
12      Q.   Was that something that you had
13  training on in your orientation?
14      A.   When a patient is non compliant,
15  we're not talking about just missing one
16  dose, that's several doses, the nurses
17  would bring them in.  And if I was there,
18  certainly I would try to reinforce what
19  they were telling them, tell them the
20  importance of taking their medication and
21  how it important it was to treat that
22  condition.
23      Q.   Now, were there forms that you or

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com

1-800-888-DEPO

# FOSHEE & TURNER COURT REPORTERS

41

1  the nursing staff was required to fill out
2  if a counseling had taken place with a
3  particular patient?
4       MS. HOLPP:  Object to the form.
5       A.  Could you rephrase that, please?
6       Q.  Well, was there a noncompliance
7  form that was required to be filled out as
8  part of the medical records?
9       A.  I'm not --
10      Q.  If a patient was non compliant
11 with medication, did you as a nurse
12 practitioner or did the nursing staff or
13 the health care unit have some type of
14 responsibility to counsel with the patient?
15      A.  No.
16      MS. HOLPP:  I'm going object to
17 the form that she can's answer for anybody
18 but herself.
19      A.  Yeah.  I documented any
20 noncompliance that I counseled within the
21 medical record.
22      Q.  Now, if you'll look in number 2,
23 in duties, it says formulate a working

42

1  diagnosis, develop and implement a
2  treatment plan, and evaluate, modify a
3  therapeutic regimens, promote patient
4  outcome.  When it says evaluate and modify
5  therapeutic regimens, is that the
6  medications that are being prescribed for
7  that particular patient?
8       A.  It may not just involve
9  medications.  It may have involved looking
10 at have they been compliant; were they
11 compliant when you did your counseling; was
12 it effective counseling; are they still non
13 compliant.  But it might involve changing
14 medications.  It might involve ordering
15 crutches.  It might involve x-rays.  And
16 based on x-ray studies, then changing the
17 treatment plan.
18      Q.  How many hours a week did you work
19 at the Bibb County Correctional Facility?
20      A.  On an average, 20.  On an average,
21 20.  I would have to look at my time sheet
22 to effectively tell you.
23

43

1
2  (Plaintiff's Exhibit Number 29 was marked
3    for identification and attached as an
4        exhibit hereto.)
5
6       Q.  I'll show you what's been marked
7  as Plaintiff's Exhibit Number 29, and ask
8  you if you can identify this document.
9       A.  Yes.
10      Q.  Does that accurately reflect your
11 hours worked at the Bibb County
12 Correctional Facility?
13      A.  As far as I can remember, yes.
14      Q.  Were you paid for your travel time
15 to and from the Bibb County Correction
16 Facility?
17      A.  No.
18      Q.  So, you were only paid for actual
19 hours worked at the facility?
20      A.  Yes.
21      Q.  Now, what shift did you generally
22 work?
23      A.  Usually it was during the daytime

44

1  hours.
2       Q.  Did you work on the same days that
3  Dr. Ifediba had been scheduled to work?
4       A.  I had to spend 10 percent of my
5  week with her.  We would really have to go
6  back and look at if there was any days.  I
7  was there usually on Tuesdays and
8  Thursdays, and maybe part of another day.
9  But I would have to review her schedule
10 also.
11      Q.  Who made sure that your hours,
12 that you worked at least 10 percent of your
13 hours with the physician?  Was that your
14 responsibility or Dr. Ifediba's or the
15 scheduling by NaphCare?
16      A.  It was my responsibility.
17 NaphCare was aware of that also.
18      Q.  Do you have any concerns at any
19 time that you weren't spending sufficient
20 time under the supervision or working with
21 Dr. Ifediba?
22      A.  No, I don't.
23      Q.  During the time that you worked

# FOSHEE & TURNER COURT REPORTERS

49

1   A.   I'm not sure it was phrased that
2   way.
3   Q.   Tell me how it was phrased.
4   A.   It was phrased that sometimes
5   inmates have manipulative behavior, whether
6   it's drug seeking behaviors or wanting to
7   have injuries to be so they could be sent
8   out to a free world hospital.
9   Q.   Okay.  Did anybody explain to you
10  why a particular prisoner or inmate might
11  be motivated to manipulate?
12  A.   Not a particular -- not a
13  particular prisoner, no.  I guess I'm not
14  following your question.
15  Q.   Because of that concern that
16  inmates may manipulate, did you kind of
17  scrutinize the subjective history a little
18  more than you would a typical patient?
19       MS. HOLPP:  Object to the form.
20  A.   Could you rephrase that, please?
21  Q.   Because you had received training
22  and understood that some of the inmates
23  manipulate health care staff and

50

1   correctional officers and that's part of
2   something that you need to watch out for,
3   did you put a little less credence or did
4   you give more scrutiny to the subjective
5   history that you received from inmates?
6       MS. HOLPP:  Object to the form.
7   Your question is very vague and broad, and
8   I'm going to object to the form.
9   A.   Could you rephrase that, please?
10  Q.   Did you have a tendency to
11  scrutinize the subjective history that you
12  received from inmates because of the
13  training or your understanding that
14  sometimes inmates manipulate the nursing
15  staff or doctors, or even correctional
16  officers?
17  A.   I didn't, you know, routinely when
18  somebody came in just automatically assume
19  that they were lying, no.  If that's what
20  you're asking.
21  Q.   No.  But did you scrutinize it?
22  Did you kind of look at it a little more
23  heavily than you would somebody in the free

51

1   world?
2   A.   It depended upon the condition.
3   Like if a person was continuously coming in
4   after having injuries and asking for muscle
5   relaxers, like Robaxin, then after a
6   pattern after we did significant tests,
7   after they were had been referred to the
8   physician, then I might scrutinize that a
9   little bit more at that time.  But I
10  treated the inmates just as I would treat
11  anybody out in the free world?
12  Q.   Now, if you'll look in Section I,
13  it talks about procedures that you had
14  authority to perform.  Did you have the
15  ability to perform each of these functions
16  at the Bibb County Correctional Facility?
17  A.   Some of them I had had training in
18  school and I was comfortable doing those
19  things, but it says -- it says perform or
20  assist with laboratory procedures or in
21  technical procedures.  We could debride
22  wounds, we could -- and I, you know, could
23  ask for it in taking wound cultures.  The

52

1   biopsy of superficial lesions, I do not
2   recall doing that.
3   Q.   Did you have authority as a nurse
4   practitioner at NaphCare to biopsy wounds
5   or to do that without an order from a
6   physician?
7   A.   Yes.
8   Q.   Tell me about your prescribing
9   authority while you worked at NaphCare.
10  A.   I prescribed based on conditions.
11  And I prescribed according to what was
12  approved by the Alabama Board of Nursing.
13  We also had a formulary, we'd try to
14  utilize those medications if they were
15  thought to be effective treatment.  If they
16  were not effective treatment, we would fill
17  out a form and it would be sent to the
18  pharmacy, and we could get those
19  medications, those additional medications.
20  Q.   How difficult was it to deviate
21  from the formulary that was provided by
22  NaphCare?
23       MS. HOLPP:  Object to the form.

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com

1-800-888-DEPO

# FOSHEE & TURNER COURT REPORTERS

53

1    A.   Could you rephrase that, please?
2    Q.   How difficult was it to get a
3  deviation from the standard formulary that
4  was provided by NaphCare?
5         MS. HOLPP:  Object to the form.
6  You have no foundation that it was
7  difficult.
8    A.   Could you rephrase that, please?
9    Q.   Well, were you given a list of
10  therapeutic drugs that were suggested
11  treatment options for you in the health
12  care unit?
13    A.   We had a formulary.
14    Q.   Okay.  I'm going to show you
15  what's been marked as Plaintiff's Exhibit
16  Number 14 and ask if you can identify that
17  document.
18    A.   This was -- this is dated
19  02/15/01.  I don't believe NaphCare or I
20  was employed at that time.  I mean, it
21  looks oddly familiar, but I'm not sure that
22  this is the formulary that NaphCare used,
23  because it's dated 02/15/01, and I believe

54

1  they had the contract that started in March
2  or April.
3    Q.   For purposes of this deposition, I
4  received this from NaphCare, so I want you
5  to assume that this was the formulary you
6  received.
7         MS. HOLPP:  Let me just make it
8  clear.  NaphCare has many other contracts
9  prior to the Alabama one, so if you're
10  saying that purely because of the date, I
11  mean, you don't have any knowledge of what
12  NaphCare when they drafted something.  So,
13  just answer her question whether or not
14  that particular document looks familiar.
15  If it doesn't, tell her that.
16    A.   It looks familiar.  It looks
17  familiar.
18    Q.   Okay.  Now, it has a list of
19  certain types of medications that are
20  recommended for certain types of treatment;
21  is that correct?
22    A.   Yes.
23    Q.   Did you have reference manuals in

55

1  the health care unit that you could go
2  access if you needed additional information
3  regarding a particular drug or uses of a
4  particular drug?
5    A.   There were reference materials.
6  But I also brought with me to work almost
7  every day that I came to work my family
8  nurse practitioner, my family practice
9  guidelines.
10    Q.   Do you still have a copy of that
11  document?
12    A.   Yes.  It's been through the water,
13  but it's --
14    Q.   Do you recall the date that that
15  reference manual was dated?
16    A.   No.
17    Q.   So, did you also utilize some of
18  the guidelines of the family practitioner
19  guidelines that you had as a reference
20  manual?
21    A.   Yes.
22    Q.   Do you recall what reference
23  manuals were actually maintained by

56

1  NaphCare in the health care unit?
2    A.   I do not recall.
3    Q.   Did you have the assistance of the
4  pharmacist, if needed?
5    A.   Yes.
6    Q.   Did you ever utilize his
7  assistance in determining what medications
8  would be more appropriate?
9    A.   I can't remember.
10    Q.   If you had consulted with the
11  physician, would that be some type of
12  information that would be included in the
13  medical records of the patient?
14         MS. HOLPP:  The physician?
15    Q.   I'm sorry.  If you consulted with
16  the pharmacist regarding medications, would
17  that be something that you would record or
18  note in your medical records?
19    A.   If I had done that, yes, I would.
20    Q.   It talks about anti-infective
21  medications on pages 2 through 5, and it
22  lists the Cephalexin, which is the Keflex.
23  Did you actually use the brand name Keflex

# FOSHEE & TURNER COURT REPORTERS

57

1 or was there some other generic form of the
2 drug that was used at the health care unit?
3     A.   Since I was not directly involved
4 in Telecom, I might order Keflex and I'm
5 not sure what the pharmacy sent.
6     Q.   Now, are you are you familiar with
7 the drug Ancef?
8     A.   Yes.
9     Q.   Would it be fair to say that Ancef
10 is just an injectable form of Keflex?
11         MS. HOLPP:  Object to the form.
12     A.   Could you rephrase that, please?
13     Q.   Is Ancef an injectable form of
14 Keflex?
15     A.   It is in the same class of drug as
16 Keflex.
17     Q.   The Cephalosporin?
18     A.   The Cephalosporin, yes.
19     Q.   Do you typically utilize
20 Cephalosporin for the treatment of MRSA
21 staph to the best of your knowledge?
22     A.   It depends on what the wound
23 culture or the cultures, whatever it -- not

58

1 necessarily wound cultures, but what they
2 showed that that is resistant to or
3 sensitive to.
4     Q.   Do you know whether MRSA, if a
5 particular culture shows positive for MRSA,
6 do the labs even test for Cephalosporin?
7     A.   They test for a wide variety of
8 drugs.  I would have to see the lab form.
9     Q.   Now, Vancomycin is not on this
10 list, so that would be non-formulary drug
11 that would require some type of request to
12 the medical director; is that correct?
13     A.   It would require a non-formulary
14 form if that is not on here.  It would
15 require that.  We'd usually send it to the
16 pharmacy with the orders or the nurses
17 would send it to the pharmacy with the
18 orders.
19
20 (Plaintiff's Exhibit Number 32 was marked
21   for identification and attached as an
22         exhibit hereto.)
23

59

1
2     Q.   Let me show you what's been marked
3 as Plaintiff's Exhibit Number 32.  Is that
4 the form that you would utilize to make a
5 non-formulary request?
6     A.   It looks very familiar.  It looks
7 very familiar.
8     Q.   Now, tell me how the procedure
9 would work.  If you made a decision that
10 you needed to use some type of
11 non-formulary medication that wasn't
12 contained in these formularies that you're
13 typically provided, how would that work?
14 Would you make the order and then the
15 nurses would be responsible for doing it?
16 I mean, tell me how that would work.
17     A.   It it was a non-formulary drug, I
18 would fill a form.  I'm not sure if this is
19 the form or a similar form, and it would be
20 sent with the orders or faxed with the
21 orders, half of the nurses did that, to the
22 pharmacy.
23     Q.   Would that non-formulary request

60

1 be included in the medical records?
2     A.   I do not know.
3     Q.   Now, how long would it take before
4 you would find some type of response on
5 whether your request was denied or granted?
6     A.   Often times, if there was a
7 problem, which I did not have any problems
8 with non-formulary medications, we would
9 know almost immediately after it was faxed
10 or if needed more information or they
11 wanted the physician's signature.  But I
12 personally did not have any problems with
13 not getting -- receiving non-formulary
14 medications.
15     Q.   Now, Refampin was on the list of
16 formulary medications; is that correct?
17     A.   Let's see.
18     Q.   Look at page 2?
19     A.   Page 2? Yes.
20     Q.   Now, did you as the nurse
21 practitioner ever talk to Danny Cassady
22 specifically about his hepatitis infection?
23     A.   I can't remember an actual

# FOSHEE & TURNER COURT REPORTERS

61

1 conversation with him.  I just can't
2 remember.  But if there was something that
3 was involved or I was concerned about his
4 hepatitis, I would probably try to address
5 in the medical record.
6     Q.  Okay.  So, if you did, it should
7 be reflected in the medical records?
8     A.  Right.
9     Q.  Do you have any knowledge of
10 anyone that you treated who had hepatitis
11 being tested to determine their eligibility
12 for treatment of hepatitis?
13     A.  Could you please clarify what kind
14 of treatment are you referring to?
15     Q.  Well, if a patient had hepatitis A
16 and C, there were certain possibilities
17 that they may be eligible for certain types
18 of interferon treatment, which had been
19 used at that time.  Was that ever explained
20 to any of the patients that you treated for
21 hepatitis?
22         MS. HOLPP:  By her?  Explained by
23 her.

63

1 analysis of the drug.  Was that done, if
2 you made a non-formulary request, were you
3 provided with cost factors, you know, to
4 assist you in determining what drugs would
5 be more appropriate?
6     A.  Not that I can recall.
7     Q.  Did you as a nurse practitioner
8 have any duty of care to the patient if you
9 believed that the patient had received
10 inadequate treatment and/or inadequate
11 medical care?
12     A.  I didn't -- I would have a duty.
13     Q.  Okay.  Tell me about that.
14     A.  If there had been a problem that I
15 actually visualized, I would report that.
16 Like if it was with nurses, I could have
17 reported it to the Director of Nursing or t
18 the charge nurse.  I did not have direct
19 supervision over the nurses supervising
20 them.  If there was a problem, if there had
21 been a problem with quality of care with a
22 physician, then I would go to the next
23 chain in command like to the medical

62

1     Q.  Uh-huh.
2     A.  Usually if I thought that the
3 hepatitis might need additional treatment,
4 I would have referred him to the physicians
5 and let them decide if they could use
6 Interferon.
7     Q.  I'm sorry.
8     A.  Often times the inmates already
9 came to the clinic, you know, talking about
10 Interferon.
11     Q.  Were you aware of any policy that
12 had been either implemented or not
13 implemented by NaphCare regarding the
14 treatment of inmates with hepatitis?
15     A.  No.
16     Q.  Were you aware that there was no
17 treatment protocol for inmates with
18 hepatitis?
19     A.  I'm not aware of any protocol.
20     Q.  Now, if you'll turn to page 18 of
21 the formulary, this is a treatment of
22 uncomplicated, and this is for a different
23 type of infection, but it's got a cost

64

1 director.
2     Q.  Who was your supervisor?
3     A.  It would have been Dr. Ifediba.
4     Q.  If you had a problem with medical
5 care or you had concerns that she wasn't
6 providing adequate medical care or that the
7 patient was not receiving adequate medical
8 care, was that something that you would
9 discuss in quality assurance meetings?
10     A.  I don't remember having quality
11 assurance meetings.
12     Q.  Did y'all have weekly staff
13 meetings?
14     A.  I was not directly involved in any
15 staff meetings as far as with the nurses,
16 no.
17     Q.  Did you attend any CQI meetings?
18     A.  Not a CQI meeting.  I'm not sure
19 of what you're asking me.
20     Q.  Did y'all have meetings at some
21 point in time at the facility where y'all
22 would go over the inmates who had been
23 treated and make determinations of what

# FOSHEE & TURNER COURT REPORTERS

65

1 kind of care that they were being provided?
2    A.  There was a meeting in July, I
3 don't know what day or whatever, that the
4 -- I'm not sure if it was arranged by the
5 Department of Corrections or through
6 NaphCare or who arranged that, but there
7 were inmates that had been selected and
8 they were brought in front of -- I'm not
9 sure if their independent physicians or
10 what, regarding their care. And I'm not
11 sure if those physicians had access to the
12 records or to some extent. But that was --
13 that's what I can remember.
14    Q.  Okay. Tell me what you remember
15 about that event in July and what was your
16 participation?
17    A.  I was mainly -- I was mainly there
18 to listen and hear what the recommendations
19 were from the physicians that were there.
20 I don't remember the physicians' names. I
21 was there and I can't remember if Dr.
22 Lyrene was there. I want to say Dr.
23 Ifediba was there and Mr. Nichols.

66

1    Q.  Do you remember somebody named
2 Rhonda Manning being present?
3    A.  I don't recall that name.
4    Q.  Do you remember whether this was a
5 medical advisory committee meeting?
6    A.  It was a meeting. I don't know
7 what it was called. It was a meeting.
8    Q.  Okay. And it was held at the Bibb
9 County Correctional Facility?
10    A.  Yes.
11    Q.  Tell me everything you can
12 remember about that meeting.
13    A.  There were several inmates that
14 were brought in, and one of them was
15 Mr. Cassady. But I don't remember any of
16 the details that were involved. Except for
17 what I had heard back after we had met, not
18 directly from the physician, is that there
19 was no additional recommendation or any
20 changes in care. Excuse me.
21    Q.  Do you have any recollection Dr.
22 Lyrene had been requested to review Danny
23 Cassady's case further? Do you have any

67

1 recollection of that?
2    A.  Not other than what's in the
3 medical record.
4    Q.  If they kept minutes of that,
5 would that refresh your recollection, you
6 think?
7    A.  It might refresh --
8    Q.  Well, we'll come back to that.
9 We'll come back to that. Were you
10 responsible for providing inmates with
11 grievance forms and/or complaint forms if
12 they believed that the medical care that
13 they received was inadequate?
14    A.  I did not give them to them. The
15 -- if I'm not mistaken, and this is the
16 nurses may have been giving them out and
17 they were also available that they could
18 get.
19    Q.  Do you know whether there was a
20 difference between a complaint form and a
21 grievance form, or you didn't participate
22 in that process?
23    A.  I was not directly involved in

68

1 that process.
2    Q.  You didn't review any complaint
3 forms?
4    A.  They did not come to me, no.
5    Q.  If an inmate had complained and it
6 involved some of the care that you had
7 provided that inmate, would you become
8 involved at that point?
9    A.  Yes, I would.
10    Q.  Do you have any recollection of
11 being involved in a complaint involving
12 Danny Cassady?
13    A.  Not that I'm aware of, no.
14    Q.  Did you ever participate in staff
15 meetings that were held by NaphCare staff?
16    A.  On the Bibb County? I can't
17 remember. I mean I can't remember.
18    Q.  Did you attend any administrative
19 meetings that were held by the health care
20 staff or correctional staff at Bibb County
21 Correctional Facility?
22    A.  Other than by the correctional
23 staff?

# FOSHEE & TURNER COURT REPORTERS

69

1     Q.  Did you attend any meetings where
2 the health care unit or the procedures or
3 policies or anything, inmates, was
4 discussed?
5     A.  Just the one I just told you
6 about.
7     Q.  That's the only one --
8     A.  That's the only one that I can
9 recall.
10     Q.  So, you didn't attend any monthly
11 staff meetings?
12     MS. HOLPP:  Object to the form.
13 She stated it was the only one she could
14 remember.
15     Q.  You don't have any recollection of
16 monthly --
17     A.  That's correct.
18     Q.  -- staph meetings?
19     A.  That's correct, that I attended,
20 that's correct.
21     MS. PILCHER:  Do you want to take a
22 break since we've been going a little
23 over an hour?  Probably in another I will

70

1 be willing to take a lunch.
2     MS. HOLPP:  Do you want to take a
3 --
4     MS. PILCHER:  I don't want to
5 stretch her out for three hours.
6     MS. HOLPP:  Okay, that's fine.
7     MS. PILCHER:  Or would you rather
8 --
9     MS. HOLPP:  That's fine.
10
11     (A short break was taken.)
12
13     Q.  Did you ever attend the
14 administrative meetings at the Birmingham
15 office of NaphCare?
16     A.  No.
17     Q.  Did you ever attend any meetings
18 where you met with Dr. Ifediba or any other
19 doctor regarding the health care provided
20 patients that you had observed, examined,
21 or treated?
22     A.  Yes.
23     Q.  Tell me about those.

71

1     A.  They were held in Clanton, I
2 believe.  We had meetings there
3 periodically.  I don't know the exact dates
4 or anything while I was employed there.
5 And maybe not a specific inmate might not
6 -- may not be discussed, but condition.
7 And it was statewide.  I mean, we'd try to
8 get as many different people from all the
9 different facilities.
10     Q.  Who all would attend these
11 meetings, if you recall?  I mean, what
12 types of people?  I don't care about the
13 names of them.
14     A.  Physicians, nurse practitioners,
15 physician's assistants, maybe district --
16 whatever, district people that, you know,
17 were supervising a particular district.
18     Q.  Would the Director of Nursing from
19 any of the facilities show up?
20     A.  Yes.
21     Q.  How about Dr. Lyrene, did he
22 participate in these meetings?
23     A.  I can't -- yes.  Yes, he did.  I

72

1 remember.  Yes, he did.
2     Q.  Do you remember any other specific
3 people that showed up for these meetings?
4     A.  Not specifics, not that I can -- I
5 didn't know the majority of the
6 individuals.  I just didn't know them.
7     Q.  How about anyone from your
8 facility that showed up?
9     A.  Dr. Ifediba, myself.  I don't
10 remember if the Director of Nursing showed
11 up or not.  I don't remember.
12     Q.  Now, did y'all have an outline of
13 the topics that would be discussed or
14 minutes that were taken of these meetings?
15     A.  I can't remember.
16     Q.  Tell me the issues that were
17 discussed in these meetings.
18     A.  Just wide issues.  I can't
19 remember specifics.  I can tell you some of
20 the wide issues was about.
21     Q.  Okay.
22     A.  It may have involved client care.
23 It may involve policies, procedures.  I

# FOSHEE & TURNER COURT REPORTERS

73

```
1   don't remember all the details.
2       Q.  Would this be a type of meeting
3   where you would have received some type of
4   in servicing and training?
5       A.  We were given information.  I'm
6   not sure if it was -- you would call it an
7   in service.
8       Q.  Okay.  Did you ever receive any in
9   servicing while you were employed with
10  NaphCare?
11      A.  As far as attending an in service
12  where I gained like contact hours?
13      Q.  Yes.
14      A.  Not from NaphCare, but
15  independently, yes.
16      Q.  Have you ever had any in servicing
17  or training with regard to MRSA staph?
18      A.  Within my nursing training, as we
19  have mentioned.  And I'm sure I have when
20  I've worked in the hospital.  I can't
21  remember the exact dates now.
22      Q.  How frequently would these
23  meetings take place?  I mean --
```

74

```
1       A.  I was only employed there six
2   months.  So, maybe during that six months,
3   twice.  I'm not real sure on that.
4       Q.  Did you discuss at these meetings
5   the individual care of a particular inmate
6   or patient?
7       A.  I can't remember.
8       Q.  Do you ever recall having
9   discussions specifically about Danny
10  Cassady at any of these meetings?
11      A.  I can't remember.
12      Q.  How did you know to attend these
13  meetings?  Did you receive memos or how did
14  all of that take place?
15      A.  I'm not sure if someone told me or
16  memos.  I can't remember.
17
18  (Plaintiff's Exhibit Number 33 was marked
19    for identification and attached as an
20           exhibit hereto.)
21
22      Q.  Okay.  I'm going to show you
23  what's been marked as Plaintiff's Exhibit
```

75

```
1   Number 33, and ask you if you're familiar
2   with that document.
3       A.  I don't remember seeing it.
4       Q.  Were you aware that NaphCare had a
5   policy that medications will be reviewed by
6   the prescribing authority every 90 days or
7   sooner if indicated?
8       A.  As far as renewal of medications?
9       Q.  It says reviewing.
10      A.  You said -- please ask the
11  question again.
12      Q.  Well, according to NaphCare
13  policy, number 2706, which is Plaintiff's
14  Exhibit Number 33, it's prescribing
15  authority and stop dates.  And it says in
16  policy number 3 "all medication will be
17  reviewed by the prescribing authority every
18  90 days or sooner if indicated".
19      A.  We did have stop dates on
20  medicines, yes.
21      Q.  Whose responsibility to review the
22  response to treatment of a particular
23  medication that may have been prescribed?
```

76

```
1       A.  It depends on the medication.
2       Q.  Okay.  Well, if it's an
3   antibiotic, whose responsibility is it to
4   review the response to treatment?
5           MS. HOLPP:  Let me back up.  Did
6   you read the entire sentence, Mary?  It
7   says if --
8           MS. PILCHER:  Indicated.  Yeah.
9           MS. HOLPP:  -- indicated.  That's
10  not saying that -- I mean, I thought you
11  phrased it that it's required to be
12  reviewed every 90 days.  But the full
13  document says if indicated.
14          MS. PILCHER:  You know, I just
15  want to know whose responsibility is it to
16  review --
17          MS. HOLPP:  Well, I'm going to
18  object to the form.  That foundation is not
19  laid up there as always the responsibility.
20      A.  I don't understand your question.
21      Q.  Whose responsibility is it to
22  review medications to insure that the
23  patients are responding to treatment?
```

# FOSHEE & TURNER COURT REPORTERS

77

1      MS. HOLPP: Object to the form.
2      A.   I don't understand the question.
3      Q.   Well, if you prescribe
4   medication --
5      A.   Uh-huh.
6      Q.   -- to a patient, whose
7   responsibility is it to insure that the
8   patient responds to the treatment protocol?
9      MS. HOLPP:  I'm going to object to
10   the form that you're extending that period,
11   to responsibility to review in every
12   instance.
13      A.   If there was a responsibility that
14   was due like with a person that had a
15   dressing change, we had a person that was
16   getting dressing changes or treatments with
17   the nurses.  The nurses would record that.
18   And then at the bottom of the page, we
19   would sign at the completion of what they
20   had been doing.
21      Q.   Okay.
22      A.   Of the treatment plan.
23      Q.   Now, did you monitor -- I mean,

78

1   did the nurses report to you or have some
2   type of duty or responsibility to report to
3   you as the nurse practitioner if one of
4   your patients appeared not to be responding
5   to the treatment protocol that had been
6   prescribed?
7      A.   Yes.
8      Q.   Okay.  And would that be
9   documented in the record?
10      A.   What would usually happen is they
11   would take that inmate back in front of me
12   to be seen or the physician to be seen.
13
14   (Plaintiff's Exhibit Number 34 was marked
15      for identification and attached as an
16         exhibit hereto.)
17
18      Q.   Okay.  I'm going to show you
19   what's been marked as Plaintiff's Exhibit
20   Number 34, and ask you if you've ever seen
21   this document.
22      A.   Yes, I have.
23      Q.   Are you familiar with the job

79

1   description of nurse practitioner under the
2   NaphCare policy and procedures?
3      A.   I'm familiar with it.
4      Q.   Now, if you'll look on page 2 of
5   Plaintiff's Exhibit Number 34, it talks
6   about duties and responsibilities, and it
7   lists 1 through 6.  Can you review those
8   and just tell me if that's your
9   understanding of the duties and
10   responsibilities that are required of you
11   as a nurse practitioner working at
12   NaphCare?
13      A.   Yes.
14      Q.   In number 1, it says evaluate
15   current health status and risk factors.
16   Tell me what you as a nurse practitioner
17   would do to insure that you've evaluated
18   his current health and risk factors.
19      A.   When an inmate came in with a
20   problem to be seen, we would also do a set
21   of vital signs.  A lot of times I would go
22   ahead and do a weight on them.  And I would
23   also find out a little bit about whatever

80

1   problem they were presenting to me there, a
2   history related to that problem.  And I
3   would also review the history that was in
4   the chart as -- the problem list that was
5   in the chart.  And I would do a focused
6   physical exam based on whatever that
7   problem was.
8      Q.   In number 2, it says formulate a
9   working diagnosis, develop and implement a
10   treatment plan, and evaluate and modify
11   therapeutic regimens to promote positive
12   patient outcomes.  Now, what duties and
13   responsibilities do you have under the
14   current standard of care or the standard of
15   care at that time to insure that you've
16   properly evaluated the therapeutic regimens
17   to determine if modifications are
18   necessary?
19      MS. HOLPP: Object to the form.
20      A.   I don't understand all the
21   question that you asked.
22      Q.   It says here you have as part of
23   your duties and responsibilities that

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com

1-800-888-DEPO

# FOSHEE & TURNER COURT REPORTERS

81

1  you're to formulate a working diagnosis.
2  And that basically means, correct me if I'm
3  wrong, that you're to make a diagnosis as
4  to what you think is wrong with him.
5      A.   That is correct.
6      Q.   And then it says develop and
7  implement a treatment plan.  And that would
8  be to assess him and then to come up with a
9  plan as to how you're going to treat him.
10     A.   Yes.
11     Q.   And then it says evaluate and
12  modify therapeutic regimens.  Now, tell me
13  what your duties and responsibilities are
14  with respect to that job duty to make sure
15  that you are providing appropriate standard
16  of care to your patient.
17     A.   If a patient's condition was not
18  improving, and it was in relation to
19  something that I was going maybe -- what I
20  was offering was not be effective, then I
21  would put that patient in front of the
22  physician.  I'd put refer to physician.
23  And then -- excuse me -- and let the

82

1  physician decide if there was additional
2  care that was needed.
3
4  (Plaintiff's Exhibit Number 35 was marked
5      for identification and attached as an
6           exhibit hereto.)
7
8      Q.   I'm going to show you what's been
9  marked as Plaintiff's Exhibit 35.  And if
10  you'll turn to page 3 of that document.
11  It's a Correctional Medical Services Health
12  Service Report for Prisons for January of
13  2001.  And it includes the average daily
14  inmate census, and it's got clinical
15  visits, segregation visits, and kind of
16  lists all the health care.  Do you know who
17  provided information to make up these
18  reports?
19     A.   No, I do not.
20     Q.   Now, if you will look -- did you
21  ever provide anyone with a report of the
22  number of patients that you had seen to
23  include in these reports?

83

1      A.   I don't recall.
2      Q.   Did you keep up with the number of
3  patients that you saw?
4      A.   It was listed on a document that
5  was just like our daily clinic list.  And
6  on the list, you'd find the diagnosis of
7  the patient.  I was not at Bibb County
8  Correctional Facility on April the 16th.
9      Q.   I understand.  I just was trying
10  to figure if you knew how.  If you'll look
11  at Plaintiff's Exhibit 36, which I'm about
12  to hand to you.
13
14  (Plaintiff's Exhibit Number 36 was marked
15      for identification and attached as an
16           exhibit hereto.)
17
18     A.   Okay.
19     Q.   I believe you may have been
20  present during some of this.  This is a
21  mini MAC meeting from October of 2001.  And
22  it talks about in section number --
23          MS. HOLPP:  Can she review it

84

1  first?
2          MS. PILCHER:  Yes.
3          MS. HOLPP:  Just take your time
4  and read through it.
5          THE WITNESS:  I wasn't there.
6          MS. HOLPP:  Just read through it
7  and answer the question.  Do you need to
8  include more than the October one in this
9  one exhibit?  You've got the April 16th
10  attached.
11          MS. PILCHER:  This came as one
12  document.  So, I've kind of been reluctant
13  to divide it up just because it came to me
14  this way.
15          MS. HOLPP:  Okay.  Just as long as
16  you make the record clear that it has more
17  than the October 15th one that you said
18  that she may have been there when she was
19  not there.  And it also includes an April
20  16th, 2001 meeting where she was not even
21  working at the facility at that time.
22          MS. PILCHER:  Well, I think what
23  they do is they include at their general

# FOSHEE & TURNER COURT REPORTERS

85

1 MAC meetings, and I think this is probably
2 part of either a quarterly meeting or a
3 full board meeting. That this came from
4 somebody from there.
5      MS. HOLPP: Well I'm just trying
6 to get the record clear that you've
7 identified it as --
8      MS. PILCHER: This consists of a
9 lot of documents.
10      MS. HOLPP: Let me finish my
11 statement, my objection that you put
12 evidence or facts not into evidence that
13 Ms. Hogue attended, the document you've
14 handed to her of October 15th, when, in
15 fact, she did not. And the document also
16 indicated meetings that she did not attend.
17 So, any questions you ask her, just let me,
18 based on what the document says.
19      Q. Okay. Were you present at the
20 October 15th, 2001 medical audit committee
21 meeting that was held at the Bibb County
22 Correctional Facility?
23      A. The document says I wasn't.

86

1      Q. Do you have any independent
2 recollection of being present?
3      A. No.
4      Q. Now, if you'll turn to page 2 of
5 the October 15th minutes, it says we're
6 down three RNs, but are in the process --
7      A. Uh-huh.
8      Q. That was Section IV, we're down
9 three RNs, but are in the process of hiring
10 new ones. Did you find that the health
11 care unit was understaffed with RNs at that
12 time?
13      MS. HOLPP: Object to the form.
14      A. I was not personally aware of it,
15 no.
16      Q. Did the lack of staffing or the
17 shortage of staffing affect the care that
18 you were able to provide your patients?
19      MS. HOLPP: Object to the form.
20      A. No.
21      Q. It says November 8th will be Ms.
22 Belinda Hogue, nurse practitioner's last
23 day. Why did you leave NaphCare's

87

1 employment after six months?
2      A. I was having medical problems.
3      Q. What type of medical problems were
4 you having?
5      A. They were trying to rule out if I
6 had MS, Multiple Sclerosis.
7      Q. I hope you did not. Now, if
8 you'll look at the NaphCare Health Services
9 Report dated July 2001, it talks about
10 clinical visits for the month of July 2001.
11 It indicates that you saw 134 patients
12 during clinical visits.
13      MS. HOLPP: It indicates that Ms.
14 Hogue did? Is that what you're saying?
15      Q. Physician assistant or the nurse
16 practitioner. Was there physician
17 assistant that was hired at NaphCare during
18 July of 2001, or were these your patients?
19      A. I was the -- I believe I was the
20 only nurse practitioner at Bibb County.
21      Q. How about any physician's
22 assistants?
23      A. I don't recall.

88

1      Q. I think you indicated earlier that
2 you didn't have anything to do with pill
3 call; is that correct?
4      A. Nothing.
5      Q. Would you dispute that that's the
6 number of patients that you saw in July of
7 2001, or you don't know? Did you keep a
8 record of the number of inmates that you
9 saw? Do you know how this report was
10 prepared?
11      MS. HOLPP: Object to the form.
12      A. There was --
13      MS. HOLPP: Which question do you
14 want her to answer? You asked about four.
15      Q. Did you participate in any manner
16 in providing information to prepare this
17 health service report for July 2001?
18      A. There was a list of patients that
19 I had seen. We did that on both the
20 physician and the nurse practitioner.
21      Q. Where were these lists maintained?
22      A. At the time I was there, we were
23 keeping them in the clinic room where we

# FOSHEE & TURNER COURT REPORTERS

89

1 actually provided services.
2    Q. Did you actively do anything to
3 count up the patients or provide
4 information on the number of patients that
5 you saw other than maintain that list?
6    A. No.
7    Q. Did you keep accurate lists of the
8 number of patients that you saw?
9    A. Yes.
10    Q. So, if your list indicated that
11 you had seen the number of patient
12 indicated on the July 2001 report, that
13 would be accurate?
14    A. The list would be an accurate
15 reflection, yes.
16    Q. Okay. And that would be true for
17 August 2001 and September 2001 as well,
18 correct?
19    A. Yes.
20    Q. Were you encouraged as a nurse
21 practitioner to use the medications listed
22 on the formulary?
23    A. Yes.

90

1    Q. Tell me about that. Who talked to
2 you about the formulary?
3    A. When I was orienting there, I
4 believe Mr. Nicholas showed me the
5 formulary and showed me that these were the
6 medicines that were readily available. And
7 if there was a problem where we needed an
8 additional medication, that we had to fill
9 out a non-formulary drug form.
10    Q. Who was responsible for triaging
11 or assessing your patients before they were
12 assigned to be seen by you during clinic
13 visits?
14    A. The nurses would do that on sick
15 call.
16    Q. Do you know when sick call took
17 place?
18    A. Sometime in the evening or the
19 early, early mornings. I'm not sure of the
20 time.
21    Q. Were you responsible in any way in
22 assessing chronic care patients?
23    A. Periodically, yes.

91

1    Q. Tell me what your involvement was.
2    A. We would have chronic care
3 clinics. And I don't remember all of the
4 chronic care clinics. And when it was
5 time, if I was there, either Dr. Ifediba
6 was there and it was time for chronic care
7 clinics, those patients would be seen by
8 us. And we had a form to go by, a
9 checklist for what needed to be addressed
10 for that chronic care problem.
11    Q. Okay. Did you have a separate
12 form that would be filled out for chronic
13 care patients or during chronic care
14 clinics, was that a separate form?
15    A. There was a separate form, yes.
16    Q. And those forms would be included
17 in the patient's record; is that correct?
18    A. I would assume they would be, yes.
19 Yes, they would be.
20    Q. Did you ever have additional
21 discussion with Danny Cassady that he had
22 been diagnosed with MRSA staph?
23    A. I don't recall a specific -- a

92

1 specific conversation. If there was a
2 conversation, I would have documented it in
3 the medical record.
4
5 (Plaintiff's Exhibit Number 37 was marked
6    for identification and attached as an
7       exhibit hereto.)
8
9    Q. I'm going to show you what's been
10 marked as Plaintiff's Exhibit Number 37.
11 It talks about medication administration.
12 Are you familiar with that document?
13    A. I'm not familiar with the
14 document.
15    Q. If you'll turn to item number 12,
16 which is on the back page, which at the top
17 here is page 5, but it's page 4 under the
18 policy, it talks about compliance review.
19 Who is responsible for --
20       MS. HOLPP: Wait, let her get it.
21 Tell her where you're going.
22    Q. Page 4. Very last page.
23    A. There it is.

# FOSHEE & TURNER COURT REPORTERS

93

1   Q.  It says compliance review.  Who
2   was responsible for reviewing the MARs to
3   determine if a patient had been compliant?
4       A.  The nurses.
5       Q.  Did you have any responsibility to
6   counsel with the patient and to make sure
7   that the patient had received appropriate
8   documentation and forms in his medical
9   record?
10      A.  If a patient was non compliant,
11  then they would come in and if I was there,
12  I would document, I would tell them about
13  their medicines and how important it was,
14  yes.
15      Q.  Is MRSA considered a communicable
16  disease?
17      MS. HOLPP:  Asked and answered.
18      Q.  A communicable disease.
19      MS. HOLPP:  We already went
20  through this, remember.
21      MS. PILCHER:  We didn't say it was
22  communicable.
23      MS. HOLPP:  Well, she corrected

94

1   you, so I would be object to it being asked
2   and answered.
3       MS. PILCHER:  I think she said it
4   was spreadable.  I called it infectious.  I
5   asked if it was an infectious disease, not
6   contagious.
7       A.  It's spreadable.
8       Q.  Okay.  Were you required to sign
9   in and out of the health care unit each
10  time you entered into the facility?
11      A.  I really don't remember.
12
13  (Plaintiff's Exhibit Number 38 was marked
14      for identification and attached as an
15          exhibit hereto.)
16
17      Q.  I'm going to show you what's
18  Plaintiff's Exhibit Number 38.  Does that
19  refresh your recollection at all?
20      A.  That's my signature.  So, yes, I
21  was.
22      MS. PILCHER:  Okay.  This is a
23  good time to take a break before we get

95

1   into the good stuff if y'all want to take a
2   break for lunch.  I don't know.
3       MS. HOLPP:  How much longer do you
4   think you --
5       MS. PILCHER:  I've just go over
6   the medical records and a couple of things.
7       MS. HOLPP:  Well, just whenever
8   the times that she saw him because it's
9   just a couple.  So, is that 30 minutes or 3
10  hours?
11      MS. PILCHER:  Well, I doubt it's 3
12  hours.
13      MS. HOLPP:  Well, you've done it
14  before.
15      MS. PILCHER:  Well, you know I got
16  to get what I got to get.  You understand.
17      MS. HOLPP:  Off the record.
18
19  (Off the record discussion is held.)
20
21  (Plaintiff's Exhibit Number 40 was marked
22      for identification and attached as an
23          exhibit hereto.)

96

1
2       Q.  Okay.  I'm going to show you
3   what's been marked as Plaintiff's Exhibit
4   Number 40, and ask you to review that
5   document, please.
6       MS. SEGERS:  While she's looking,
7   what were 38 and 39?  Did I miss those?
8       MS. PILCHER:  Health care sign in
9   sheet.
10      MS. SEGERS:  Yeah.  Yeah, that's
11  fine.  Thanks.
12      MS. HOLPP:  Are you going to ask
13  questions about the other inmates so that
14  she needs to read those?
15      Q.  No.  If you'll look on page 4, it
16  talks about Rhonda Manning.  I'll represent
17  to you that inmate number 103002 is Danny
18  Cassady.
19      MS. HOLPP:  Okay.
20      Q.  Okay.  Does this refresh your
21  recollection any about the meeting held
22  July 12th, if it's the same meeting that
23  you had discussed earlier?

# FOSHEE & TURNER COURT REPORTERS

93

1   Q.  It says compliance review.  Who
2   was responsible for reviewing the MARs to
3   determine if a patient had been compliant?
4       A.  The nurses.
5       Q.  Did you have any responsibility to
6   counsel with the patient and to make sure
7   that the patient had received appropriate
8   documentation and forms in his medical
9   record?
10      A.  If a patient was non compliant,
11  then they would come in and if I was there,
12  I would document, I would tell them about
13  their medicines and how important it was,
14  yes.
15      Q.  Is MRSA considered a communicable
16  disease?
17          MS. HOLPP:  Asked and answered.
18      Q.  A communicable disease.
19          MS. HOLPP:  We already went
20  through this, remember.
21          MS. PILCHER:  We didn't say it was
22  communicable.
23          MS. HOLPP:  Well, she corrected

94

1   you, so I would be object to it being asked
2   and answered.
3           MS. PILCHER:  I think she said it
4   was spreadable.  I called it infectious.  I
5   asked if it was an infectious disease, not
6   contagious.
7       A.  It's spreadable.
8       Q.  Okay.  Were you required to sign
9   in and out of the health care unit each
10  time you entered into the facility?
11      A.  I really don't remember.
12
13  (Plaintiff's Exhibit Number 38 was marked
14   for identification and attached as an
15          exhibit hereto.)
16
17      Q.  I'm going to show you what's
18  Plaintiff's Exhibit Number 38.  Does that
19  refresh your recollection at all?
20      A.  That's my signature.  So, yes, I
21  was.
22          MS. PILCHER:  Okay.  This is a
23  good time to take a break before we get

95

1   into the good stuff if y'all want to take a
2   break for lunch.  I don't know.
3           MS. HOLPP:  How much longer do you
4   think you --
5           MS. PILCHER:  I've just go over
6   the medical records and a couple of things.
7           MS. HOLPP:  Well, just whenever
8   the times that she saw him because it's
9   just a couple.  So, is that 30 minutes or 3
10  hours?
11          MS. PILCHER:  Well, I doubt it's 3
12  hours.
13          MS. HOLPP:  Well, you've done it
14  before.
15          MS. PILCHER:  Well, you know I got
16  to get what I got to get.  You understand.
17          MS. HOLPP:  Off the record.
18
19  (Off the record discussion is held.)
20
21  (Plaintiff's Exhibit Number 40 was marked
22   for identification and attached as an
23          exhibit hereto.)

96

1
2       Q.  Okay.  I'm going to show you
3   what's been marked as Plaintiff's Exhibit
4   Number 40, and ask you to review that
5   document, please.
6           MS. SEGERS:  While she's looking,
7   what were 38 and 39?  Did I miss those?
8           MS. PILCHER:  Health care sign in
9   sheet.
10          MS. SEGERS:  Yeah.  Yeah, that's
11  fine.  Thanks.
12          MS. HOLPP:  Are you going to ask
13  questions about the other inmates so that
14  she needs to read those?
15      Q.  No.  If you'll look on page 4, it
16  talks about Rhonda Manning.  I'll represent
17  to you that inmate number 103002 is Danny
18  Cassady.
19          MS. HOLPP:  Okay.
20      Q.  Okay.  Does this refresh your
21  recollection any about the meeting held
22  July 12th, if it's the same meeting that
23  you had discussed earlier?

# FOSHEE & TURNER COURT REPORTERS

97

1    A.   I don't remember.

2    Q.   Because it does not indicate that
3  you were present.

4    A.   I don't remember if this was or
5  not. I can't recall the people's name that
6  were there, so I can't remember.

7    Q.   Did Danny Cassady ever talk to you
8  about wanting to see a free world doctor or
9  a dermatologist or anything of that nature?

10    A.   On one occasion.

11    Q.   Tell me about that.

12    A.   It's in the medical record.

13    Q.   Well, I'm going to show you what's
14  been marked as Plaintiff's Exhibit Number
15  15, which is the medical record.

16    MS. HOLPP:  Do you mind if she
17  just looks at our copy?

18    MS. PILCHER:  As long as we can
19  have some type of correlating page. That
20  would be helpful.

21    MS. HOLPP:  Our's aren't date set
22  that if we need a date, and if it's in the
23  hospital section or the progress, she

98

1  probably can find it.

2    MS. PILCHER:  Okay.

3    MS. HOLPP:  And that way we won't
4  have to pass it back and forth.

5    Q.   I don't remember what date it is.

6    A.   It was in August.

7    Q.   It's in the treatment record or
8  the interdisciplinary notes?

9    A.   August the 7th. It's in the
10  physician progress notes.

11    Q.   Okay. Danny Cassady asked you, I
12  need to see a dermatologist; is that
13  correct?

14    A.   Yes.

15    Q.   Did his medical history, in your
16  opinion, warrant the visit to the
17  dermatologist since he had been suffering
18  from skin infections for over a year?

19    MS. HOLPP:  Object to the form,
20  facts not in evidence.

21    Q.   Why don't you, if you'll turn back
22  to -- go to the treatment records. Well,
23  let me ask this. At this point in time

99

1  that you saw him in August of 2001, would
2  you have reviewed his comprehensive record
3  and reviewed his treatment of this illness
4  and complaints of skin infection that he'd
5  had?

6    MS. HOLPP:  Object to the form.

7    A.   I don't understand the question.

8    Q.   Okay. Well, let's go back. When
9  was the first time that you saw Danny
10  Cassady?

11    A.   In May with Dr. Ifediba. It's
12  under what hospital.

13    Q.   Would that be May 15th?

14    A.   Yes, I believe so.

15    Q.   And that would be Bates stamped
16  number 027?

17    A.   Ours aren't Bates stamped.  May
18  15th, 2001, interdisciplinary progress
19  notes?

20    Q.   Was Dr. Ifediba in the examining
21  room with you or did he just review your
22  records?

23    MS. HOLPP:  Dr. Ifediba is a

100

1  woman.

2    A.   Dr. Ifediba was with me. This was
3  like my second day working, yeah.

4    Q.   Prior to seeing Danny Cassady on
5  May 15th of 2001, did you review his
6  comprehensive history with regard to his
7  treatment of skin infection?

8    MS. HOLPP:  Object to the form.

9    A.   I can't remember.

10    Q.   Is that something that the
11  standard of care would require you to do to
12  look at his comprehensive history?

13    A.   I would look at his history, but I
14  can't remember if I did it that day.

15    Q.   Okay.

16    A.   It's my second day there, so I
17  can't remember.

18    Q.   Did you ever look at his
19  comprehensive history --

20    A.   Yes.

21    Q.   -- of skin infection?

22    A.   Comprehensive in regards -- I'm
23  sorry. Yes, I did look at his history of

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com

1-800-888-DEPO

# FOSHEE & TURNER COURT REPORTERS

101

1  skin infection.
2      Q.  Were you also aware that Danny
3  Cassady had hepatitis A and C?
4      A.  Yes.
5      Q.  What effect, if any, did that have
6  on his assessment or treatment or prognosis
7  plan?
8          MS. SEGERS:  At any particular
9  time?
10     Q.  At any particular time.  Was that
11 a risk factor?  I mean, what effect, if
12 any, did that have on his condition or
13 health status?
14         MS. HOLPP:  We'll object to the
15 form, because I just don't -- it's pretty
16 vague when you just say his condition.  If
17 you want to ask her about specific
18 conditions or specific infections or
19 specific problems, but as long as you're
20 keeping it broad, she worked there for six
21 months, and I'm going to object to that
22 form.
23     Q.  Well, I'll get a little more

102

1  specific.  You were aware that Danny
2  Cassady had hepatitis A and C; is that
3  correct?
4      A.  Yes.
5      Q.  What effect did that have on his
6  health status in May of 2001?
7          MS. HOLPP:  At the time she saw
8  him?
9      Q.  Uh-huh.
10         MS. HOLPP:  May 15th, 2001.
11     A.  With his history, and I found it
12 was particularly that I made sure that the
13 antibiotic that he was receiving was going
14 to help with that infection, so that's why
15 I put monitor the cultural report on the
16 wound.  Also, the urine dip stick.  If
17 liver enzymes were elevated, that could be
18 a possible cause of it turning very amber
19 color.
20     Q.  With a darker urine, if he had
21 darker urine, that would indicate that he
22 was having some kidney dysfunction.  Would
23 that be fair?

103

1      A.  Specific.
2      Q.  Well, that was a risk factor that
3  had to be ruled out.  Let's put it that
4  way.
5          MS. HOLPP:  Object to the form.
6      A.  I don't -- I'm not following you.
7      Q.  Well, you did do a wound culture
8  at that point in time?
9      A.  Yes.  And if you'll go -- well, I
10 put monitor.  I'm not sure if it was
11 actually done.  It says monitor cultural
12 report on wound.  It may have already been
13 done.
14     Q.  Now, let's go back to that order
15 on the wound culture.
16     A.  Okay.
17     Q.  When was the wound culture
18 actually taken according to your records or
19 according to your records or according to
20 the records?
21         MS. HOLPP:  Collected?
22     Q.  Yes.
23     A.  The date collected was according

104

1  to the medical record was 05/15/01.
2      Q.  So, it's possible that you
3  actually collected?
4          MS. HOLPP:  Object to the form.
5      A.  Okay.
6      Q.  You don't have an independent
7  recollection of --
8      A.  No.  No.
9      Q.  -- taking a wound culture?
10     A.  No.  Usually if there was -- the
11 orders say obtain a wound culture, it does
12 not mean that the physician or the nurse
13 practitioner is the one that did that.
14     Q.  Now, at this point in May 15th of
15 2001, did you review the medications that
16 Mr. Cassady had taken prior to that time
17 for this condition?
18     A.  I cannot remember that I
19 specifically went all the way through the
20 medical records just based on memory, but
21 it's very likely that I did.  But as far as
22 actually going through the entire thing, I
23 can't remember.

# FOSHEE & TURNER COURT REPORTERS

117

1  medications that were prescribed to Danny
2  Cassady from July 2000 to April of 2001
3  were for a skin infection, and I'll give
4  you an opportunity to go review the record
5  to make that determination, based upon your
6  training and skill and understanding of
7  your duties as a nurse practitioner, is
8  that something that you should have
9  considered in making a determination of
10  what medications would be appropriate in
11  April -- in May of 2001?
12       MS. SEGERS:  Same objection.
13       MS. HOLPP:  Same objection.
14       A.  I would have looked at the
15  medicines. I'm not sure how far back I
16  would have gone, but I would have looked at
17  the medicines.
18       Q.  When you say I'm not sure how far
19  I would have gone back, would that not be
20  significant to go back as far as the
21  problem had existed?
22       MS. HOLPP:  Object to the form.
23       A.  When a patient came to me, I was

118

1  given their chart. It may not have been
2  all the volumes of the chart.
3       Q.  Well, if you were given a chart
4  that indicated he was having problems for a
5  particular condition, such as Danny Cassady
6  was, if you were given a chart that
7  indicated that he was being treated already
8  for a skin infection, would you have then
9  requested additional charts or records to
10  make sure that you had a comprehensive
11  history of the illness?
12       MS. HOLPP:  Object to the form.
13       A.  I might would have. I might would
14  have. I really do not remember if I did or
15  did not with Mr. Cassady.
16       Q.  If a treatment plan was being
17  devised for a particular patient, in this
18  particular incident Mr. Cassady, wouldn't
19  the response to treatment or all of the
20  treatment, especially to the therapeutic
21  regimen that had been prescribed, wouldn't
22  that be a significant factor that should be
23  considered for devising a treatment plan

119

1  for him from May 15th forward?
2       MS. HOLPP:  Object to the form.
3       A.  We did wound cultures on him. And
4  that helped determine our treatment plan.
5       Q.  Okay. Whose idea was it to
6  perform wound cultures?
7       A.  On May the 14th, it was Dr.
8  Ifediba.
9       MS. HOLPP:  Was that wide open,
10  ever since the time she was there or we're
11  just wanting in May?
12       MS. PILCHER:  No, in May. In May.
13       A.  All right.
14       Q.  So, my question then is what were
15  the results of that culture that was taken
16  in May?
17       MS. HOLPP:  Which one in May,
18  Mary?
19       Q.  Well, it was collected May 15th.
20       A.  The record shows that it was
21  growing staph RS.
22       Q.  So, that would be MRSA staph?
23       A.  Not necessarily.

120

1       Q.  Okay.
2       A.  A staph is on your skin.
3       Q.  Well, if you'll look on what I've
4  got as Bates stamp number, result number 1
5  for 05/15, where it talks about
6  susceptibilities.
7       MS. SEGERS:  There's another lab.
8       A.  Okay. I didn't see the other lab.
9       Q.  It was the same collection data
10  date, but it was reported on 05/18/01 that
11  it was methacylin resistant staph; is that
12  correct
13       A.  That is correct.
14       Q.  What's the significance, if any,
15  of a staph being methacylin resistant?
16       A.  That the antibiotic that is being
17  utilized is not effective for that
18  particular organism.
19       Q.  And that would have been the
20  Keflex, correct?
21       A.  It says Cesazolin, so that would
22  be in the same family as Keflex.
23       Q.  Now at that point Dr. Ifediba

# FOSHEE & TURNER COURT REPORTERS

121
1 changed the treatment protocol; is that
2 correct?
3    A.  On May 21st, there is a new order,
4 yes.
5    Q.  And that was based upon the labs
6 that she received?
7       MS. HOLPP:  Object to the form.
8 She can't testify as to why Dr. Ifediba
9 ordered it.
10    A.  You would have to ask Dr. Ifediba,
11 I can't speak for her.
12    Q.  Did you talk to Dr. Ifediba at
13 that point in time about the treatment of
14 Danny Cassady?
15    A.  I don't recall.
16    Q.  Did you typically have discussions
17 with Dr. Ifediba about patients that you
18 were involved in their care?
19    A.  Periodically we did discuss
20 patients.
21    Q.  Did you document the discussions
22 that you had with Dr. Ifediba in the
23 medical records?

122
1    A.  I don't -- I know I recorded some.
2 I'm not sure about Mr. Cassady's case.
3    Q.  Was it your standard practice to
4 record if you had had discussions with the
5 doctor?
6       MS. HOLPP:  Object to the form.
7       MS. SEGERS:  Are you asking now
8 about any doctor or Dr. Ifediba?
9       MS. PILCHER:  Any doctor.
10    A.  As in the medical record, when I
11 discussed something with Dr. Lyrene, it's
12 documented.
13    Q.  Some nurses have certain
14 procedures that they follow and they
15 typically follow those procedures each and
16 every time.  Is it your standard operating
17 policy or procedure that you go by to
18 document in the medical records when you've
19 had discussions with doctors?
20       MS. HOLPP:  Object to the form.
21    Q.  Is that something you typically
22 do?
23    A.  Typically if I have a discussion

123
1 with another provider, yes, I would
2 document it in the medical record.
3 Typically.
4    Q.  Now, according to my records, and
5 it may be that I can't read your writing,
6 but yours was one of the easier ones.
7    A.  I was going to say it should be
8 easy.
9    Q.  The next time that I have you
10 seeing Mr. Cassady is on July the 9th of
11 2001.  Is that consistent with your
12 records?
13    A.  Whatever the medical records show.
14    Q.  Is that correct?
15    A.  That is correct.  According to the
16 medical records, I saw him on July the 9th,
17 2001.
18    Q.  Now, tell me about what occurred
19 during that examination of Mr. Cassady?
20    A.  I'll be glad to read you the
21 medical record.
22    Q.  Okay.  "Weight, 210 and a half;
23 gain of two and half pounds since July 2nd,

124
1 2001."  S is direct quote.  "I haven't
2 missed a lot of my medicine.  When will the
3 swelling in my foot go down?  I just itch
4 on my arms and sometimes I get these brown
5 spots to come up on me."  Then O.
6    Q.  That would be your objective?
7    A.  Objection.  "Head, normal
8 cephalic.  No lesions or masses noted,
9 talkative, oriented times 4, cooperative,
10 calm.  PERRL.  Heart, RRR, S1, S2, with
11 systolic murmur, not gallops or rubs.
12 Chest, respiration's even, regular,
13 unlabored; lungs clear, with bilateral
14 breath sounds.  Abdomen, round, soft,
15 symmetrical; active bowel sounds in and all
16 father quadrants.  Lower liver edge,
17 approximately three and a half centimeters
18 below lower rib cage.  No tenderness or
19 masses noted upon palpation.  Skin, some
20 jaundice noted.  No lesions noted in arms
21 where inmate points to.  On posterior right
22 upper thigh, wound about two centimeters
23 long, about one-half centimeter wide,

# FOSHEE & TURNER COURT REPORTERS

125

1  draining light tan material.  Non pitting
2  edema in left foot.  Right foot and lower
3  right calf, edematous plus one.  Erythema
4  noted on right foot and right calf.  Labs
5  reviewed:  growing staph orius from wound.
6  May 2001, Bilirubin, 2.4; AST, 120, ALT,
7  84; protein 4.9; albumin, 3.0.  A:  Right
8  thigh -- number 1, right thigh wound
9  infection.  Number 2, cellulitis right
10 foot.  Number 3, liver disease.  History of
11 hepatitis A and C. 4:  Edema.  Plan:  KIM
12 20, 2 is wound CNS five days after Cipro
13 completed.  3 is Aldactone, 50 milligrams,
14 PO BID times 30 days.  4 is daily dressing.
15 5 is return to clinic PRN."
16     Q.  So, you were going to take -- let
17 him finish out a round of Cipro and do
18 another wound culture on him; is that
19 correct?
20     A.  That is what the orders reflect.
21     Q.  You were aware based on his
22 medical history at this point in time that
23 he had been hospitalized for an infection

126

1  of MRSA staph; is that correct?
2     A.  Yes.
3     Q.  Did you review the labs and the
4  orders to see what medications had been
5  prescribed to make a determination what the
6  best form of treatment would be for
7  Mr. Cassady?
8     A.  Yes, I reviewed the labs.  I did
9  some review of the medications.  I don't
10 remember how much, but I did review some of
11 them.
12     Q.  Okay.  All right.  Let's look at
13 the medications that had been provided.
14         MS. HOLPP:  What day?
15     Q.  Starting in May 15th, 2001.
16         MS. HOLPP:  Are you talking about
17 the ones administered or the ones ordered?
18     Q.  Ones ordered.
19     A.  May 2001.
20     Q.  Uh-huh.
21     A.  okay.
22     Q.  Now, the Keflex was ordered and
23 then DCed because for whatever reason.  And

127

1  on 05/21, I think we said he was given
2  Clindamycin and both IM and IV.  Is that
3  correct?
4     A.  That is correct.
5     Q.  Then in 06/30 of 2001, he was
6  given Keflex; is that correct?
7     A.  06/30?
8     Q.  Uh-huh.
9         MS. SEGERS:  Were you asking about
10 orders or --
11     Q.  Orders.
12     A.  I see an order on 06/29 for Keflex
13 by Dr. Ifediba.
14     Q.  Now, based on his medical history
15 with him only being released from the
16 hospital in the end of May, would you as a
17 nurse practitioner have some concern that
18 it may be a return of staph infection?
19     A.  I can't speak for what Dr. Ifediba
20 thinks.
21     Q.  I'm asking for you as a nurse
22 practitioner.
23     A.  I would -- I would have to refer

128

1  back to the record to the actual progress
2  note from that day, if there was one.  And
3  let's see, 06/01.  But I thought you had
4  said 06/29.  We're taking about you went
5  back to June, didn't you?
6     Q.  Yes, ma'am.
7     A.  Went back to June.
8         MS. HOLPP:  So, do you want her to
9  review the records and put herself in the
10 position of Ifediba?
11         MS. PILCHER:  No.  No.
12         MS. HOLPP:  Then what's your
13 question?
14         MS. PILCHER:  My question --
15         MS. HOLPP:  She didn't ask to
16 order --
17         MS. PILCHER:  I understand.  She
18 is making some orders in July of '01.  And
19 she's already testified earlier that it was
20 her practice to review the medical history
21 and treatment that had been provided.
22     Q.  So, would it be fair to say that
23 it would have been your standard practice

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com

1-800-888-DEPO

# FOSHEE & TURNER COURT REPORTERS

137

1  treatment request records for 07/02/01.
2      A.   Okay.
3          MS. HOLPP:  What's your question?
4      Q.   Okay.  You have a signature down
5  at the bottom?
6      A.   Yes.
7      Q.   B. Hogue, CRNP 7901.  So, you had
8  actually -- that would be an indication
9  that you had reviewed this record?
10      A.   Yes.
11      Q.   Did you typically sign all of the
12  records that you had reviewed?
13      A.   Not all of them, no.
14      Q.   But you did on this particular
15  occasion?
16      A.   This one here was it was policy
17  that after a treatment was completed, that
18  it required a physician's or the nurse
19  practitioner or if there was PA to sign
20  that.
21      Q.   And that was when the Gentamycin
22  was provided?
23      A.   That is what the record reflects.

138

1      Q.   Now, in 06/01 of '01, Mr. Cassady
2  came in complaining of feet swelling,
3  pitting edema.  He was complaining that he
4  wanted a lower bunk, but he was examined.
5  And Lisa Lewis noted that he had pitting
6  edema on both lower legs and feet.  And she
7  referred the chart to the MD.  Now, when
8  she refers the chart to the MD, does that
9  mean that the MD had to see her or you had
10  to see her or just to review of the chart?
11      A.   Dr. Ifediba's initial is at the
12  bottom.
13      Q.   And then on June 7th, he continued
14  to complain of problems with his skin; is
15  that correct?
16      A.   Yes.  That's what the record
17  reflects.
18      Q.   And then on June 27th --
19      A.   Okay.
20      Q.   June 27th, he continues to
21  complain of problems with his skin.
22      A.   Uh-huh.
23      Q.   It says the same problem, just

139

1  that I'm breaking out in reddened areas.
2  And the nurse returned him to see the MD on
3  06/28/01.
4      A.   And he was a no show for an 8:00
5  a.m. appointment.
6      Q.   And that was your signature --
7      A.   That is my signature.
8      Q.   Did you notify anybody at the DOC
9  that he had failed to show?
10      A.   Not that I can recall.
11      Q.   Okay.  Was it your -- did you
12  notify anybody in the nurse's office or
13  direct anyone to notify him to see if you
14  could get him for the appointment?
15      A.   Not that I can recall.
16      Q.   Now, on 06/29, Mr. Cassady came in
17  again?
18      A.   Yes.
19      Q.   And didn't see the doctor at this
20  time?
21      A.   He -- this is a sick column, and
22  Dr. Ifediba did see him on July the 2nd, I
23  believe.

140

1      A.   Okay.
2      Q.   But he's still complaining of
3  problems with his skin?
4      A.   That is what the record reflects.
5      Q.   And then on 06/29/01, your
6  signature of 07/12/01, talking about wound
7  care.  You were just reviewing that the
8  wound care had taken place; is that
9  correct?
10      A.   Yes.
11      Q.   When you review the treatment at
12  that point in time, do you also review the
13  response to treatment?
14      A.   It would be addressed in the
15  progress notes.
16      Q.   Okay.  Well, area drainage, bloody
17  drainage; dressing applied.  It doesn't
18  really talk about whether or not he's
19  responding to treatment, it only talks
20  about what was done.  Is it your
21  responsibility as a nurse practitioner who
22  seen him in July, I believe we said July 20
23  --

# FOSHEE & TURNER COURT REPORTERS

141

1   A.   Huh-uh.  It was July the 9th.
2   Q.   I'm sorry.  You're right.
3       MS. HOLPP:  July 9th.
4   Q.   July 9th.  You're seeing him July
5   9th.  Is it your job and responsibility to
6   review these records and make a
7   determination of whether or not he's
8   responding to treatment?
9       MS. HOLPP:  I'm going to object to
10  the form.  She saw him, and you just asked
11  is it her responsibility to review the
12  records to see if he's responding.  But she
13  saw him on July 9th.
14      MS. PILCHER:  I understand.
15      MS. HOLPP:  So, I'm going to
16  object to the form.
17  A.   Repeat the question, please.
18  Q.   When you saw Mr. Cassady on July
19  the 9th, 2001, was it your responsibility
20  as a nurse practitioner to review the
21  history and treatment of this illness and
22  these complaints of symptoms and make a
23  determination of what treatment's been

142

1   given and whether he is in fact responding
2   to treatment?
3   A.   Yes.  And that was done.
4   Q.   Okay.  Now, and, of course, you
5   signed again on 07/02/01, you signed there
6   that you had reviewed that treatment; is
7   that correct?
8       MS. HOLPP:  Where are you, Mary?
9   Q.   Treatment record dated 07/02/01.
10  A.   07/02/01?
11  Q.   Uh-huh.
12  A.   My signature there indicated that
13  I had reviewed the treatment that was
14  given.  And I saw him the same day that I
15  reviewed it.
16  Q.   And you saw him the same day that
17  you reviewed it?
18  A.   Yes.
19      MS. HOLPP:  Just answer.
20  Q.   What do you recall about that
21  visit other than what's in the medical
22  record?
23  A.   I don't recall anything other than

143

1   what's in the medical records.
2   Q.   Now, did you have a discussion
3   with Dr. Ifediba at this time or it's not
4   reflected that you talked with Dr. Ifediba?
5       MS. HOLPP:  When?
6   Q.   In 07/09/01 in your progress note,
7   you don't indicate that you talked to Dr.
8   Ifediba.
9   A.   That is correct.  I did not
10  indicate it.
11  Q.   Now, let's talk about some of the
12  symptoms he was experiencing.  He said
13  jaundice noticed.  What significance did
14  that have to his evaluation and/or
15  treatment?
16  A.   Jaundice is a reflection, often
17  time is a reflect if there is a liver
18  disease.
19  Q.   Are there any special
20  considerations that should be given to
21  Mr. Cassady or any -- because of -- let me
22  strike that.
23      Was there any specific

144

1   considerations that should have been given
2   to Mr. Cassady or that was given to
3   Mr. Cassady because he had hepatitis A or
4   C?
5       MS. HOLPP:  Object to the form.
6       MS. SEGERS:  What do you mean by
7   considerations?
8   Q.   Well, you were aware that
9   Mr. Cassady had hepatitis A and C?
10  A.   Yes, because I've reflected that
11  in my records.
12  Q.   And now we know he's jaundiced.
13  So, we know he's having some liver
14  dysfunction that's affecting -- that his
15  liver is not completely functioning
16  properly; is that correct?
17  A.   When a person has hepatitis A and
18  C that does tell that they have a liver
19  problem.
20  Q.   And it would be true to say that
21  when they have A and C together, it
22  accelerates the liver disease; is that
23  correct?

# FOSHEE & TURNER COURT REPORTERS

145

1    A.   It may or may not.
2    Q.   But what significance was it to
3  you that he was jaundiced?  I mean, did
4  that create any concern for you in the
5  treatment of Mr. Cassady?
6    A.   I knew that often times with
7  people with liver disease that that is an
8  expected finding with that.  And I was
9  going to monitor that.
10    Q.   Okay.  Would it have any effect on
11  his treatment of MRSA staph?
12        MS. HOLPP:  Object to the form.
13  You're assuming he had it.
14    A.   I don't understand the question.
15    Q.   Well, Mr. Cassady had been treated
16  in the hospital less than a month?
17    A.   Uh-huh.
18    Q.   Let's see.  He was released at the
19  end of May from the infirmary with MRSA
20  staph.  And according to the medical
21  records, he had only had a nasal culture
22  done at the time that he left.  Okay.  Is
23  that fair to say?  Would you agree with

146

1  that?
2        MS. HOLPP:  I'm going to object to
3  the form that he only had -- he had a nasal
4  culture.
5    Q.   And that the culture before that
6  showed moderate growth of the MRSA staph?
7    A.   The culture from May showed that
8  he had, I believe it was May --
9    Q.   15th.
10    A.   -- 15th, showed that he had MRSA.
11    Q.   Okay.  And at least as of the last
12  culture that had been done, he only had no
13  evidence of MRSA in his nasal passage; is
14  that correct?
15    A.   I believe -- it says no growth of
16  72 hours after incubation.  That's with a
17  nasal swab.
18    Q.   And if you'll look at your
19  medications, you'll see that on 05/15 Dr.
20  Ifediba -- or around 05/15 Dr. Ifediba
21  prescribed Keflex again?
22    A.   Okay.
23    Q.   Okay.

147

1    A.   That is what she prescribed, yes.
2    Q.   And of course, Keflex wouldn't be
3  effective against MRSA staph; is that
4  correct?  It's a Cephalosporin?
5    A.   Based on whatever the culture
6  report said at that time.
7    Q.   Starting on 06 -- in June, he was
8  again prescribed Keflex.  So, after he got
9  back, he took the Clindamyin, both IM and
10  IV that we discussed earlier.  And then in
11  June, he was again prescribed Keflex by Dr.
12  Ifediba?
13    A.   On June the 29th?
14    Q.   Uh-huh.
15    A.   Yes, he was prescribed that by Dr.
16  Ifediba.
17    Q.   Okay. And then on 07/02, he was
18  prescribed Cipro by Dr. Ifediba and took
19  Cipro from 07/02 to 07/11; is that correct?
20        MS. HOLPP:  Object to the form.
21  It's compound when it was ordered and what
22  was taken.
23        MS. PILCHER:  Well, it was ordered

148

1  07/01.
2        MS. HOLPP:  Object to the form.
3  It was not ordered 07/01.  Facts not in
4  evidence.  I mean, you're looking at the
5  MAR.  It would help to look at the orders.
6        MS. PILCHER:  Okay.
7        MS. HOLPP:  I mean, I will just
8  represent to you that the order says
9  07/02/01, DC Keflex, Cipro 500 MG by mouth.
10        MS. PILCHER:  That's what I said
11  07/02.
12        MS. HOLPP:  You said 07/01.
13        MS. PILCHER:  Oh, I'm sorry.
14  07/02.
15    Q.   What is your understanding of the
16  use of Cipro for the treatment of MRSA
17  staph?
18    A.   Cipro was sensitive to that
19  organism.
20    Q.   Okay.
21    A.   And that's why it was ordered.
22    Q.   In the treatment of MRSA staph
23  specifically, are there some concerns that

# FOSHEE & TURNER COURT REPORTERS

149

1   you get resistance to Cipro pretty quickly?
2        MS. HOLPP:  Object to the form.
3        Q.   Was that something that was
4   considered by you on 07/09 that Cipro --
5   that MRSA can show susceptibility in a lab,
6   but often times in the clinical
7   environment, it is not susceptible?  That
8   it doesn't -- it has resistance -- MRSA has
9   resistance to --
10       MS. HOLPP:  Object to the form.
11   That's several questions.  You may want to
12   start over.
13       Q.   It is your understanding from
14   reviewing pharmaceutical reference books
15   and other material that you've had, and
16   your education and training, that a lot of
17   times Cipro will show susceptible in the
18   lab, but in fact is resistant to MRSA?
19       MS. HOLPP:  Object to the form of
20   a lot of times.
21       A.   I am not aware of the fact that
22   when it shows that it's sensitive, that
23   there can also be resistance with that

150

1   particular organism for that time -- for
2   that particular time.
3        Q.   Did you review any reference
4   materials or books to determine the best
5   method of treatment for MRSA staph?
6        A.   I base my treatment plan based on
7   the lab results and also looking at the
8   medical records and what had been utilized
9   in the past.  And we had used Cipro, and I
10   believe it had been utilized one time in
11   the past.  And that is what I -- we
12   continued -- Dr. Ifediba ordered on 07/02.
13       Q.   Had his condition significantly by
14   the use of Cipro from 07/02 to 07/11?
15       MS. HOLPP:  Through when?  07/11?
16       Q.   Uh-huh.
17       MS. HOLPP:  And let me state my
18   objection.  I think she can testify as to
19   what her notes reflect up to 07/09.  But
20   she would be just reading what the chart
21   reflects on 07/11.  We all know that
22   there's a clinical judgment, that's not
23   documented in the medical records.

151

1        Q.   Did you consider whether or not
2   Mr. Cassady had shown any improvement from
3   taking Cipro?  Did you review his response
4   to treatment?
5        MS. SEGERS:  When?
6        MS. PILCHER:  From 07/02 until
7   07/02.
8        MS. SEGERS:  When are you asking
9   her did she consider that?
10       MS. PILCHER:  On 07/09.
11       MS. SEGERS:  Okay.  Thank you.
12       Q.   On 07/09 did you consider Mr.
13   Cassady's response to treatment from when
14   he went on this Cipro on 07/02?
15       A.   I did consider the response, but I
16   knew that we were only about halfway
17   through that at the time, that order for
18   Cipro at the time.
19       Q.   Okay.  So, you decided to give it
20   some additional time?
21       A.   Yes.
22       Q.   And then you ordered a wound --
23       A.   Wait just a second.  Also, on the

152

1   medication record, let me find it for July
2   -- no, I was incorrect.  Never mind.
3        Q.   Now, when was the next time that
4   you saw Mr. Cassady?
5        A.   I think the record reflects in
6   August.
7        Q.   Now, did you check to make sure
8   that the wound culture was taken in July?
9   Let's look at your -- I guess we got to go
10   back to the orders.
11       A.   The last culture that I see was
12   done on 07/05/2001.  Well, that's a report
13   date.  The collection time was 07/02.
14       Q.   07/02.  So, that would have been
15   the wound culture that you had ordered on
16   07 -- who ordered that wound culture?  You
17   did?  That's where I'm confused.
18       MS. HOLPP:  Look at the orders.
19       Q.   I think this is where my order is.
20   I can't see it.  Sorry.
21       A.   Dr. Ifediba ordered wound cultures
22   on 07/02.
23       Q.   Okay.  Now, if you'll look on the

# FOSHEE & TURNER COURT REPORTERS

153

1 orders, you had ordered a low bump profile
2 for Danny Cassady on 06/05/01. Did you
3 actually see him on that day?
4      A.   No, I did not.
5      Q.   How did that come about, if you
6 recall?
7      A.   Based on sick call.
8      Q.   Did you review the sick call?
9      A.   Let's see. That was on what --
10 what day was the order?
11      Q.   06/05 is when you ordered it or he
12 came in on 06/04.
13      A.   No, I did not see him on that day.
14 And I did not address that sick call.
15      Q.   But you wrote the order for the
16 low bump profile?
17      A.   Right.
18      Q.   At the request of the nurse or --
19      A.   I don't remember who requested
20 that.
21      Q.   Now, if you'll turn to the next
22 page 07/12/01. You said discuss with Dr.
23 Lyrene on --

154

1           MS. HOLPP:  What are you looking
2 at? The orders?
3           MS. PILCHER:  Yes, medication
4 orders.
5      A.   Yes.
6      Q.   Discuss with Dr. Lyrene on round?
7      A.   Yes.
8      Q.   So, did Dr. Lyrene actually come
9 to the facility?
10      A.   If I wrote that it was on rounds,
11 then he was at the facility.
12      Q.   Okay. And he ordered a Venice
13 Dopplar study?
14      A.   Actually the order's signed by me,
15 but it was discussed with Dr. Lyrene, as
16 all of this was discussed with Dr. Lyrene.
17      Q.   Okay. Do you have an independent
18 recollection of talking with Dr. Lyrene
19 about Danny Cassady?
20      A.   Not what was said. All I remember
21 is what's right here.
22      Q.   Do you recall why you had a
23 discussion with Dr. Lyrene about Danny

155

1 Cassady?
2      A.   I'm not sure if that was the time
3 that was around that meeting that they had
4 with all the doctors and all. I'm not sure
5 about that.
6      Q.   All right. Now, if you'll turn to
7 I believe it's -- maybe your records are
8 better than mine. I believe it's 08/22 of
9 '01.
10           MS. HOLPP:  That's a copy. If you
11 flip to the next one, it's just the carbon
12 thing.
13           MS. PILCHER:  So, these are the --
14           MS. HOLPP:  That's what it appears
15 to me. I mean, I would assume that's what
16 see. But I don't know any more than you
17 do.
18      Q.   Okay. Now, you made on 08/28/01,
19 you said scheduled to see Dr. Ifediba
20 regarding edema drainage?
21      A.   Uh-huh.
22      Q.   Whose responsibility at that point
23 was it to make sure that Danny Cassady got

156

1 in to see Dr. Ifediba?
2           MS. HOLPP:  Object to the form.
3      A.   The orders were signed off by one
4 of the nurses. I wrote the orders.
5           MS. HOLPP:  Answer the question
6 that she asked. Whose responsibility it
7 was to make sure he came in to see. And I
8 objected to the form assuming that it
9 wasn't nobody's responsibility. Facts not
10 in evidence.
11      Q.   Once this order was written, did
12 somebody have the responsibility to make
13 sure that he got put on the list or that he
14 got in there to see the doctor?
15           MS. HOLPP:  Object to the form.
16 Compound.
17      A.   For the list part of it, the
18 nurses when the order was taken. The
19 nurses would make the list and send it to
20 the dorms.
21      Q.   Okay.
22      A.   And he was seen on August 29th.
23      Q.   Do you know whether or not Danny

# FOSHEE & TURNER COURT REPORTERS

157

1   Cassady saw the doctor?
2       A. Yes, he did.
3       Q. Okay. And where is that?
4           MS. HOLPP: In the progress notes.
5           MS. PILCHER: I have no progress
6   note.
7           MS. HOLPP: I didn't give you the
8   records. You got the records on your own.
9   And it appears from me looking at what
10  you're holding, you didn't copy the back of
11  them. There are two sides of many pages.
12  But those didn't come from our client. I
13  believe you copied those.
14          MS. PILCHER: No, I didn't copy
15  them. They were provided by DOC.
16          MR. REDD: The copy center copied
17  it.
18          MS. PILCHER: DOC?
19          MR. REDD: I mean, I sent them out
20  to copy --
21          MS. HOLPP: And my copy came from
22  the DOC.
23          MS. PILCHER: Okay. Can I look at

158

1   that?
2           MS. HOLPP: Yeah. Mary, you may
3   want to look at the originals that came
4   from Andy because your office copied and
5   working copy and didn't -- I don't know why
6   he would have given me and not given you.
7           MS. PILCHER: They copied it for
8   us. They did it according to a subpoena.
9           MS. HOLPP: I'm just saying your
10  office could have made a copy that you're
11  working from.
12          MS. PILCHER: No, I don't have it
13  in any of our copies.
14      Q. Now, he has on there UTI. Urinary
15  tract infection?
16          MS. HOLPP: She.
17      Q. I mean she. UTI, urinary tract
18  infection.
19      A. Dr. Ifediba's notes do reflect
20  that it did have a urinary tract infection.
21      Q. What's significance does that
22  have, if any?
23      A. That he had an infection in his

159

1   urinary system. And we needed to treat it.
2       Q. And that was why the Bactrim was
3   ordered; is that correct?
4       A. Yes.
5           MS. PILCHER: Can I get a copy of
6   that?
7           MS. HOLPP: Do you want it right
8   now or after the depo?
9           MS. PILCHER: I can get it
10  afterward.
11      Q. All right. Did you see
12  Mr. Cassady again after August the 7th?
13      A. I did not see in the medical
14  records that I did.
15      Q. What was the date of that visit
16  from Dr. Ifediba?
17      A. 08/29/01. That's what it looks
18  like.
19      Q. All right. On 09/27/01, on this
20  order, you requested a chemical panel?
21      A. Yes.
22      Q. Do you know whether you saw him
23  before you ordered that chemical panel?

160

1       A. I cannot find it in the medical
2   records.
3       Q. Did you typically write an order
4   without seeing the patient?
5           MS. HOLPP: Object to the form.
6       Q. I mean, I'm just asking. Is that
7   something that you would --
8           MS. HOLPP: Object to the form.
9           MS. SEGERS: Well, let's let her
10  ask her question before you answer.
11      Q. In your practice as a nurse
12  practitioner, is it your practice to see
13  the patients before writing any orders?
14      A. On some of the sick calls, I'm
15  just saying in general population, based on
16  what was available on the sick call sheets,
17  we might write orders without having seen
18  the patient.
19      Q. And you would write those orders
20  based on the medical records?
21      A. Based on the medical records and
22  what was available on sick call.
23      Q. Now, on 08/29/01, it looks like --

# FOSHEE & TURNER COURT REPORTERS

161

1  is that your signature on it?  It says
2  Hogue.  It looks like Hogue.
3      A.  That's not my signature.  It's a
4  different --
5      Q.  Okay.  That was my question.  All
6  right.  Now, if you will look on 08/06/01.
7  You request -- you wrote an order for Cipro
8  500 milligrams.  But if you'll look out on
9  the outer corners, it says non-formulary
10  request filled out.
11      A.  That is correct.
12      Q.  Do you have any recollection of
13  what you requested or why?
14      A.  The Cipro.  And it was based upon
15  the sick call that was done.
16      Q.  Which is that same day?
17      A.  Which was the date that I signed
18  off on that sick call was 08/06/01.
19      Q.  Okay.  And that was the sick call
20  that he had not -- that's 08/05.  Okay.
21  I'm missing records.  Can I look at that
22  one?
23      A.  I don't want to lose my place.

162

1          MS. HOLPP:  You may not be
2  missing.  Ours are all over the place as if
3  the copy center had thrown them down a
4  stair case.
5          MR. REDD:  I think they copied
6  them as they were in the file.
7          MS. SEGERS:  You threw them down
8  the staircase, huh?
9          MS. HOLPP:  But some of my sick
10  calls are in different places.  So, you may
11  before you assume you're missing records,
12  look at a different location.  Because I've
13  noticed how you and I have them in
14  different places.
15      Q.  So, you reviewed the sick call of
16  08/06/01; is that correct?
17      A.  That is correct.
18      Q.  Did you go back and review at
19  08/06/01 all of the drugs that had been
20  provided him at that time?
21          MS. HOLPP:  Object to the form.
22      Q.  Well, let's say since he came out
23  of the hospital at the end of May.  At that

163

1  point he'd been on Cipro, that would have
2  been his third time on Cipro.  And based
3  upon the fact that he's continuing to
4  complain of the same problems.
5          MS. HOLPP:  Let me object to the
6  form.  You can answer.
7      A.  Seeing that I had reviewed the
8  chart from time to time, I reviewed between
9  this visit and when I had seen him and
10  between the last visit that I had -- you
11  know, since the last time I had seen him.
12      Q.  Well, you were requesting a
13  non-formulary drug?
14      A.  Yes.
15      Q.  Were there any reason that you did
16  not request Mycin since the last lab report
17  that had been done indicated he had a heavy
18  growth of MRSA staph?
19      A.  I can't remember.  I can't
20  remember exactly the reason I did`not order
21  Vancomycin.  I don't particularly like
22  Vancomycin.  Just personal preference, but
23  that's just me though.

164

1      Q.  What are the drugs that are
2  recommended by the CDC to treat MRSA staph?
3      A.  It's based on your culture report.
4      Q.  They don't have specific drugs
5  that are recommended for the treatment of
6  MRSA staph?
7      A.  Vancomycin can be used, but you
8  have to be very careful with Vancomycin.
9      Q.  I didn't ask what can be used.
10  What is the CDC's recommended treatment for
11  MRSA staph in 2001?
12      A.  I would have to go back and review
13  exactly all that's involved from the CDC.
14  We base -- a lot of the treatment is based
15  on culture and sensitivity reports.
16      Q.  Okay.  And not on recommended
17  treatments?
18      A.  We look at the culture
19  insensitivity reports.
20      Q.  Was there some reason that -- did
21  you research or reference MRSA staph at
22  that point in time?
23      A.  I don't recall.

# FOSHEE & TURNER COURT REPORTERS

165

1   Q.   Do you recall ever researching
2  MRSA staph during 2001?
3   A.   I don't recall.
4   Q.   Did you pull any reports?  I mean,
5  if you did in fact research it, would that
6  be something that you would note in your
7  medical records?
8       MS. HOLPP:  Object to the form.
9  She's already testified, she doesn't
10  recall.  So you're asking her to speculate.
11   Q.   No, I'm asking if you had
12  researched MRSA staph as it related to
13  Danny Cassady, would that be something that
14  you would have noted in the medical
15  records?
16   A.   I don't know.
17   Q.   Now, if you'll look on 08/12 --
18  well, let me see.  If you will look, I'm
19  sorry at 08/27/01.
20       MS. HOLPP:  What kind of document
21  are your looking at?
22   Q.   Which is the treatment health
23  service request form.

166

1   A.   This one.
2       MS. SEGERS:  Sick call?
3   Q.   Sick call.  Mr. Cassady states on
4  here both of my feet and legs are swelling
5  bad.  Can I please have the doctor look at
6  this.  You signed off on this medical
7  chart.  Did you make any attempt to get Mr.
8  Cassady to see the doctor on 08/27/01?
9   A.   The physician, I'm not sure the
10  physician was there.  The physician -- he
11  was seen by the physician on 08/29.
12   Q.   Okay.  Let's look at that record.
13   A.   That's the one you just looked at.
14   Q.   Okay.  That's the one on 18 --
15  okay.  All right.  When's the next time
16  that you have that Mr. Cassady saw the
17  doctor?
18       MS. HOLPP:  After 08/29?
19       MS. PILCHER:  After 08/29.
20   A.   I see in the medical records that
21  he was seen on October the 5th.
22   Q.   Based upon your review of the
23  medical records, did it appear that Danny

167

1  Cassady was responding to the antibiotics
2  that were being prescribed for him?  Was he
3  responding to treatment?
4       MS. HOLPP:  At what time?
5   Q.   Between May of 2001 and October of
6  2001.  I'm going to look at the hospital
7  records, because he was just -- what I'm
8  looking for is when he was -- after the
9  time he was released from the hospital,
10  which I believe May 28th.
11       MS. HOLPP:  May 31st.
12   Q.   May 31st.
13   A.   And he filled out another request
14  on 06/01.  But on May 31st, I want to say
15  that Dr. Ifediba, if she seen him again,
16  was on this one.  On May 30th, the record
17  reflects that Mr. Cassady's skin lesions
18  had healed.  And the records reflect that
19  his ** cellulitis had improved.  Will
20  obtain nasal swab to mark or check for
21  colonization.
22   Q.   Okay.  So, he was improving while
23  he was in the hospital.  But on June 1st of

168

1  2001, he's got both feet swollen, pitting
2  edema on both lower legs and feet, small
3  bumps on right foot, and the draining of
4  brownish looking fluid.  Skin warm to toe.
5       MS. SEGERS:  Are you asking her to
6  confirm that's what the record said?
7       MS. HOLPP:  And I'm going to
8  object, because that is June 4 when that
9  subjective was taken.  He wrote the sick
10  call request on June 1st, but he was --
11       MS. PILCHER:  Okay.
12       MS. HOLPP:  Let me finish.  And
13  the subjective was taken on June 4th.
14   Q.   So, on June 4th, he's seen by the
15  doctor and his condition has not improved
16  since his release on the 31st.
17       MS. SEGERS:  Object to the form.
18       MS. HOLPP:  Object to the form.
19   A.   They had improved when he left on
20  May 31st from the infirmary.
21   Q.   How would you describe -- I mean,
22  if you had to visually describe what his
23  lesions looked like, can you do that?

# FOSHEE & TURNER COURT REPORTERS

169

1    MS. HOLPP:  At what time?
2    Q.   The last time you saw him in
3  August.
4    A.   I can tell you what the records
5  show.  The records show that he had
6  numerous lesions ranging in size from 4
7  millimeters to 2.5 centimeters.  They're in
8  degree of healing, red scabby, some
9  draining yellow material.
10    Q.   So, he had open wounds on his
11  legs; is that correct?
12    MS. HOLPP:  At what time?
13    MS. PILCHER:  In August.
14    MS. HOLPP:  On what day in August?
15    MS. PILCHER:  August the 7th.
16    Q.   The last time you saw him, August
17  7th.
18    A.   The records do reflect that he did
19  have some open lesions.  Some draining
20  lesions, excuse me.
21    Q.   What risks are associated with
22  having open lesions?
23    MS. SEGERS:  What what?  I'm

170

1  sorry.
2    MS. PILCHER:  What risks.
3    MS. SEGERS:  Risks.  Oh, I'm
4  sorry.
5    Q.   Are there any medical risks to
6  having open lesions?
7    A.   Well, with open lesions, if you do
8  not take care of them, you can spread that
9  from place to place depending on what it's
10  growing.  You can also, if, you know,
11  they're not covered and not treated, then
12  the lesions can actually become larger.
13    Q.   Are they more susceptible to other
14  germs and infection?
15    MS. HOLPP:  Object to the form.
16    A.   When there is a break in any type
17  of skin integrity, anybody is more prone to
18  infection with any open area on their skin.
19    Q.   Tell me about the risk of long
20  term use of antibiotics.
21    MS. SEGERS:  Object to the form.
22    MS. HOLPP:  Object to the form.
23    MS. SEGERS:  Pretty general.

171

1    Q.   Are there any risks associated
2  with the long term use of antibiotics?
3    MS. HOLPP:  For just everybody
4  walking on this earth?  I mean, object to
5  the form, it's broad and vague.
6    MS. PILCHER:  Well, let's be
7  specific.
8    MS. HOLPP:  There you go.
9    MS. PILCHER:  Now, we've talked
10  about it, and I'm withdrawing Plaintiff's
11  Exhibit Number 39, because we've gone
12  through the record at this point.
13    Q.   The records indicate that
14  Mr. Cassady had taken antibiotics from
15  about June of 2000 until the day he died.
16  Well, pretty consistently from through
17  09/07 of 2001, Mr. Cassady was on
18  antibiotics.
19    MS. HOLPP:  I am going to object
20  to the form, pretty consistently.
21    Q.   Mr. Cassady had taken antibiotics
22  from June of 2000 until 09/07 of 2001.
23    A.   Not continuously.

172

1    Q.   What is the effect of taking
2  antibiotics at least once a month, if not
3  more, which he did, for over a year?  Does
4  it have any -- you know, are there any side
5  effects to taking antibiotics?
6    MS. HOLPP:  Still object to being
7  broad.  You can answer.
8    A.   They are side effects from taking
9  any medication, including antibiotics.
10    Q.   Antibiotics, they kill bad germs
11  and then they kill good germs, too,
12  correct?
13    A.   That can.
14    Q.   So, somebody who is taking
15  antibiotics on a regular basis may have
16  susceptibilities to certain germs that
17  otherwise they wouldn't have; is that
18  correct?
19    MS. HOLPP:  Object to the form,
20  broad.
21    A.   That is very broad, you're right.
22  People can get develop resistance or and --
23  or they develop resistance to antibiotics

# FOSHEE & TURNER COURT REPORTERS

173

1 working for them. For instance, a person
2 that used something for sinus infection, we
3 use antibiotics. Maybe they've been on the
4 antibiotics several times. Then no longer
5 that antibiotic may no longer work for
6 them.
7     Q.  Okay.  So, one of the side effects
8 is they may have resistance to that
9 particular antibiotic?
10     A.  To that, yes.
11     Q.  Okay.  And that's why it's so
12 important to look at the response to
13 treatment that a patient has; is that
14 correct?
15     A.  It is --
16         MS. HOLPP: Object to the form.
17     A.  It is important to look at the
18 response to treatment, correct.
19     Q.  And that's part of the standard of
20 care for medical providers who are
21 prescribing?
22         MS. HOLPP: Object to the form.
23     Q.  Is that correct?

174

1         MS. HOLPP: What is?
2     Q.  Reviewing the patient's response
3 to treatment is part of the standard of
4 care that is required for prescribing
5 medical personnel?
6         MS. HOLPP: Object to the form.
7     A.  Ask that one more time.  I'm
8 sorry.  Just ask it one more time for me.
9     Q.  Isn't it true that the standard of
10 care requires prescribing medical personnel
11 to review a patient's response to treatment
12 to antibiotics that have already been
13 prescribed?
14         MS. SEGER: Object to the form.
15         MS. HOLPP: And I'm going to
16 object and limit that she can answer what a
17 CRNP --
18         MS. PILCHER: I understand.
19         MS. HOLPP: Well, then ask it that
20 way.  It's very important.
21     Q.  Would it be a fair statement that
22 a nurse practitioner who is prescribing
23 medications should review a patient's

175

1 response to treatment of similar
2 antibiotics that may have been ordered for
3 the same condition --
4         MS. HOLPP: Object to the form.
5     Q.  -- before prescribing additional
6 antibiotics?
7         MS. HOLPP: Object to it being
8 broad and vague and ambiguous.  She's not
9 asking a specific about this.  Listen to
10 her question.
11         MS. PILCHER: Can you read the
12 question back?
13
14     (A portion of the record was read.)
15
16     A.  I did review his response.
17     Q.  That's not what I'm asking you.
18     A.  Yes.  I would review, yes.
19     Q.  But is that the standard of care
20 that a nurse practitioner should review
21 response to treatment of a patient to prior
22 medications that have been ordered?
23         MS. HOLPP: Object to the form.

176

1 You're leaving that wide open.  You know, a
2 nurse practitioner in any setting, with any
3 patient, with any length of time, with any
4 condition.  It would be a lot quicker and
5 simpler to get to the point of specifics.
6 I mean, I'm just going to object to that
7 being broad, vague, ambiguous.
8         MS. PILCHER: Okay.
9         MS. HOLPP: You can answer it as
10 best you can.
11     Q.  You do assess how a patient has
12 responded to medication and your
13 prescribing it?
14     A.  Yes.
15     Q.  Had you ever received complaints
16 from Mr. Cassady or any other inmate that
17 their medications were not available when
18 they went through the pill call line?
19     A.  I'm not aware of any complaints.
20     Q.  Did any of your patients ever
21 complain to you that they felt they had
22 received inadequate medical care?
23     A.  I can't recall anyone complaining

# FOSHEE & TURNER COURT REPORTERS

177

1  directly to me.
2      Q.   Did Mr. Cassady ever complain to
3  you that he thought he hadn't been treated
4  fairly?
5      A.   I can't recall him complaining to
6  me about that.
7      Q.   You have any recollection of
8  Mr. Cassady complaining to you that he
9  needed to see a specialist or a free world
10  doctor?
11      A.   The medical records reflect that
12  on August the 17th, he did tell me he
13  needed to see a dermatologist.
14      Q.   Did you submit his request to
15  anyone to review?
16      A.   He -- those determinations are
17  made by the physician.  He was then
18  followed up with the physician.
19      Q.   Did you talk with Dr. Lyrene
20  and/or Dr. Ifediba that Danny Cassady might
21  need to go see either an infectious disease
22  specialist and/or a dermatologist?
23      A.   I do not see it reflected in the

178

1  medical records.
2      Q.   During the time that you were
3  employed with the Bibb County Correctional
4  Facility --
5          MR. REDD:  Objection.  She wasn't
6  employed by the Bibb County Correctional
7  Facility.
8      Q.   During the time that you worked at
9  the Bibb County Correctional Facility, were
10  you aware of any on site specialty clinics
11  that were held for dermatology?
12      A.   I'm not aware of any.
13      Q.   Did you participate in any way in
14  the death review of Danny Cassady?
15      A.   No, I did not.
16      Q.   Did you review in a peer review
17  meeting or quality review meeting of any
18  sort the death of Danny Cassady?
19      A.   No, I did not.
20      Q.   Did you participate in a peer
21  review of Dr. Ifediba?
22      A.   No, I did not.
23      Q.   Do you know what a medical hold

179

1  is?
2      A.   Not the definitive definition.  I
3  have an idea, but it's not a definitive
4  definition, no.
5          MS. PILCHER:  Okay.  All right.
6  If y'all give me about ten minutes, I think
7  I'm --
8          MS. HOLPP:  Okay.  Do you want to
9  stay in here and us take a break --
10          MS. PILCHER:  It doesn't matter.
11
12      (Deposition ended at 3:25 p.m.)
13
14
15
16
17
18
19
20
21
22
23

A Legalink Company * 1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com

1-800-888-DEPO