UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

EVELYN PIERCE,                          ]
as Administratrix for the Estate        ]
of Danny Cassady, Deceased,             ]
                                        ]
        Plaintiff,                      ]
                                        ]
        vs.                             ]   CV-03-CO-02764-W
                                        ]
NAPHCARE, *et al.*,                     ]
                                        ]
        Defendants.                     ]

MEMORANDUM OF OPINION

I.      Introduction.

        The Court has for consideration motions for summary judgment filed

on January 18, 2006, by defendants Naphcare, Inc. ("Naphcare") (Doc. 222),

Dr. Lang Quang Huynh ("Dr. Huynh") (Doc. 223), Registered Nurse Robert

Nichols ("RN Nichols") (Doc. 224), Dr. Uchenna Grace Ifediba ("Dr. Ifediba")

(Doc. 225), Certified Registered Nurse Practitioner Belinda Hogue ("CRNP

Hogue") (Doc. 226), Licensed Practical Nurse Eula Smith ("LPN Smith") (Doc.

227), and Dr. George Allan Lyrene ("Dr. Lyrene") (Doc. 228).  Plaintiff

Evelyn Peirce ("Ms. Pierce") filed her original complaint (Doc. 1) in this

action on October 7, 2003, as administratrix for the estate of Danny Cassady

("Mr. Cassady"), and the Court granted her motion to amend the complaint

on February 3, 2005.  (Doc. 128.)  Plaintiff's amended complaint includes

claims against Defendants under 42 U.S.C. § 1983 ("§ 1983") for violations

of the Eighth Amendment to the United States Constitution, failure to train

and supervise, failure to fund, and unconstitutional supervisory liability, as

well as state law claims for negligence or wantonness, wrongful death, and

personal injury.  (Doc. 128.)  It appears to the Court that there are no longer

claims pending based upon negligence, wantonness, or personal injury.  The

issues raised in Defendants' motions have been fully briefed and are now

ripe for decision.[1]  Upon full consideration of the legal arguments and

evidence presented, Defendants' motions are due to be granted in all

respects.

---

[1]Both Ms. Pierce and the defendants in this case have filed motions to file excess pages for their response and reply briefs respectively.  (Docs. 248 & 264.)  Those motions are due to be granted to the extent of the material they submitted along with their respective motions.

II.     Facts.[2]

At all times relevant to this action, Danny Cassady was a convicted inmate in the custody and control of the Alabama State Department of Corrections ("ADOC").  Ms. Pierce is Mr. Cassady's sister.  At times relevant to this lawsuit, Cheryl Price served as Assistant Warden at the Bibb County Correctional Facility with primary supervisory responsibilities over security.  Eddie Nagle served as Warden of the facility with primary supervisory responsibilities over administration, including health care.  Naphcare is a corporation organized and existing in the State of Alabama, and on February 13, 2001, it entered into a contract with ADOC to provide medical services to inmates at the Bibb County facility beginning March 2001.  At all times relevant to this action, Defendants were acting under color of State law.

---

[2]The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, the parties' Joint Status Report, and the Court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Cassady was treated from 1999 through March 2001 for a skin rash and/or skin infection by healthcare providers.  This was prior to the time of Naphcare's contract with the State of Alabama to provide medical services. On or about December 9, 1999, Cassady complained of a rash.  He filed approximately 22 sick call requests from December 1999 through August 2001 for this condition and was subsequently and thoroughly assessed by healthcare providers.

Cassady was not tested and/or treated for Hepatitis C by any of his health care providers.  His physicians did not discuss with him any possibility of medicines and/or treatment for viral Hepatitis C, and his physicians did not order a special diet for him.  The agreement between the ADOC and Naphcare did not include treatment of Hepatitis C.

Between July 2000 and March 2001 Cassady was prescribed Keflex, Bactrim, and Ancef for his various medical needs.  Drs. Huynh and Ifediba prescribed Keflex, Bactrim, Ancef, Tetracycline, Clindamycin IV, Clindamycin IM, Ciproflexin, and Gentamycin IM.

On February 26, 2001, Cassady was noted to have swelling of his lower extremities.  The medical records noted Cassady to have swelling on several

occasions from February 26, 2001, through October 7, 2001.  On April 16, 2001, Cassady filed a complaint form stating, "I have the same problem.  I need to see a free world doctor or Dr. Granyer.  I need some help.  I have a big bump on my butt and two on my penis.  Also, swelling up feet, legs and places that are breaking out."  On April 17, 2001, the Director of Nursing, RN Robert Nichols reviewed his complaint and responded, "You need to access healthcare as explained on your intake to this facility."  On April 17, 2001, Cassady followed the proper procedures and filed a Sick Call Request stating, "I have two places that is swelling up, leaking and infected dark red area.  I need help today now."  Cassady was assessed by a nurse who noted his vital signs, and "redden, raised bumps noted to face, arms, legs and penis.  Redden area the size of a golf ball noted in the cress of buttocks with the center of the bump yellow in color."  On April 18, 2001, Dr. Huynh entered orders for Cassady to have a Chem 14 on April 19, 2001, triple antibiotic ointment twice per day for seven days, and to check the wounds for signs and symptoms of infection.  Dr. Huynh also entered orders on April 19 and 20, 2001, for Cassady to receive Keflex 500 mg three times

per day for ten days, to check his wounds every three days for ten days, and Ancef 1 gram twice per day for three days.

On April 24, 2001, it appears that Cassady refused Sick Call screening after requesting to be seen at Sick Call by completing a Sick Call request form on April 23, 2001, complaining of sores.  On April 28, 2001, RN Wanda Oakes scheduled Cassady an appointment with Dr. Ifediba fore April 30, 2001, on which day Dr. Ifediba diagnosed him as having Folliculitis and pedal edema.  She ordered Tetracycline 500 mg three times per day, a CBC with differential, and a urinalysis test.  Two days later, on May 2, 2001, RN Debra Conway drew blood from Cassady for his CBC and urinalysis lab tests.  On May 3, 2001, RN Conway reported Cassady's lab values to Dr. Ifediba.

On May 15, 2001, Dr. Ifediba ordered a wound culture of Cassady's skin lesion.  The results indicated methicillin-resistant staphylococcus aureus ("MRSA").  Cassady was thereafter treated with intravenous antibiotics until his IV infiltrated.  The treatment order was thereafter changed to intramuscular injections of the same antibiotic.  On May 31, 2001, Dr. Ifediba released Cassady to general population and ordered a nasal culture. The nasal culture returned negative for MRSA.

On June 4, 2001, Cassady was assessed at Sick Call following his request for an update to his bottom bunk profile.  He was noted by Nurse L. Lewis to have swelling of both feet with pitting edema to both lower legs and feet.  She noted a small bump on his right foot draining a brownish looking fluid.  On June 5, 2001, CRNP Belinda Hogue ordered Cassady a low bunk profile for ninety days and a slide (shoes) profile for ninety days.  Dr. Ifediba had already ordered a diuretic to reduce Cassady's swelling on June 4, 2001, prior to his being seen at Sick Call that same night.  On June 6, 2001, Cassady submitted a Sick Call Request stating, "I need the Lace water pills up'ed to 40 mg and I need the nurse to check my foot.  I don't want to be back in the box so help me out here."  Nurse Lewis noted, "Both feet swollen and warm to the touch with pitting 3+ edema.  Drainage noted from right foot.  Skin warm, dry to the touch."  On June 8, 2001, Nurse D. Hall noted Cassady stating, "I don't have any drainage wounds.  I just got this swelling."  She noted his "skin intact, no visible draining wounds to torso or extremities."  She assessed him as being a potential for poor skin integrity and advised him to return to the health care unit and/or Sick Call as needed.  Dr. Ifediba ordered Lasix 40 mg every day for two weeks.

On June 27, 2001, Cassady presented to the Infirmary at 8:30 p.m. complaining of "the same problem just that I'm breaking out in redden areas."  The nurse assessed him and issued a Pink Slip instructing inmate to return to healthcare unit the following morning to see the medical doctor. CRNP Belinda Hogue noted that Cassady failed to show up for his appointment on June 28, 2001.  On Friday, June 29, 2001, Cassady presented to the infirmary at 9:15 p.m. complaining of "my feet are swelled up.  I got some more places on my body.  I've had cramps for 4 days now my stomach hurts."  Nurse T. Smith telephoned Dr. Ifediba who ordered a UA dip test, Keflex 500 mg, and Lasix 40 mg.  On Monday, July 2, 2001, when Dr. Ifediba returned to the infirmary, she examined Cassady, discontinued the Keflex, ordered a wound culture, ordered Ciproflexacin 500 mg twice a day for 10 days and Gentamycin 80 mg twice a day for seven days, ordered a CBC, Chem 14 test, and daily wound dressing.  On July 5, 2001, the culture returned with results of heavy growth of methicillin resistant staphylococcus aureus and showing the bacteria as sensitive to Ciproflexacin.

On July 12, 2001, the Medical Advisory Committee ("MAC") met.  MAC consisted of various healthcare providers, including physicians from different

practices, throughout the State of Alabama who were appointed by the governor to evaluate the healthcare provided to inmates for quality, appropriateness, and continuity of care.  At the request of Warden Price, Cassady was brought before the MAC to review his complaints and condition. Dr. George Lyrene, Corporate Medical Director for Naphcare, was present at the meeting.  No physician physically examined Cassady, but his case was presented to the Committee for review.  CRNP Hogue noted in her order for Cassady on July 12, 2001, "Discussed with Dr. Lyrene on rounds:  1. Venous Doppler Studies in lower extremities; 2. PTT, PT, INR; also, Hydrocortisone Crème 170 twice a day for 14 days."  Dr. Lyrene did not order Cassady to be seen by a provider outside the system.

On July 15, 2001, Cassady was transferred to the St. Clair Correctional Facility and placed in investigative segregation.  On his Transfer Reception Screening form, Nurse C. Ray noted in the Subjective part of her screening that his current complaints were Cellulitis and Thrombocytopenia.  Nurse Ray noted in the Plan portion of her screening that routine sick call instructions were given, as well as a physician referral.  She circled "Urgent" for Medication Evaluation and Chronic Care Clinics.  On July 17,

2001, Cassady underwent the Peripheral Venous Ultrasound and Abdominal Ultrasound.   Also on July 17, 2001, physician's assistant ("PA") Otwell examined Cassady.  PA Otwell ordered: (1) CBC Differential, Chem 20 Panel, Hepatitis Profile; (2) Lasix 40 mg; (3) KCL 20 mg; (4) Medical Hold for 180 days; and (5) PT, PTT, INR.  He also ordered: (1) Atarax 25 mg; (2) Shower profile every day; (3) Triple Antibiotic Ointment ("TAO"); and (4) Bandage changes to left thigh wound for five days.  The peripheral venous ultrasound results showed no sign of deep vein thrombus and were signed as read by Dr. Hammack on July 20, 2001.  The Abdominal Ultrasound results were signed as read by Dr. Hammack on July 20, 2001.  Cassady was not placed in Chronic Care Clinics.

On July 30, 2001, Dr. Hammack ordered that Cassady's name be placed on Dr. Lyrene's list to see Cassady on Lyrene's next visit to the St. Clair County Correctional Facility.  On July 31, 2001, PA Otwell prescribed Cassady with Atarax 50mg, Maxzide 75/50, and AI cream.  On August 1, 2001, Cassady was transferred back to the Bibb County Correctional Facility and placed in segregation housing.  He was not seen by Dr. Lyrene, or any physician off-site, from August 1, 2001, until the time of his death.  Dr.

Lyrene submitted his resignation to Naphcare during the month of August 2001 and did not visit facilities during September 2001.

On August 7, 2001, CRNP Hogue examined Cassady and noted that Cassady said he needed to see a dermatologist.  CRNP Hogue discontinued the Maxzide and ordered Atarax 25 mg and a Chem 14 panel for August 10, 2001.  She had ordered Cipro 500 mg for fourteen days on the previous day. No consult for a dermatologist was ordered.  On August 21, 2001, Dr. Ifediba continued the Cipro 500 mg for five additional days by a voice order.  On August 28, 2001, CRNP Hogue ordered an appointment for Cassady with Dr. Ifediba for August 29, 2001.

On August 29, 2001, Dr. Ifediba examined Cassady, and she noted a rash on his left foot, itching all over, pitting edema to his lower extremities, two circular erythematous macules on the dorsum of his left foot, and a few erythematous macules on his arms.  She assessed him as follows, "(1.) Pedal edema – may be related to liver disease.  Doppler studies of lower legs in July 2001 was normal.  (2.)  Liver disease – Ultrasound of Abdomen was within normal limits.  Has increase in liver enzymes, hepatitis C.  (3.) UTI –

ordered Bactrim by mouth twice a day.  (4.)  Tinea infection – antifungal cream."

In September 2001, Warden Price recalls receiving a telephone call from a person purporting to be Cassady's sister who wanted to get him to an outside doctor.  Price does not recall any discussions that the family agreed to bear the costs of such treatment.  Plaintiff contends she offered to pay for the outside medical care.  She also states that she contacted her State Representative seeking assistance for her brother.  Price did not have the authority to send Cassady or any other inmate to an outside physician.

On Thursday, October 4, 2001, Cassady presented to the infirmary at 5:45 p.m., complaining of discomfort to his right foot after his cellmate jumped off his upper bunk that morning and landed on Cassady's right foot. Nurse Lewis noted an oral temperature of 100.8; right lower leg as reddened, swollen, slightly warm to touch, with limited range of motion, and without drainage from lesions.  She notified Dr. Ifediba by telephone and received orders to admit Cassady to the infirmary.  Dr. Ifediba also ordered 3 doses of Ancef 1gm injections, Motrin 800 mg, Keflex 500 mg for 10 days following the 3 Ancef injections, to schedule x-rays for Monday,

October 8, 2001, and a twenty-three-hour observation of Cassady within the infirmary.  On Friday, October 5, 2001, Dr. Ifediba examined Cassady and noted a temperature of 99.0, no skin breakdown, edema to dorsum of right foot and not warm to touch, and full range of motion of all joints.  She assessed him as having "Cellulitis/Sprain right foot."  She noted the order for x-rays of right foot and his medications previously ordered being Keflex, Lasix, Aldactone and Motrin.  She further ordered a shower shoe profile for sixty days, bottom bunk profile for sixty days, no prolonged standing profile over fifteen minutes for two weeks, and discharged Cassady to population.

On October 7, 2001, at 4:30 a.m., Cassady's body was brought into the infirmary and subsequently pronounced dead.  The Alabama Department of Forensic Sciences ("ADFS") performed only an external examination and obtained cultures from Cassady.   Cassady's family requested a gross examination, which included a microscopic description from the University of South Alabama Medical Center ("USA").  The USA Autopsy's Summary and Interpretation findings included:

> Extensive blood clots in both lungs, heart enlargement, cirrhosis, cellulitis and gangrenous necrosis of the right lower extremity, and blood clots in the veins of the right lower extremity.  Blood

> cultures obtained shortly after death and subsequently analyzed at USA's Medical Center Pathology Department at the time of the autopsy grew pseudomonas aeruginosa, a bacteria which commonly causes fatal infection. These findings are consistent with death due to overwhelming sepsis associated with gangrene and infection of the right leg, and pulmonary emboli arising from blood clots in the right lower extremity veins.

The ADFS Report of External Examination noted "Cause of Death: Pseudomonas aeruginosa septicemia due to gangrenous cellulitis, right lower extremity. Contributory Cause of Death: Nutritional cirrhosis and hepatitis C and A. Manner of Death: Natural."

III.   Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting

evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id*. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

IV.    Discussion.

    A.    Wrongful Death Under the AMLA.

Plaintiff's wrongful death claims are governed by the Alabama Medical Liability Act ("AMLA").  *See* Ala. Code  § 6-5-480, *et seq.*, and § 6-5-540, *et seq.*  Under the AMLA, a plaintiff must prove, by substantial evidence, "that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers" in the same area of practice.  *Id.*; *see also Complete Family Care v. Sprinkle*, 638 So. 2d 774, 777 (Ala. 1994) (holding that "[d]octors have the legal duty to exercise the degree of care, diligence, and skill that reasonably competent physicians in the national medical community would ordinarily exercise when acting in the same or similar circumstances.") (citing Ala. Code § 6-5-484; *Bradford v. McGee*, 534 So. 2d 1076 (Ala. 1988)).  To find liability in a medical malpractice case in Alabama, "there must be more than a mere possibility or one possibility among others that the negligence complained of caused the injury.  There must be evidence that the negligence *probably* caused the injury."  *McAfee v. Baptist Medical Center*, 641 So. 2d 265, 267 (Ala. 1994) (quoting *Baker v. Chastain*, 389 So. 2d 932, 934 (Ala. 1980)) (internal

citations omitted).  Under this heightened burden of proof, Ms. Pierce must demonstrate: (1) the appropriate standard of care; (2) that the defendant health care providers deviated from the appropriate standard of care in treating Mr. Cassady; and (3) a proximate causal connection between the providers' care and Mr. Cassady's death.  *See Hauseman v. University of Alabama Health Services Foundation*, 793 So. 2d 730, 734 (Ala. 2000) (quoting *Looney v. Davis*, 721 So. 2d 152, 157 (Ala. 1998)).

Defendants contend that each has made a *prima facie* showing that he or she exercised "such reasonable care, diligence, and skill as . . . health care providers in the same community, and in the same general line of practice, ordinarily have and exercise in a like case." (*See, e.g.*, Doc. 223, p. 6. (quoting Ala. Code § 6-5-484(a)).  They cite to the case of *Williams v. Spring Hill Memorial Hosp.*, 646 So. 2d 1373 (Ala. 1994), for the proposition that Plaintiff is first required to prove each element of her case through expert testimony.  *Id.* at 1375.  Exceptions to this rule include where an understanding of the alleged lack of care requires only common knowledge or where the plaintiff employs a generally recognized standard or authoritative medical text or treatise to prove what is or is not proper

practice.  *See, e.g., McAfee*, 641 So. 2d at 267; *Sprinkle*, 638 So. 2d at 777; *McMickens v. Callahan*, 533 So. 2d 579 (Ala. 1988).   Defendants do not believe that Plaintiff can establish the alleged negligence through expert medical testimony by showing what is or is not the standard practice, treatment, or procedure.  *See, e.g., Sprinkle*, 638 So. 2d at 777; *see also Dansby v. Hagood*, 719 So. 2d 839, 842 (Ala. 1998) (stating that a plaintiff in a medical malpractice case must utilize medical expert testimony to establish causation).   Additionally, Defendants aver that Plaintiff cannot prove each element of her case by substantial evidence as required by the AMLA.  Ala. Code §§ 6-5-548, 6-5-549.  Finally, Defendants point out that Plaintiff is not able to establish through substantial evidence that their alleged negligence probably, not possibly, caused Cassady's death.  *Id*. at § 6-5-549; *see also Dansby*, 719 So. 2d at 842; *McAfee*, 641 So. 2d at 267; *University of Alabama Health Services Foundation v. Bush*, 638 So. 2d 794, 802 (Ala. 1994).

1.    Similarly Situated Experts and the *Medlin* Framework.

In order to establish each element of her case through expert testimony, Ms. Pierce must prove that her expert witnesses are "similarly situated" to the defendants in this case.  The Alabama Supreme Court has established a three-prong test to be applied by trial courts before deciding whether a proffered expert witness is a "similarly situated health care provider" under Alabama Code § 6-5-548.  *Medlin v. Crosby*, 583 So. 2d 1290 (Ala. 1991).  Under *Medlin*, a court must consider three questions:

> (1) What is the standard of care alleged to have been breached?
> (2) Is the defendant 'health care provider' a specialist in the discipline or school of practice of the standard of care that the court has previously determined to have been breached? (3) Does the proffered expert witness qualify as a "similarly situated health care provider" under the subsection determined in the second step to apply[?]

*Id.* at 1293; *accord Husby v. South Alabama Nursing Home, Inc.*, 712 So. 2d 750, 753 (Ala. 1998); *Dempsey v. Phelps*, 700 So. 2d 1340, 1344 (Ala. 1997).

a.    Standard of Care.

*Medlin* requires the Court to first determine the standard of care that was allegedly breached.  583 So. 2d at 1293.  Plaintiff contends that Defendants' argument presumes that the standard of care for this case is

equivalent to what a patient would expect in what is referred to as the "free-world" setting.  (Doc. 242, p. 3.)  She states that "[a] whole body of correctional medical standards has arisen," and that the standard of care must take into account the unique environment of a state correctional facility.  *Id.*  As support for her contention, Ms. Pierce cites to case law which she believes establishes a tailor-made standard of care for nursing homes and long-term care facilities.  *See, e.g., Bradley v. Mariner Health, Inc., et al.,* 315 F. Supp. 2d 1190, 1195 (S.D. Ala. 2004) (finding that the standard of care that was allegedly breached was "'hands-on' nursing care and treatment . . . in a nursing home setting"); *cf. Husby*, 712 So. 2d at 753 (establishing the standard of care in a case involving nurses who worked in a nursing home as "that governing a nurse administering direct care").  Plaintiff contends that a prison medical facility is even more unique than a nursing home and that her expert, Dr. Robert B. Greifinger, is an expert in that "body of authority."  (Doc. 242, p. 4.)  She opines that "[c]orrectional facilities are restrictive and coercive environments which impose nearly total control over [their] residents[']s activities and lives."  *Id.*  Ms. Pierce goes on to say that "[c]orrectional healthcare is unique among health care

systems with special policies, procedures and systems designed to provide

access to appropriate healthcare to inmates.  As a result, national standards

have been promulgated as the minimum standard of care in a correctional

healthcare setting."[3]  *Id*.  Plaintiff states that "[c]orrectional health care is

unique" due to the fact that inmates cannot self-medicate and/or treat

themselves.  *Id*.  Therefore, "prison healthcare is utilized to treat a wide

variety of medical problems, including complaints that would not require

medical care in a 'free-world' environment."  *Id*. at 5-6.  Premised upon this

information, Dr. Greifinger, believes that the appropriate standard of care

for this case is:

> that one owed by a medical provider in a correctional facility
> during the periods from March 2001 to October 2001 to provide
> the appropriate standard of care, to provide access to treatment
> and ordered care, and to provide appropriate diagnosis, to
> appropriately respond to symptoms and complaints, and to
> appropriately provide treatment and follow up, all with
> appropriate medical judgment to inmates with infectious
> diseases.

*Id*. at 7.

---

[3]According to Ms. Pierce, the National Commission on Correctional Health Care
("NCCHC") publishes written standards for the prison health care system.  *Id*. at 5.  She
offers that the NCCHC's standards are considered the minimum standards of care for a
correctional health care setting in 2001.  *Id*.

Plaintiff's argument that the appropriate standard of care in this case is unique to a prison setting is not supported by Alabama case law.  In a case factually similar to the one at hand, the Alabama Court of Civil Appeals held that the standard of care for the purposes of meeting the first prong of the *Medlin* analysis was "that of a doctor practicing internal medicine in diagnosing a patient with infections of the brain."  *King v. Correctional Medical Services, Inc.,* 919 So. 2d 1186, 1193 (Ala. Civ. App. 2005).  In *King*, the sister of a deceased inmate brought the action against the state department of corrections, the commissioner of the department of corrections, and the department's medical provider for negligence and violation of an inmate's constitutional rights arising out of the inmate's death resulting from a brain infection.  *Id.*  The Court declined to narrow the scope of the standard to limit it to "correctional" medicine as proposed by Ms. Pierce.  Therefore, the Court finds that the appropriate standard of care for this case is that of a doctor, RN, CRNP, or LPN practicing internal medicine in diagnosing and treating a patient with a MRSA skin infection and later a pseudomonas aeruginosa infection.

b.   Are Defendants Specialists?

The second prong of the *Medlin* analysis requires the Court to inquire into whether any of the defendant health care providers qualifies as a specialist in the discipline, or school of practice, of the standard of care that the Court set out above.  583 So. 2d at 1293.  In order to qualify as a specialist under § 6-5-548(c), a health care provider must meet the following criteria: (1) board certification as a specialist in the area in question; (2) training and experience in that specialty; *and* (3) holding himself out as a specialist.[4] § 6-5-548(c) (emphasis added); *see also Ronderos v. Rowell*, 868 So. 2d 422, 426 (Ala. 2003) (holding that the doctor met "*all* of the criteria for a 'specialist' listed in § 6-5-548(c)") (emphasis added); *Waddail*,  827 So. 2d at 793 (noting that the post-1996 amendment version of the statute requires that all three requirements be met in order for a doctor to qualify

---

[4]Defendants misquote the statute as including "or" where it actually employs "and." (*See, e.g.,* Docs. 266, pp. 5-6.)  Prior to the 1996 amendment to § 6-5-548(c), the statute included "or," but the Alabama legislature later changed it to "and" to require that all three criteria be met.  *Ex parte Waddail*, 827 So. 2d 789, 793 (Ala. 2001).  This is not an insignificant oversight, as the use of "and" requires Defendants to meet all three criteria, but in their briefs the three doctors merely stated that they are board certified and, therefore, qualify as specialists under the statute.

as a specialist); *cf. Medlin*, 583 So. 2d at 1292-93 (quoting the former version of the statute which employed "or" instead of "and").

Drs. Ifediba and Lyrene are both board certified by the American Board of Internal Medicine, and Dr. Huynh is certified by the American Board of Family Practice.  (Docs. 228, p. 20; 266, p. 6.)  However, this alone does not qualify them as specialists.[5]  The doctors allege in their briefs that they qualify as specialists under § 6-5-548(c), but they do not explicitly establish all three elements required by the statute to show that they are specialists.  (*See, e.g.,* Doc. 223, p. 7.)  As discussed in the following section, Drs. Huynh and Ifediba have shown that they are trained and experienced in family practice and internal medicine respectively.  However, the evidence shows that Drs. Ifediba, Lyrene, and Huynh practiced medicine at the prison at the time of the alleged negligent acts - it does not show that they held

---

[5]Plaintiff cites to the case of *Ex parte Waddail*, 827 So. 2d 789, for the proposition that a defendant physician who is board certified in one area of medicine but the alleged breach occurred in another area is not a specialist under § 6-5-548(c).  (Doc. 242, p. 17.) In *Waddail*, the doctor was board certified in family medicine and the alleged breach occurred in an emergency room setting.  *Id.* at 793.  Therefore, Plaintiff argues that since the defendant doctors were not certified in the correctional healthcare setting they are not specialists under the statute.  However, as Defendants observed in their reply brief, there does not appear to be an American Board of Prison Medicine, or any equivalent certifying body.  (Doc. 266, p. 6.)  The board certifications of Drs. Huynh, Ifediba, and Lyrene are sufficient to meet the first prong of the test under § 6-5-548.

themselves out as specialists in the areas of internal medicine and family practice.  In *Medlin*, the Court explained that to hold themselves out as specialists the defendant doctors must have "taken affirmative steps to present [themselves] to the public as a specialist." 583 So. 2d at 1295.  The defendant doctors did not provide sufficient evidence that they satisfied all three requirements of § 6-5-548(c) to qualify as specialists in their respective fields.  Therefore, the Court cannot find that Drs. Ifediba, Lyrene, and Huynh are specialists under the statute.

RN Nichols, CRNP Hogue, and LPN Smith do not attempt to hold themselves out as specialists such that they would come under § 6-5-548(c). (Docs. 224, p. 7; 226, p. 17; 227, p. 11.)

c.    "Similarly Situated" Experts.

The final step in the *Medlin* framework is to determine whether Plaintiff's experts are "similarly situated health care providers." 583 So. 2d at 1293.  Dr. Huynh became board certified by the American Board of Family Practice in 1996 and was serving as the Onsite Medical Director at the Bibb County Correctional Facility from March 1, 2001, until April 22, 2001.  (Doc. 223, Exhibit D, p. 14.)  At the time of the alleged negligent acts, Dr. Ifediba

was board certified by the American Board of Internal Medicine, and she began working as the Onsite Medical Director for the facility in April 2001. (Doc. 225, Exhibit E, p. 10.)  Dr. Lyrene is board certified by the American Board of Internal Medicine, and in June 2000, he was working for Naphcare as their Corporate Medical Director.  (Doc. 228, Exhibit E, p. 10.)  RN Nichols was Director of Nursing for the facility when Naphcare took over management on March 1, 2001.  (Doc. 224, Exhibit A, pp. 22-23.)  Nichols was a LPN in 1986 prior to becoming a RN in 1988.  *Id*. at 13.  CRNP Hogue has been a licensed RN since 1982, when she obtained her Bachelors of Science degree in nursing.  (Doc. 226, Exhibit E, p. 12.)  She received her certification as a licensed nurse practitioner in June 2000 and began working at the Bibb County facility the week of May 14, 2001.  *Id*.  LPN Smith has been a licensed nurse practitioner in the State of Alabama since 1989, and she began working for Naphcare at the facility on March 1, 2001.  (Doc. 227, Exhibit B, p. 8.)

The AMLA specifically enumerates what is required in order for an expert witness to be "similarly situated" such that his or her testimony can be used to establish a case of medical negligence.  *See* Ala. Code §§ 6-5-

548(b) & (c); *see also Husby*, 712 So. 2d at 751-52 (finding that the nursing

home administrator and anaesthesiologist offered by the plaintiff as experts

were not "qualified to testify about the standard of care allegedly

breached" because neither of them "was a nurse qualified to give testimony

regarding the standard of care of 'hands on' health care providers in a long-

term care facility.").  If the defendant is found to be a specialist in the

second part of the *Medlin* analysis, the Court applies a different, more

stringent, set of criteria to determine whether the plaintiff's expert is

"similarly situated" than if the defendant health care provider is not a

specialist in the discipline of the standard of care that was allegedly

breached.  Because the Court finds that none of the defendants in this case

qualify as specialists under subpart (c), the Court must look to § 6-5-548(b)

to determine whether Plaintiff's experts are "similarly situated."[6]   Dr.

_____

[6]Defendants argue that § 6-5-548(b) does not apply to Drs. Huynh, Ifediba, and Lyrene because they are certified by an appropriate board as being specialists. Defendants have again failed to appropriately interpret the statute.  The statute clearly states that it applies to health care providers who are: (1) not certified by an appropriate American board as being a specialist; (2) not trained and experienced in a medical specialty; *or* (3) does not hold himself out as a specialist.  Ala. Code § 6-5-548(b).  There is no evidence that the defendant doctors hold themselves out as specialists.  For the same reason that they do not qualify as specialists under § 6-5-548(c), they qualify as non-specialists under § 6-5-548(b).

Greifinger and McCullars are "similarly situated" if they meet each of the following qualifications:

(1) Is licensed by the appropriate regulatory board or agency of this or some other state.
(2) Is trained and experienced in the same discipline or school of practice.
(3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred.

Ala. Code § 6-5-548(b).

For the reasons set forth below, Plaintiff's experts cannot meet the requirements set forth in § 6-5-548(b) such that they would be considered "similarly situated" to the defendant health care providers.  Plaintiff is correct in asserting that the first requirement is met because both of the experts are licensed to practice medicine.  Dr. Greifinger has been a physician since 1971, is licensed in both New York and Pennsylvania, and is board certified in pediatrics.  Dr. McCullars is licensed to practice medicine in the state of Alabama and is board certified by the American Board of Pathology in Clinical Pathology.

Drs. Greifinger and McCullars must also be "trained and experienced in the same discipline or school of practice" as the defendants.  Ala. Code

§ 6-5-548(b).   For example, this requires that Plaintiff's experts have training and experience in the areas of internal medicine and family practice within the context of correctional medicine, as well as working experience and training as a RN, CRNP, and LPN.[7]  According to Plaintiff, Greifinger has been engaged in the practice of correctional healthcare for eighteen years and has been on the "cutting edge" of correctional healthcare through judicial monitoring and consultations with the Center for Disease Control and Prevention and the National Institute of Health with regard to correctional standards and guidelines.  (Doc. 242, p. 9.)  In fact, Greifinger has specifically consulted with the CDC with respect to the diagnoses and treatment of Hepatitis, MRSA, and HIV.  *Id.*  From 1987 to 1989, he managed the medical care at Riker's Island, New York City's jail.  From 1989 until 1995, he was the Chief Medical Officer for the New York State Department of Correctional Services, directing a staff of 1,100 and a budget of $140

---

[7]While the Court declines to restrict the standard of care to those who practice "correctional medicine," it is necessary to consider the setting in which the defendants practice medicine in order to determine whether Plaintiff's proposed expert witnesses are trained and experienced in the same discipline or school of practice.   When determining the appropriate standard of care which the defendants allegedly breached, the Court must consider the treatment that was provided to Mr. Cassady.   When determining whether the expert witnesses are similarly situated, the Court must instead look to the area of medicine and setting in which the defendants practice.

million.  From 1995 until the present, Greifinger has consulted in the design, management, and quality improvement programs for correctional healthcare systems.  As part of this work, he has served as court-appointed monitor for the medical care in jails in Philadelphia, Pennsylvania; Fulton County, Georgia; and DeKalb County, Georgia.  He is currently the federal court monitor for the jail in Albuquerque, New Mexico.  However, there is no evidence that he is experienced, or has training, in the same disciplines, or schools of practice, as the defendants in this case.  No evidence has been presented which shows that Dr. Greifinger has either training or experience as a practicing internist or family practitioner.

Furthermore, there is no evidence that Dr. Greifinger has experience or training as a RN, CRNP, or LPN.  By his own admission, Dr. Greifinger cannot meet the requirements of § 6-6-548(b) as it pertains to defendants Nichols, Hogue, and Smith.  He affirmed during his deposition that he has never been a registered nurse.  (*See* Doc. 224, Exhibit D, p. 80.)  He has never practiced hands-on nursing care in any state, and he has not practiced nursing or worked in a nursing environment in a clinical setting as either a RN or CRNP.  *Id.*  While he has amassed an impressive curriculum vitae as it

relates to the administration aspect of correctional medicine, it does not show that he is trained as a practicing physician in either internal medicine or family practice, or as a RN, CRNP, or LPN in the correctional healthcare setting.

Plaintiff provides that Dr. McCullars has engaged in correctional healthcare through the Mobile County Jail and is actively engaged in a general practice in Mobile, Alabama.  (Doc. 242, p. 9.)  Additionally, Plaintiff states that McCullars is engaged in a "family practice" similar to the type of medicine practiced by Dr. Ifediba at the Bibb County Correctional Facility.  However, Dr. McCullars' practice does not involve the care of inmates in the correctional setting.  He testified at his deposition that he has seen inmates in his office on a "fee for service" basis, but he has never treated inmates inside a prison.  (Doc. 223, Exhibit G, pp. 81-83.) Like Dr. Greifinger, it is undisputed that McCullars is a medical doctor who has never practiced or been trained as a nurse, whether registered, licensed, or practical.  (Doc. 224, Exhibit E.)

Even if Plaintiff's experts were able to satisfy the second prong of the test, they cannot meet the third prong, which requires that they practiced

in the same discipline, or school of practice, as Defendants during the year preceding the alleged negligent acts. § 6-5-584(b)(3). Although Plaintiff's experts are licensed physicians, there is no evidence that either of them provided hands-on medical care to patients as an internist from October 7, 2000, through October 7, 2001, and there is no evidence that Dr. Greifinger provided hands-on medical care to patients as a General Practitioner from March 1, 2000, through April 24, 2001. As stated above, Plaintiff points to Dr. Greifinger's participation in the development of guidelines for correctional healthcare with the National Institute of Health and the CDC as evidence that he has practiced in the field of correctional healthcare for the past eighteen years. She also notes that Dr. Greifinger has "actively engaged in correctional healthcare standards of care serving as a Court Monitor, consultant and has co-authored text books on correctional healthcare." (Doc. 242, p. 10.) Plaintiff states that Dr. McCullars, *"although not an expert on correctional healthcare*, has had 'hands-on experience' within the last year in a general practice and has specifically treated bacterial skin infections, including MRSA." *Id*. (emphasis added). McCullars avers that his medical training with respect to bacterial skin

infections requires "no special training or certifications in internal medicine, or any other medical specialty, with regard to the diagnosis, treatment, response to treatment and follow-up care and/or speciality consults required by a medical provider." *Id*. at 10-11.

Plaintiff attempts to sidestep the requirement that her experts must have practiced in the same discipline as the individual defendants during the year preceding the alleged negligent acts by saying that the requirement is satisfied when the proffered experts are so highly qualified and possess such requisite post-graduate degrees in the applicable field that it can be shown that her witnesses have "made it their business to determine what was on the 'cutting edge' of the profession by continual studies of the modern trends . . . ." *See Dowdy v. Lewis*, 612 So. 2d 1149, 1151 (Ala. 1993).  In *Dowdy*, the proffered experts devoted their time to the teaching of nursing, possessed post-graduate degrees in nursing, and "made it their business" to follow the trends developing in the field.  *Id*. at 1151-52.  One of the experts was the associate dean and director of graduate studies at the University of South Alabama, the seventh largest nursing school in the country, while the other worked as a teacher and was supervising nursing

students as they actually performed nursing care on patients.  *Id*. at 1152.

Plaintiff also cites to the case of *Healthtrust, Inc. v. Cantrell*, 689 So. 2d

822 (Ala. 1997), in which an expert was allowed to testify despite the fact

that she had not practiced in the area for the year preceding the alleged

negligent acts "because of her training, experience, and practice as the

director of medical services" at a regional medical center during the

relevant twelve month period.  *Id*. at 827.  The expert in *Cantrell* also held

several offices within the organization that set the very standards in

question concerning operating room procedure and training.  *Id*.  Plaintiff

argues that like the experts in *Dowdy* and *Cantrell*, Dr. Greifinger was on

the "cutting edge" of the requisite standards for correctional medicine.[8]

(Doc. 242, p. 13.)

There is simply no evidence that Dr. Greifinger was providing hands-on

patient care as a physician for the year preceding the alleged malpractice

from March 2000 through April 2001 or from October 2000 through October

---

[8]Plaintiff also directs the Court's attention to the case of *Jackson v. Fauver*, 334 F. Supp. 2d 697, 740 (D. N.J. 2004), in which the district court relied upon Dr. Greifinger's report to reach its decision.  However, the state law claims in *Jackson* do not appear to require the same stringent criteria required by a medical malpractice claim brought under the AMLA.

2001.  In fact, according to his testimony, Dr. Greifinger has not provided

any hands-on patient care since 1985.   (Doc. 224, Exhibit D, p. 195.)

Defendants direct the Court's attention to the Alabama Court of Civil

Appeals' decision in *King*, 919 So. 2d 1186, where Dr. Greifinger was not

found to be qualified to testify as an expert in the field of internal medicine

against prison internists in a case involving claims of medical malpractice

and deliberate indifference to a prisoner's serious medical needs against a

private company providing correctional health care to inmates in Alabama.

*Id*.  In distinguishing Dr. Greifinger from the expert nurses in *Dowdy*, which

were allowed to testify even though they had not practiced hands-on

medicine for the year prior to the alleged acts of negligence, the Court of

Civil Appeals stated that:

> [N]one of the testimony in Dr. Greifinger's deposition indicates
> that he is, by virtue of his past experience with the New York
> State Department of Correctional Services or by virtue of his
> recent experience as a federally appointed monitor, highly
> qualified in the field of internal medicine or that he has made
> it [his] business to determine what was on the cutting edge of
> the profession by continual study of the modern trends in
> internal medicine or correctional medicine.   Nor did Dr.
> Greifinger testify concerning any professional standards
> articulated by professional associations or accrediting
> commissions regarding the standard of care applicable to the

practice of internal medicine in a correctional setting as the
witness in [another case] did.

*Id.* at 1195-96 (internal quotations and citations omitted).  The Court went

on to note that much of Dr. Greifinger's correctional experience was in the

area of developing programs to address inmate health concerns, such as the

treatment of HIV and tuberculosis-infected inmates.  *Id.* at 1196.

Plaintiff believes that Defendants' attempt to strike Dr. McCullars'

testimony fails for a different reason: the acts of the defendants would have

been so obvious that any physician, whether trained in internal medicine or

otherwise, should have recognized them.  (Doc. 242, p. 16.)  McCullars

testified that Cassady had a skin condition, MRSA, which was a recognizable

condition that was diagnosable and treatable by "all branches of medical

practice."  *Id.*  He stated that he did not believe that the condition was

specific to internal medicine or that it required knowledge by a physician

trained in internal medicine.  *Id.* at 16-17.  Plaintiff is correct in asserting

that the Alabama Supreme Court has recognized that expert testimony is

unnecessary in cases where "want of skill or lack of care is so apparent . . .

as to be understood by a layman, and requires only common knowledge and

experience to understand it . . . ." *Ex parte HealthSouth Corp.*, 851 So. 2d 33, 38 (Ala. 2002) (internal quotations and citations omitted).  However, the Court also provided examples of the type of case that may fall within this exception: (1) where a foreign object, such as a sponge, is left in a body after surgery; (2) where the injury is unrelated to the condition for which the plaintiff sought treatment; (3) where the plaintiff relies on an authoritative medical treatise to prove what is or is not proper; and (4) where the plaintiff himself or herself is a medical expert.  *Id*.  The current case does not resemble any of the *HealthSouth* Court's examples, and the alleged lack of care in this case is not so apparent as to be understood by simple common knowledge.

As to defendants Nichols, Hogue, and Smith, Plaintiff cannot show that either Greifinger or McCullars practiced as a RN, CRNP, or LPN during the relevant twelve month period.  Similarly, Dr. Greifinger is not "similarly situated" to the defendant doctors because he does not have training and experience in the same school or discipline as the defendant doctors and he has not provided hands-on patient care for over twenty years, either in a correctional setting or some other environment.  The Court also finds that

Dr. McCullars is not similarly situated to the defendant doctors because he was not practicing hands-on medical care as an internist or general practitioner in the correctional setting for the year preceding the alleged negligent acts.  Without similarly situated experts under § 6-5-548 and the *Medlin* framework, Ms. Pierce cannot meet her burden of proving through substantial evidence that the defendants breached the standard of care. However, as discussed in the following section, even if Dr. McCullars is similarly situated to the defendant doctors due to his experience as a general practitioner for the year preceding the alleged negligent acts, his testimony does not establish the requisite causal connection between the alleged breaches of the standard of care and Cassady's eventual death.  *See Hauseman*, 793 So. 2d at 734.

      2.    Causal Connection.

Even if the Court was of the opinion that Dr. McCullars is "similarly situated" to the defendant doctors, Plaintiff has not shown that there is "more than a mere possibility or one possibility among others that the negligence complained of caused the injury."  *McAfee*, 641 So. 2d at 267. Ms. Pierce has not shown that there is "evidence that the negligence

*probably* caused [Cassady's death]." *Id.* (emphasis in original).  In addition to demonstrating the appropriate standard of care, as discussed in the previous section regarding similarly situated experts, Plaintiff must show: (1) that the defendant health care providers deviated from the appropriate standard of care in treating Cassady and (2) a proximate causal connection between the providers' care and Cassady's death.  *See Hauseman*, 793 So. 2d at 734.

Plaintiff asserts that the defendant doctors violated the standard of care in correctional medicine care by failing and/or refusing to provide Cassady access to ordered care, specialized care, and appropriate medical judgment.  She believes that the actions of the defendants fell below the minimum standard of care, and she relies on Dr. McCullars' affidavit in which he states that Drs. Huynh and Ifediba's failure "to recognize and/or review Cassady's response to treatment, alter treatment protocols, and/or refer Cassady for specialized treatment was below the standard of care required of physicians."  (Doc. 239, Exhibit 5, p. 3.)

Plaintiff argues at some length in her brief that Dr. Huynh failed to review Cassady's course of treatment and failed to obtain necessary wound

cultures and alter the treatment protocols accordingly.  (Doc. 242, pp.18-20.)  According to Plaintiff, Huynh was aware of the fact that Cassady's wounds were exhibiting signs of resistance to antibiotic treatments, but she claims that Huynh continued to prescribe Keflex for treatment of his skin infection and failed to obtain wound cultures, which she believes evidences a departure from the standard of care.  *Id*. at 19-20.  From October 2000 though April 2001, Plaintiff states that Cassady presented with draining, or open wounds, that could have been cultured.  She also presents evidence that Cassady failed to respond to the treatment and medications prescribed by Dr. Huynh and that he exhibited signs of resistance to Keflex, Bactrim, and Ancef.  *Id*. at 20.  According to Ms. Pierce, Dr. Huynh failed to obtain wound cultures to determine bacterial sensitivities, even though he believed the infection to be a drug resistant bacteria, such as MRSA.  *Id*. at 21.  Plaintiff also believes that Dr. Huynh's failure to implement Chronic Care Clinics at the Bibb County facility provides further evidence that his care fell below the appropriate standard.  *Id*. at 23.

According to Ms. Pierce, Dr. Ifediba's care was well below the appropriate standard for many of the same reasons as Dr. Huynh's.  For

example, she alleges that Dr. Ifediba failed to obtain wound cultures or bacterial sensitivities despite evidence of the failure of Cassady's treatment regimen.  (Doc. 243, pp. 18-20.)  Plaintiff provides that Dr. Ifediba failed to order additional antibiotic treatments for Cassady which were consistent with the lab sensitivity results received in May 2001.  *Id.* at 20.  Throughout June 2001, Plaintiff opines that Cassady continued to present with draining wounds which were not cultured or appropriately diagnosed.  *Id.*  Ms. Pierce also argues that Dr. Ifediba, like Dr. Huynh, failed to provide Cassady with Chronic Care Clinics and specialized treatment plans.  *Id.* at 22.  According to Plaintiff, Ifediba's denial of specialized care violated Naphcare's policies and procedures, as well as the standard of care in a correctional facility. *Id.* at 23.

The Medical Advisory Committee asked Dr. Lyrene to consult with Dr. Ifediba regarding Cassady's medical treatment on July 12, 2001.  During the meeting, Lyrene was advised of Cassady's medical condition, but he never examined Cassady or provided a consultation with regard to Cassady's medical condition or treatment.  Plaintiff contends that Dr. Lyrene's failure

to address Cassady's medical needs fell below the standard of care.  (Doc.
244, pp. 19-20.)

Even if Plaintiff is able to show that the treatment provided by the
three defendant doctors fell below the standard of care, she has not met
her burden of establishing a causal connection between the alleged
breaches and Cassady's death.  For example, Dr. McCullars stated during his
deposition that he would not testify at trial that Dr. Huynh did something
wrong prior to his leaving Bibb County Correctional Facility in April 2001 that
was a direct cause of Cassady's death.  (Doc. 223, Exhibit G, p. 115.)  He
also stated that he was not of the opinion that Dr. Lyrene failed to do
something that was a direct cause of Cassady's death.  *Id*. at 117.

When discussing Dr. Ifediba, Dr. McCullars testified that her
prescription of Cipro for treatment of Cassady's MRSA infection fell below
the standard of care.  (Doc. 223, Exhibit G, p. 115.)  McCullars does not
believe that it was the best course of treatment, but he qualified his
statement by saying that "it is being used by doctors all over."  *Id*.
Referring to Dr. Ifediba's continued treatment of Cassady during the time
immediately prior to his death, Dr. McCullars testified, "Absolutely the

standard of care was breached . . . ." *Id.* at 134-35.  However, McCullars was not willing to testify that if Cassady had received the treatment that he would have prescribed had he been the one treating Cassady that Cassady would have survived.  *Id.* at 135.  He could not say, based upon Dr. Ifediba's findings in the medical record, that there was evidence that Cassady had pseudomonas aeruginosa on October 5, 2001, the final time that Ifediba saw Cassady prior to his death.  *Id.* at 137.

Defendants' expert, Dr. William Lapidus, has provided deposition testimony with respect to the proximate cause of Cassady's death.  (Doc. 223, Exhibit I.)  Dr. Lapidus has been licensed to practice medicine in Alabama since 1990, and he is board certified in infectious disease and internal medicine.  *Id.* at 169.  He practiced infectious disease and internal medicine during the year preceding the allegations forming the basis of this case.  As part of his regular practice, Dr. Lapidus has treated patients with MRSA staph infections, as well as patients with pseudomonas aeruginosa.  *Id.* at 169-70.  First, Dr. Lapidus testified that the MRSA infections Cassady experienced during the months leading up to his death were in no way related to his death.  He does not "believe that [the] individual - skin

problems along the way, the occasional infections he had along the way had anything to do with his death." *Id*. at 13.  Dr. Lapidus is of the opinion that no prior skin infections had anything to do with the severe gangrenous skin infection that resulted in Cassady's death.  *Id*. at 145.  Defendants' other expert, Dr. Glenn Yates, also testified that "the previous infections [Cassady had] of his leg had no bearing on his pseudomonas infection and the treatment thereof of his MRSA."  (Doc. 223, Exhibit F, pp. 177-78.)

Defendants have established a prima facie case showing that there is no genuine issue of material fact as to whether Defendants' alleged breach of the appropriate standard of care proximately caused Cassady's death. Therefore, the burden shifts to Plaintiff "to present substantial evidence, through the expert testimony of a similarly situated health care provider, that [the individual defendants'] conduct breached the standard of care and was the proximate cause of Cassady's death."  *See Brooks v. Goldhammer*, 608 So. 2d 394, 395 (Ala. 1992).  Plaintiff cites to the case of *Parker v. Collins*, 605 So. 2d 824 (Ala. 1992), for the proposition that an action "may properly be submitted to the jury where there is evidence that prompt diagnosis and treatment would have placed the patient in a better position

than she was in as a result of her inferior medical care." *Id.* at 826. However, Plaintiff is unable to establish through Dr. McCullars' testimony that an alternative course of diagnosis and/or treatment would have placed Cassady in a better position than he was in as a result of the care provided by Drs. Huynh, Ifediba, and Lyrene.

McCullars stated in his affidavit that the actions of Drs. Huynh and Ifediba "contributed to the decline of Cassady's medical condition and/or death." (Doc. 239, Exhibit 5, p. 3.)  However, as to Dr. Huynh, Plaintiff's own expert, Dr. McCullars, testified that he could not say that Dr. Huynh did something wrong that was a direct cause of Cassady's death.  (Doc. 223, Exhibit G, p. 115.)  McCullars was also unable to testify that Dr. Lyrene acted or failed to act in some way that was a direct cause of Cassady's death.  *Id.* at 117.  In addition to reiterating her arguments as to why Dr. Ifediba breached the standard of care, Plaintiff makes the conclusory statement that "[t]he substandard care provided Cassady by Ifediba was the proximate cause of Cassady's declining medical condition and placed him at risk for developing fatal bacterial infections, including pseudomonas." (Doc. 243, pp. 25-26.)  In fact, Plaintiff presents no factual support to meet her

burden of establishing a causal relationship between Dr. Ifediba's alleged breach of the standard of care and Cassady's death.  She merely cites to Alabama case law which establishes her burden with regard to proving causation.  (Docs. 242, pp. 25-26; 244, p. 21.)  Therefore, Plaintiff has not met her burden of establishing that there is more than a mere possibility that the doctors' alleged negligence caused Cassady's death.

Defendant Naphcare is not liable for wrongful death under the AMLA because Plaintiff has not proffered the testimony of similarly situated experts which show that its agents breached the applicable standard of care and that the alleged breach proximately caused Cassady's injuries. Therefore, Defendants' motions for summary judgment are due to be granted as to Plaintiff's claims for wrongful death under the AMLA due to Plaintiff's failure to adduce expert testimony from similarly situated healthcare providers of a breach of the applicable standard of care and that the alleged breach proximately caused the death of Danny Cassady.

B.     Section 1983 Claims.

1.     Eighth Amendment Violations - Deliberate Indifference.

Plaintiff alleges that the individual defendants violated Mr. Cassady's

Eighth Amendment rights by acting with deliberate indifference to his

serious medical needs.  The Eighth Amendment governs the conditions under

which convicted prisoners are confined and the treatment they receive

while in prison.  *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting

*Helling v. McKinney*, 509 U.S. 25, 31 (1993)); *see also Whitley v. Albers*, 475

U.S. 312, 327 (1986) (holding that "the Due Process Clause affords . . . no

greater protection").     While "[t]he Constitution 'does not mandate

comfortable prisons,'" it does not "permit inhumane ones."  *Id.* (internal

citations omitted).  The Amendment requires prison officials to provide

"humane conditions of confinement; prison officials must ensure that

inmates receive adequate food, clothing, shelter, and medical care, and

must 'take reasonable measures to guarantee the safety of the inmate.'" *Id.*

(quoting *Hudson v. Palmer*, 468 U.S. 517, 526-57 (1984)).  However, not

"every governmental action affecting the interest or well-bring of a

prisoner" is to be scrutinized by the courts; rather, "[a]fter incarceration,

only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley*, 475 U.S. at 319 (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)) (internal quotation marks omitted).

The government has an obligation to provide medical care to those it incarcerates. *See Estelle v. Gamble*, 429 U.S. 96, 103 (1976). Deliberate indifference to the serious medical needs of inmates constitutes the "'unnecessary and wanton infliction of pain'" prohibited by the Constitution. *Id.* at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). In *Estelle*, the Supreme Court held that a prison physician's "negligen[ce] in diagnosing or treating a medical condition" was not sufficient to establish a claim of deliberate indifference under the Eighth Amendment. 429 U.S. at 106. Medical malpractice is not a constitutional violation simply because the victim is a prisoner. *Id.* The inmate must establish acts or omissions "sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.*; *see also McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999). The Supreme Court noted in *Estelle* that the plaintiff's primary allegation was that "more should have been

done" to diagnose and treat a back injury.  *Id*. at 107.  The Court explained,

"a medical decision not to order an X-ray, or like measures, does not

represent cruel and unusual punishment.  At most it is medical malpractice

. . . ."  *Id*.  Deliberate indifference to an inmate's serious medical needs "is

shown when prison officials have prevented [him] from receiving

recommended treatment or when an inmate is denied access to medical

personnel capable of evaluating the need for treatment."  *Ancata v. Prison*

*Health Services, Inc.*, 769 F.2d 700, 704 (11th Cir. 1985).

The Supreme Court rejected a purely objective test  for deliberate

indifference, adopting instead a standard which includes both objective and

subjective components.

> We hold . . . that a prison official cannot be found liable under
> the Eighth Amendment for denying an inmate humane conditions
> of confinement unless the official knows of and disregards an
> excessive risk to inmate health or safety; the official must both
> be aware of facts from which the inference could be drawn that
> a substantial risk of harm exists, and he must also draw the
> inference . . . .   An act or omission unaccompanied by
> knowledge of a significant risk of harm might well be something
> society wishes to discourage, and if harm does result society
> might well wish to assure compensation.   The common law
> reflects such concerns when it imposes tort liability on a purely
> objective basis.  But an official's failure to alleviate a significant
> risk that he should have perceived but did not, while no cause

> for commendation, cannot under our cases be condemned as the infliction of punishment.

*Farmer*, 511 U.S. at 837 (internal citations omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring control over a tumultuous cellblock." *Whitley*, 475 U.S. at 319; *see also Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996). Therefore, a plaintiff must satisfy both an objective and a subjective inquiry in order to establish that a prison official acted with deliberate indifference. *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (citing *Taylor v. Adams*, 221 F.3d 1254, 1257 (11th Cir. 2000); *Adams v. Page*, 61 F.3d 1537, 1543 (11th Cir. 1995)). The objective component is met by providing evidence of a serious medical need. *Id*. The subjective component requires showing that the official acted "with an attitude of 'deliberate indifference' to that serious medical need." *Id*.

a.  Serious Medical Need.

In the Eleventh Circuit, a serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994) (internal quotation marks and citations omitted).  The medical need must be "one that, if left unattended, pos[es] a substantial risk of serious harm."  *Farrow*, 320 F.3d at 1243 (internal quotation marks and citations omitted).[9]

_____

[9]The Eleventh Circuit has recognized a range of conditions that are sufficient to constitute a "serious medical need" for the purposes of the Eighth Amendment.  *Compare Farrow*, 320 F.3d at 1243-44 (finding in certain circumstances that the need for dental care combined with the effects of not receiving it may give rise to a sufficiently serious medical need); *Adams v. Poag*, 61 F.3d 1537, 1539-41, 1543 (11th Cir. 1995) (holding that asthma, with continual breathing difficulties and intermittent wheezing, coughing, and hyperventilating can constitute a serious medical need); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (finding that a painful broken foot can be a serious medical need); *and Aldridge v. Montgomery*, 753 F.2d 970, 972-73 (11th Cir. 1985) (stating that a one-and-a-half-inch cut over the detainee's eye which was bleeding for two and a half hours was a serious medical need); *with Shabazz v. Barnauskas*, 790 F.2d 1536, 1538 (11th Cir. 1986) (holding that the inmate's "shaving bumps," even if shaving is required by prison officials and is ordered by the physician, "does not rise to the level of the cruel and unusual punishment forbidden by the Eighth Amendment"); *and Dickson v. Colman*, 569 F.2d 1310, 1311 (5th Cir. 1978) (determining that the inmate's high blood pressure did not present a "serious threat" to his health).

Mr. Cassady's ailments included the serious medical conditions of MRSA infections and pseudomonas aeruginosa.   An autopsy determined that Cassady died because of pseudomonas aeruginosa septicemia due to gangrenous cellulitis in his right lower extremity.   The autopsy also found that nutritional cirrhosis and Hepatitis C and A contributed to Cassady's death.   It appears to the Court that Cassidy clearly suffered from serious medical conditions such that if they were left untreated they posed a serious, even fatal, risk of harm.   Therefore, Cassady was suffering from serious medical needs as that term has been defined by the Eleventh Circuit.

> b.   Deliberate Indifference.

To violate the Cruel and Unusual Punishments Clause, the defendant must have a "'sufficiently culpable state of mind,'" and in cases such as this, "that state of mind is one of 'deliberate indifference' to inmate health . . . ." *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).   "[O]nly the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment."  *Whitley*, 475 U.S. at 319 (quoting *Ingraham*, 430 U.S. at 670 (quoting *Estelle,* 429 U.S. at 103)) (internal quotation marks omitted).   In

*McElligott*, the Court clarified the three components of deliberate indifference: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence. 182 F.3d at 1255.   For example, "an official acts with deliberate indifference when he knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997).  Even if medical care is provided to the inmate, a prison official may still act with deliberate indifference "by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott*, 182 F.3d at 1225.  Therefore, in addition to showing that Mr. Cassady suffered from a serious medical need, Ms. Pierce must allege that: (1) the individual defendants were deliberately indifferent to that need; and (2) the defendants' deliberate indifference caused Cassady to suffer harm.  *See Marsh v. Butler*, 268 F.3d 1014, 1058 (11th Cir. 2001) (citing *McElligott*, 182 F.3d at 1254-55).

According to the defendants, "[t]he evidence clearly shows that [they] did not act intentionally or recklessly to deny or delay medical care, or to interfere with any treatment which was prescribed or directed." (*See* Docs. 223, p. 18; 225, p. 36.)  They believe that the evidence demonstrates that Plaintiff's claims are without merit, that Cassady's medical conditions were at all times adequately addressed, and that Cassady was not deliberately or recklessly denied any necessary medical treatment.  *Id.*  Plaintiff's argument relies upon the statements provided by her expert, Dr. Robert B. Greifinger.[10]  He observed in his affidavit that Defendants:

---

[10]In their briefs, Defendants contend that "Dr. Greifinger is not competent to testify as set out above."  They appear to be referring to their arguments in support of their motion for summary judgment as to Plaintiff's wrongful death claims under the AMLA.  Defendants are correct in asserting that the Court is "the gatekeeper in determining whether Dr. Greifinger is qualified to testify under [Fed. R. Evid.] 701 and the *Daubert* standards." (*See* Doc. 225, p. 37.)  Because he relies upon scientific, specialized medical knowledge to reach his opinions, Dr. Greifinger would not be able to testify under Rule 701, which applies to opinion testimony by lay witnesses.  However, simply relying on their previous arguments is not sufficient to make out a *Daubert* challenge to Dr. Greifinger's ability to testify regarding whether Defendants acted with deliberate indifference.  As stated by Judge Pittman, in concurring specially with the opinion in *King v. Correctional Medical Services, Inc.*, 919 So. 2d 1186:

[T]he expert-testimony requirements that are applicable in state-law medical-malpractice actions do not apply in the context of federal civil-rights claims pursuant to 42 U.S.C. § 1983. . . . [T]he gravamen of a federal civil-rights claim in this context is not a mere negligent breach of the applicable standard of medical care (as it is in claims governed by the [AMLA]); rather, it is the deliberate indifference of correctional officials

refused to provide appropriate diagnostic services to determine whether Mr. Cassady was eligible for antiviral therapy for his chronic liver disease caused by viral Hepatitis C. *If* he had been a candidate for treatment, and *if* he was treated appropriately, there was a great *likelihood* that his liver disease would not have progressed as far as it did, causing swelling of his legs and making it more difficult for his infections to heal.

(Doc. 239, Exhibit 11, p. 17 (emphasis added).)  Additionally, Plaintiff relies

on Dr. Greifinger's final conclusions as to the cause of Mr. Cassady's death.

Mr. Cassady had a serious medical need, with his liver disease and chronic skin infections.  He was denied appropriate care for each of these conditions.  [Defendants] failed to obtain a diagnosis by an appropriate health care professional, they failed to provide effective treatment, and the care provided was cursory. . . .   The Defendants failed to train and supervise their staff to provide for Mr. Cassady's special need.  As a result, he suffered greatly.  The denial of care by the appropriate health professionals was the proximate cause of his death.   The Defendants were aware of Mr. Cassady's serious medical needs and they chose to ignore these needs.  The ADOC, Naphcare, and

---

and agents to a particular prisoner's medical care.

*Id*. at 1196.  Even though Dr. Greifinger did not meet the standard for a similarly situated expert under the AMLA, it appears to the Court that he is qualified to testify competently regarding the matters he has addressed in Plaintiff's deliberate indifference claims, the methodology by which he reached his conclusion is sufficiently reliable as determined by the sort of inquiry required by *Daubert*, and his testimony would assist the trier of fact through the application of his specialized, medical expertise to understand the evidence or a fact in issue.  *See, e.g., Toole v. Baxter Healthcare Corp.*, 233 F.3d 1307, 1312 (11th Cir. 2000); *Allison v. McGhan Medical Corp.*, 184 F.3d 1330, 1309 (11th Cir. 1999); *City of Tuscaloosa v. Harcross Chem., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).

the named defendants were deliberately indifferent to Mr. Cassady's serious medical needs.

*Id.* at 25-26.

However, liability may only be imposed for deliberate indifference if Ms. Pierce proves that the individual defendants actually knew of "an excessive risk to [Cassady's] health or safety" and disregarded that risk. *Campbell*, 169 F.3d at 1364 (quoting *Farmer*, 511 U.S. at 837).   Dr. Greifinger's statements are conclusory and do not show acts or omissions which rise to the level of deliberate indifference.  Plaintiff is essentially making a "more should have been done" argument, which has been explicitly rejected by the Supreme Court in *Estelle v. Gamble*, 429 U.S. at 107.  Defendants' alleged failure to test Cassady and order the treatment regimen proposed by Dr. Greifinger, a physician who is board-certified in pediatrics, is at best an argument to support Plaintiff's claim for medical malpractice.  Ms. Pierce has not even attempted to show the sort of punitive mental element that is required in order to establish a claim for deliberate indifference.   *See Wilson*, 501 U.S. at 297-99.   In fact, the evidence establishes that Defendants, especially Drs. Ifediba and Huynh, were aware

of Cassady's chronic swelling, edema, and skin infections, including MRSA,

and they treated him for such diagnoses.

(1)     Huynh, Ifediba, and Lyrene.

Based upon Dr. Greifinger's findings, Plaintiff argues that Dr. Huynh

failed to provide Cassady treatment for his Hepatitis C, to conduct any tests,

including blood tests and wound cultures, and to determine susceptibilities

and/or diagnosis.  (Doc. 242, p. 32.)  As Defendants note in their reply brief,

Plaintiff never alleged in her complaint a failure to test Mr. Cassady for

Hepatitis C in an effort to determine if he was even a candidate for antiviral

therapy.  (Doc. 266, p. 12.)  However, even if Plaintiff is allowed to move

forward with this contention, Plaintiff must provide evidence as to how Drs.

Ifediba and Huynh are responsible for this failure.  Defendants contend that

it is the ADOC which made the determination to exclude any testing and/or

treatment of its inmates for Hepatitis C within the contract that it entered

into with Naphcare.  Defendants also rely upon the deposition testimony of

their infectious disease expert, Dr. William Lapidus, for the proposition that

Cassady would not have received such treatment during the time Naphcare

provided  services  to  the  inmates  because  he  satisfied  many  of  the

contraindications for receiving antiviral treatments. *Id*. at 13. Dr. Greifinger's statements that "*if* he had been a candidate for treatment, and *if* he was treated appropriately, there was a great *likelihood* . . ." amount to nothing more than mere speculation. Plaintiff has not shown how Drs. Ifediba and Huynh's alleged failure to test Cassady for potential candidacy for treatment of Hepatitis caused his death.

Ms. Pierce further alleges that Dr. Huynh failed to provide specialized care to Cassady for his liver disease or skin infections and that his failure to secure appropriate diagnostic services to determine Cassady's need for changes in treatment protocol, specialized services, chronic care clinics, a specialized treatment plan, counseling regarding missed medications and/or appointments, appropriate housing, and acute care constitutes deliberate indifference. *Id*. Plaintiff also observes that Huynh either "knew or should have known" that Cassady was likely to deteriorate without proper treatment and that pseudomonas aeruginosa typically infects individuals who are immune compromised. But, the standard for a claim of deliberate indifference does not allow a plaintiff to allege that a defendant "should have known" that an inmate's condition would deteriorate. *See, e.g.,*

*Lancaster*, 116 F.3d at 1425.  Ms. Pierce is required to show that Dr. Huynh

failed or refused to provide Cassady medical treatment despite knowing that

Cassady was in serious need of medical care.  *Id.*  Plaintiff fails to

differentiate between Huynh's knowledge of the facts (e.g., that Cassady

had a skin condition) and her burden of showing that Huynh knew what the

skin condition demonstrated (e.g., the existence of a serious, even fatal

infection, such as pseudomonas aeruginosa).  Plaintiff must establish that

Huynh knew that Cassady suffered from a skin infection that could cause

serious medical problems or even death, such as pseudomonas aeruginosa,

and not simply that Huynh was aware of the existence of a skin infection.

*See, e.g., Lancaster*, 116 F.3d at 1425 ("[A]n official acts with deliberate

indifference when he knows that an inmate is in serious need of medical

care, but he fails or refuses to obtain medical treatment for the inmate.");

*Hill*, 40 F.3d at 1186 ("[K]nowledge of the need for medical care and

intentional refusal to provide that care constitute[s] deliberate

indifference."); *Ancata*, 769 F.2d at 704 ("[K]nowledge of the need for

medical care and the intentional refusal to provide that care has

consistently been held to surpass negligence and constitutes deliberate

indifference."). Plaintiff fails to address the fact that Dr. Huynh claims to have been unaware of the fact that Cassady was infected with pseudonomas aeruginosa in October 2001.[11] *Id.* at 32-33. In fact, there is no evidence that Cassady was infected with pseudomonas aeruginosa in April 2001. Dr. Huynh's last day working for Naphcare was April 22, 2001. (Doc. 223, Exhibit E, p. 14.) Plaintiff has not shown that Dr. Huynh knew of the infection or that she knew of the substantial risk of serious harm or death the infection posed. Plaintiff has not shown that Huynh had knowledge of a constant and persistent MRSA skin infection and acted wantonly to deny or delay access to care.

Ms. Pierce argues that Dr. Ifediba examined Cassady on October 5, 2001, and could have determined his declining medical condition at that time. (Doc. 243, p. 32.) Based upon Cassady's symptoms and signs of infection, Plaintiff avers that Dr. Ifediba failed to take any action to determine whether he was suffering from a systemic infection, the bacterial

---

[11]Plaintiff often uses the date October "2004" in her brief to refer to the time in which Cassady was infected with pseudomonas aeruginosa. The Court assumes that she intended to state October "2001," as the current cause of action was not filed until October 8, 2003. (*See, e.g.,* Docs. 242, p. 33; 243, p. 32.)

source of his infection, or sensitivities to antibiotic treatment. *Id*. Again, Plaintiff's argument rests upon the insufficient assertion that Dr. Ifediba's diagnosis could have been more thorough or more accurate. This is a claim for deliberate indifference and not medical malpractice. Plaintiff has failed to show that Dr. Ifediba acted in such a way as to wantonly, or even recklessly, deny or delay medical care to Cassady. In fact, the evidence demonstrates that Cassady's medical conditions were evaluated, treated, and monitored by Dr. Ifediba. Also, despite Dr. Greifinger's speculation that Cassady suffered from a MRSA skin infection from 1999 through 2001, the evidence shows that Dr. Ifediba was aware of Cassady's swelling, edema, and weeping skin that frequently occurred due to his liver damage as a result of his Hepatitis C. She was aware of his Folliculitis, Cellulitis, and MRSA infections in May and July 2001. Dr. Ifediba attempted to treat Cassady's MRSA infection by prescribing a course of antibiotics in accordance with the results of the bacteria's sensitivity and susceptibilities report. Finally, Dr. Ifediba examined Cassady for the final time prior to his death on October 5, 2001, and the evidence shows that she was not aware that he

was infected with pseudomonas aeruginosa at the time of her exam or any time thereafter.

Plaintiff similarly claims that Dr. Lyrene acted with deliberate indifference in failing to appropriately treat Cassady for his conditions. However, the evidence leads to the conclusion that Dr. Lyrene was aware of Cassady's complaints regarding his skin condition and ordered a battery of tests that were performed at the St. Clair County Correctional Facility. (*See* Doc. 228, p. 32.)  Plaintiff has again failed to prove that on any occasion Dr. Lyrene failed to provide, refused to provide, and or delayed medical treatment to Cassady despite knowing that he was in need of such treatment.  Like Drs. Huynh and Ifediba, there is no evidence that Dr. Lyrene knew that Cassady was infected with pseudomonas aeruginosa at or before the time of his death.  Dr. Lyrene submitted his resignation at the end of August 2001, and his last day in Naphcare's corporate office was at the end of September 2001.  He did not visit the facilities during the month of September, and there is no evidence that Cassady was infected with pseudomonas aeruginosa prior to September 2001.

Plaintiff responds by alleging that since Dr. Lyrene was aware of Cassady's Hepatitis A and/or C infection, as well as the fact that Cassady was immune compromised and suffered from recurrent bacterial skin infections and had a recent diagnosis of MRSA, Dr. Lyrene "either *knew or should have known* that Cassady's serious medical condition . . . posed a risk that Cassady would develop . . . pseudomonas." (Doc. 244, p. 28 (emphasis added).) Plaintiff believes that Dr. Lyrene denied Cassady access to medical care which he was "constitutionally entitled to receive" and that with the appropriate consultations Cassady would have likely received access to medical care. *Id.* In her briefs, Ms. Pierce repeatedly cites to *Farmer* for the assertion that the Supreme Court only requires that the "official be aware of 'facts' and from those facts an inference can be drawn of the substantial risk of serious harm." She has simply misread the language of the case. The opinion in *Farmer* states that a prison official can be liable for deliberate indifference when he or she "knows of and disregards an excessive risk to inmate health or safety; the official must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Farmer*, 511

U.S. at 837 (emphasis added).  Ms. Pierce has not shown that the defendant

doctors knew that a serious risk of harm existed at the time of Cassady's

death and failed to provide him with apprpriate medical treatment.  *See,*

*e.g., Lancaster*, 116 F.3d at 1425; *Hill*, 40 F.3d at 1186; *Ancata*, 769 F.2d at

704.   Plaintiff's argument that more *should* have been done *if* the doctors

would have known about Cassady's condition is simply not a valid argument

in support of a claim for deliberate indifference.  She must allege, and

provide evidence to support, a claim that the doctors *did* know that Cassady

suffered from a serious medical condition such that they could act in a

manner that was deliberately indifferent to that need and that the

deliberate indifference caused Cassady's death.  *See Marsh*, 268 F.3d at

1058.

(2)    Nichols.

Plaintiff relies upon the findings of her expert, Dr. Greifinger, as to RN

Nichols' liability for deliberate indifference: "When [Cassady] complained

to the Director of Nursing, in April 2001, he was treated brusquely and

imperiously, disallowing his complaint.  The nursing director was insensitive

and dismissive to a legitimate request for care.  This falls far below the

standard of correctional care."  (Doc. 239, Exhibit 11, p. 18.)  From this,

Plaintiff argues that "Nichols' failure to properly address Cassady's

complaints and enforce Naphcare's policies and procedures with respect to

medication administration, quality assurance, missed appointments,

segregation assessments, staffing levels, and diagnostic services constitutes

deliberate indifference."  (Doc. 246, p. 32 (citing *Ancata*, 769 F.2d at 704).)

The Court agrees with RN Nichols that Plaintiff has failed to provide

evidence that on any occasion he failed to provide, refused to provide,

and/or delayed medical treatment to Cassady.  (Doc. 224, p. 22.)  Plaintiff

has not even attempted to prove that RN Nichols had the requisite state of

mind to be held liable for deliberate indifference.  There is no evidence that

RN Nichols was aware that Cassady suffered from pseudomonas aeruginosa,

which lead to his becoming septic, and he did not even work at the Bibb

County Correctional Facility in August, September, or October of 2001.

Nichols testified at his deposition that during his tenure as Director of

Nursing at the Bibb County facility, he served in more of an administrative

role rather than a medical provider role.  (Doc. 224, Exhibit A, pp. 19-21,

23.)  As he notes in his reply brief, there is no evidence that Nichols ever

actually provided hands-on medical care to Mr. Cassady.  In fact, there is no evidence that Nichols ever had a duty to provide such care.  Contrary to Plaintiff's argument, Nichols' written reply to Cassady's April 16, 2001, complaint, in which he instructed Cassady to request healthcare in the appropriate manner, does not show that Nichols was aware of a risk of serious harm to Cassady.  Once Cassady followed the appropriate protocol and completed a Sick Call Request form on April 17, 2001, his chart was referred to Dr. Huynh, who then entered an order for treatment based upon Cassady's complaints.   Nichols' insistence that proper procedures be followed (procedures which Cassady had followed in the past) does not support a finding that he refused treatment for Cassady's serious medical needs.  There is simply no evidence to support Plaintiff's claim that Nichols acted with deliberate indifference towards Cassady's serious medical needs.

(3)    Hogue.

Mirroring her allegations against Dr. Huynh, Pierce contends that CRNP Hogue failed to conduct testing, including blood tests and wound cultures, or to determine susceptibilities of Mr. Cassady's Hepatitis C.  (*See* Doc. 241, p. 31.)  She alleges further that Hogue did not react to Cassady's failure to

respond to treatment and that she failed to provide specialized care. *Id*. In response to Hogue's assertion that she was unaware that Cassady was infected with pseudomonas aeruginosa in October 2001 and therefore cannot be held liable for his death, Plaintiff opines that CRNP Hogue was aware of Cassady's declining condition. *Id*. at 32. She then states that Hogue "*knew or should have known* that Cassady, who was immune compromised, was likely to contract an infection as a result of the open wounds on his leg and resistance from extended use of antibiotic treatment." *Id*. (emphasis added.) As she does with the doctors discussed above, Ms. Pierce continually states that Hogue "knew or should have known" various facts about Mr. Cassady's condition, but a plaintiff cannot meet her burden in a claim for deliberate indifference by stating that a defendant "should have known" that the inmate's medical condition was serious. The defendant must have actually known about the serious medical condition and either denied or delayed treatment for that condition. *See McElligott*, 182 F.3d at 1255; *see also Lancaster*, 116 F.3d at 1425; *Hill*, 40 F.3d at 1186 ; *Ancata*, 769 F.2d at 704.

CRNP Hogue contends that she was aware of Cassady's swelling, edema, and weeping skin that frequently occurred due to his liver damage as a result of his Hepatitis C.  (Doc. 226, p. 34.)  She was also aware of his Cellulitis and MRSA infections in May and July 2001.  *Id.*  She treated Cassady's infection by prescribing a course of antibiotics in accordance with the results of the bacteria's sensitivity and susceptibilities report.  *Id.*  CRNP Hogue provided medical treatment to Cassady on several occasions from May 15, 2001, through September 27, 2001; however, Plaintiff has not provided evidence of any occasion where Hogue failed to provide, refused to provide, and/or delayed medical treatment to Cassady.  *Id.* at 35.  Plaintiff cannot simply allege that "more should have been done" in an effort to prove that Hogue acted with deliberate indifference towards Mr. Cassady's serious medical needs.

Furthermore, Plaintiff's expert, Dr. Greifinger, testified that even though the Wound Culture and Sensitivities Lab report showed that Cassady's wound was sensitive to Cipro, Hogue's prescribing of Cipro was below the standard of care.  This is not evidence of deliberate indifference - it is more akin to a claim for medical negligence where the plaintiff alleges

that more should have been done.  *See Estelle*, 429 U.S. at 107 (finding that a claim that "more should have been done" is at most a claim for medical malpractice).  Hogue's prescription of antibiotics shows that she was aware of Cassady's condition and was attempting to treat it.

The evidence clearly establishes that during the months of August, September, and October, Cassady only requested to be examined on August 5, 2001, for swelling and a rash; August 12, 2001, for breaking out; August 24, 2001, for swelling to his leg; and August 27, 2001, for swelling and itching.  (Doc. 226, Exhibit A, Part 8.)  In response to these requests, CRNP Hogue responded to the Sick Call Exam notes that followed the formal requests made by Cassady on August 5, 2001, and August 27, 2001.   In response to the August 5, 2001, Sick Call Exam, Hogue entered an order for Cassady for Cipro for two weeks, as well as Lasix, and she ordered him to see her again on the following day.  *Id*.  Hogue examined Cassady on August 7, 2001, and ordered Atarax, a Chemistry for August 10, 2001, and she discontinued the Maxzide that was previously ordered at the St. Clair County facility in July 2001.  *Id*.  In response to Cassady's Sick Call Exam on August 27, 2001, CRNP Hogue entered an order to schedule Cassady to see Dr.

Ifediba on August 29, 2001, regarding his edema and drainage.  *Id*.  Dr. Ifediba then examined Cassady and entered the appropriate orders.  Dr. Ifediba directly responded to the other two Sick Call Exams on August 12 and August 24, 2001, by continuing the Cipro for five more days and ordering Aldactone and Lasix for ninety days.  *Id*.  Hogue was not involved with Cassady's complaint on October 4, 2001, in which he complained of pain related to his bunkmate jumping off the upper bunk onto Cassady's foot. The evidence clearly establishes that CRNP Hogue was aware of Cassady's swelling and itching, his history of recurrent Cellulitis and skin infections, his previous MRSA infection, and his complaints on August 5 and August 27, 2001.  Plaintiff has not shown how the evidence supports a finding that Hogue's responses to Cassady's complaints constitute evidence of the requisite subjective element of a claim for deliberate indifference.

CRNP Hogue's final entry for Cassady prior to his death was on September 27, 2001, and there was no occasion from that day until the day Cassady died on which she saw Cassady.  *Id*.  Hogue did not work at the Bibb County facility from October 5, 2001, until Cassady's death on October 7, 2001, and there is no evidence that Cassady was infected with pseudomonas

aeruginosa when Hogue entered her last order for Cassady on September 27, 2001.  Plaintiff has not provided any evidence that Hogue was aware of Cassady's pseudomonas aeruginosa infection; thus, Plaintiff has failed to prove that CRNP Hogue knew of the substantial risk of harm or death that could result from the infection.  For these reasons, CRNP Hogue cannot be held liable for deliberate indifference towards Cassady's serious medical needs.

(4)    Smith.

In her response brief to defendant LPN Smith's motion for summary judgment, Plaintiff states that "Russell disputes she denied Cassady access to care."  (Doc. 247, p. 27.)  Assuming that Plaintiff is referring to LPN Smith, she still has not provided evidence from which a factfinder could conclude that Smith is liable for deliberate indifference.  Ms. Pierce must support her claim by showing that Smith knew of and disregarded an excessive risk to Cassady's health or safety.  *See Farmer*, 511 U.S. at 837.

The evidence demonstrates that Cassady died from being infected with the bacteria pseudomonas aeruginosa leading to his becoming septic.  (Doc. 227, Exhibit C & D.)  LPN Smith's last assessment of Cassady prior to his

death occurred on July 14, 2001, and there is no evidence that he was infected with pseudomonas aeruginosa when LPN Smith provided nursing care to Cassady on that day.  Plaintiff has not provided any evidence that LPN Smith knew of Cassady's pseudomonas aeruginosa, and she has not shown that Smith knew of a substantial risk of serious harm or death that could have resulted from the infection.

On October 6, 2001, Cassady allegedly asked LPN Smith for help and requested to see a physician while she was working at the Pill Call window. (Doc. 247, p. 20.)  Relying on the affidavits of Cassady's fellow inmates, Plaintiff believes that Cassady was "deathly ill" at the time he saw Smith. *Id.*  Based upon these affidavits, Plaintiff alleges that Smith responded to the request by saying, "You must have banged your f------ head."  *Id.* Plaintiff avers that this shows that Smith either knew or should have known that Cassady was in serious need of medical attention.  However, as stated in the previous sections, a plaintiff cannot meet her burden by establishing that a defendant "should have known" that an inmate needed medical attention.  Ms. Pierce also alleges that Smith commented to another nurse,

"Don't do a damned thing for [Cassady] up here . . . if he get's stabbed, let him bleed out." *Id.* at 21.

Smith "adamantly denies" Plaintiff's accusations that she made inappropriate comments to Cassady.  (Doc. 265, p. 22.)  However, even if the statements were made, they were highly inappropriate but do not show that Smith acted with deliberate indifference to a serious medical need.  If Cassady needed medical attention, he should have gone to the Emergency Room rather than the Pill Call window, as he had done on many previous occasions.  *Id.* at Exhibit B, pp. 88-89.  The Pill Call window is not the apprpriate place to request or receive medical attention.   Plaintiff's accusations regarding Smith's statement to the other nurse do not provide evidence of deliberate indifference because they do not show that she acted in a manner that disregarded a risk of serious harm of which she possessed subjective knowledge. *See McElligott*, 182 F.3d at 1255.

Plaintiff has also failed to provide any evidence to support her assertion that Smith failed to adequately assess Cassady while in the Segregation Unit.  There is no evidence that Smith had a duty to provide an assessment of Cassady while he was in the Segregation Unit.  The evidence

shows that if an inmate requests attention, the assessment takes place within the infirmary and not within the Segregation Unit.

As previously stated, to prevail on a claim of deliberate indifference as to any of the individual defendants, Plaintiff, at a minimum, must provide evidence sufficient to create a question of fact as to whether the defendants were subjectively aware of a substantial risk of harm to Cassady and then acted with deliberate indifference towards that risk. *McElligott*, 182 F.3d at 1256.  Plaintiff has simply not met that burden.

(5)   Naphcare.

Plaintiff alleges that Naphcare, as well as its agents, acted with deliberate indifference to Cassady's serious medical needs through its failure to train and supervise its agents.  (Doc. 245, p. 2.)  According to Ms. Pierce, that failure is a "policy or custom" that gives rise to liability under section 1983 when the failure "reflects deliberate indifference to the constitutional rights of its citizens." *Id.* at 3.  A municipality cannot be held liable under section 1983 on a theory of respondeat superior. *Monell v. New York City Dept. of Social Svcs.*, 436 U.S. 658, 691 (1978).  There must be some evidence that a municipal policy or custom caused the constitutional

injury. *Leatherman v. Tarrant Co. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1991). "[R]ecovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' - that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. Cincinnati*, 475 U.S. 469, 480 (1986). Therefore, Naphcare may only be held liable under § 1983 for the execution of an unconstitutional governmental policy or custom. *Monell*, 436 U.S. at 694. Furthermore, Ms. Pierce must prove that Naphcare "caused the alleged deprivation of rights." *Buckner v. Toro*, 116 F.3d 450, 452-53 (11th Cir. 1997); *see also City of Clanton v. Harris*, 489 U.S. 378, 385 (1989) (reiterating that the first inquiry in any case alleging municipal liability under § 1983 is to ask "whether there is a direct causal link between [the] policy or custom and the alleged constitutional deprivation."); *Ort v. Pinchback*, 786 F.2d 1105, 1107 (11th Cir. 1986) (holding that the plaintiff had not shown that the defendant was directly involved in the injury or that the injury was the result of the defendant's policy or custom). Ms. Pierce must demonstrate that Naphcare, "through its *deliberate* conduct," was the "moving force" behind Cassady's eventual

death.  *Board of the County of Com'rs of Bryan County, Okl. v. Brown*, 520

U.S. 397, 404 (1997) (emphasis in original).

(a)   Failure to Train and Supervise.

In certain limited circumstances, an allegation of "failure to train" can

form the basis of a claim for liability under § 1983 "where a municipality's

failure to train its employees in a relevant respect evidences a 'deliberate

indifference' to the rights of its inhabitants."  *See Harris*, 489 U.S. at 387,

389.  As noted by the Eleventh Circuit in *Gold v. City of Miami*, 151 F.3d

1346 (11th Cir. 1998), the standard of proof for plaintiffs seeking to impose

liability on a municipality for failure to train under § 1983 is high.  *Id.* at

1351 n. 10 ("[P]ermitting cases against cities for their 'failure to train'

employees to go forward under § 1983 on a lesser standard of fault would

result in de facto respondeat superior liability on municipalities.").  Plaintiff

must show not only that Naphcare's employees violated Cassady' rights, but

that Naphcare's policies and customs were the "moving force" behind

Cassady's injuries and eventual death.  *Id.* at 1350.  As Ms. Pierce notes in

her brief, a plaintiff cannot establish a deliberate policy of inadequate

training of medical providers simply by establishing that they were

inadequately trained.  (Doc. 245, p. 4.)  There must have been a "strong likelihood" that the constitutional deprivation would result from the defendant's failure to act.  *See Cagle v. Sutherland*, 334 F.3d 980, 987 (11th Cir. 2003) (quoting *Tittle v. Jefferson County Com'n*, 10 F.3d 1535, 1540 (11th Cir. 1994)).  Moreover, the Court has already found that Plaintiff has failed to demonstrate that any of the individual defendants remaining in this action acted with deliberate indifference to the serious medical needs of Mr. Cassady.

Plaintiff alleges that the evidence demonstrates that Naphcare failed to conduct Chronic Care Clinics for inmates who suffered from chronic diseases, such as Hepatitis C, confined at the Bibb County Correctional Facility, and that this custom and practice negatively affected Mr. Cassady since he was infected with Hepatitis C and suffered from a chronic skin infection.  (Doc. 245, pp. 4-5.)  Additionally, Plaintiff contends that Naphcare failed to provide a special treatment plan for Cassady's Hepatitis and his MRSA infection.  *Id*. at 5.  She also notes that Naphcare has stated that it did not treat any inmate infected with Hepatitis C, and it did not issue policy guidelines within the time-frame required by the ADOC Health

Services Agreement.  *Id.*  Through its alleged failure to supervise and train its employees, Plaintiff alleges that Naphcare failed to provide Cassady with appropriate diagnostic care and medical judgment.  *Id.*  Ms. Pierce states in her brief that Naphcare failed to detect serious medical illnesses and conditions that would have prevented an inmate's segregation and that this violation of its policies created additional violations with respect to emergency, infirmary, hospital, and acute primary care.  *Id.* at 6.  Plaintiff argues that Naphcare had a policy and/or practice of denying treatment to inmates with Hepatitis C.  (Doc. 245, p. 10.)  As a result of this policy, Plaintiff contends that Naphcare and its employees denied Cassady treatment for his Hepatitis C liver condition by failing to provide appropriate diagnostic services to determine if he was a viable candidate for interferon treatment.  *Id.* at 11.  Plaintiff then proceeds to argue that this falls below the standard of care and that individuals with Hepatitis C have a more difficult time fighting infections because they have an impaired immune system.  *Id.*

Plaintiff believes that Naphcare violated its own Quality Improvement Program, which was specifically designed to detect systemic failures.  *Id.*

She is of the opinion that the record reflects that Dr. Ifediba was unaware of her obligations with respect to implementing Quality Assurance programs and that she failed to perform the essential functions required by a correctional healthcare system.  *Id.*  Ms. Pierce is of the opinion that the record shows that Dr. Lyrene failed to adequately train his clinical staff, Dr. Ifediba, Dr. Huynh, and CRNP Hogue with regard to essential polices and procedures at Naphcare.  *Id.* at 7.  According to Plaintiff, Naphcare had problems with RN staffing, physician staffing, and the number of hours worked from March 2001 through October 2001.  *Id.*  Ms. Pierce points to Dr. Ifediba's alleged ignorance of her job responsibilities and CRNP Hogue's alleged lack of notice regarding missed appointments as evidence of Naphcare's failure to adequately train its staff.  *Id.* at 7-8.  Finally, Plaintiff says, "Not only did Naphcare fail to follow medication administration policies, but also violated policies with respect to segregation assessment policies, infirmary policies, infectious disease policies, acute care policies, inmate transfer policies, and communication policies, chronic care clinics, special treatment plans, and quality assurance requirements."  *Id.* at 8.  This is allegedly evidence of Naphcare's continual violations of its policies

which falls below the standard of care and is the direct result of its failure to properly train its employees.  *Id*.

Although she offers that Naphcare had staffing difficulties, Plaintiff has failed to show what the appropriate levels of staffing for the positions in question would have been.  Defendants have presented the deposition testimony of Ron Cavenaugh, Director of Treatment for ADOC, where he explains that the contract between ADOC and Naphcare did not include required staffing levels.  (Doc. 240, Exhibit 23, p. 82.)  Even if there were staffing problems, Plaintiff has failed to show how they were the "moving force" behind Cassady's injuries and eventual death.  In fact, the evidence shows that Cassady was seen following each Sick Call Request form that he completed except where he refused the Sick Call Screening.  At the very least, Plaintiff has failed to demonstrate a causal link between Naphcare's alleged insufficient staffing and a deprivation of Cassady's constitutional rights.

Plaintiff's argument that Naphcare's healthcare providers were not adequately trained is unsupported by the record.  Nichols testified at his deposition that he trained the physicians and nurses as to Naphcare's

policies and procedures.  (Doc. 222, Exhibit F, pp. 61-62.)  Naphcare had a structure in place to assure that its employees followed its policies and procedures.  For example, Dr. Lyrene supervised the treatment provided to inmates at the Bibb County facility by Dr. Ifediba and CRNP Hogue, and RN Nichols supervised the nurses and staff at the facility.  Nichols was in turn supervised by the Naphcare Regional Administrator, Lottie Wiley.  (Doc. 222, p. 11.)

Plaintiff contends that Naphcare's failure to adequately supervise its medical providers supports a claim for liability under § 1983.  (Doc. 245, p. 12.)   She believes that Naphcare failed to implement policies and procedures designed to insure that inmates received the minimum standard of care required in a correctional facility.   *Id*.   As support for this contention, Ms. Pierce points to Dr. Lyrene's alleged failure to review health service reports and complaints, as well as his alleged failure to insure that the Quality Assurance Programs were being conducted.  *Id*.   As evidence of RN Nichols' failure to supervise, Plaintiff again points to the fact that Naphcare was understaffed and on many occasions had no RN on duty from March 2001 through October 2001.   *Id*. at 12.   According to Plaintiff,

Naphcare's failure to discipline or address prior conduct made the resulting violation of Cassady's constitutional rights more likely. *Id*. at 14.

Plaintiff concludes her brief by arguing that Naphcare had a custom and policy of failing to adequately supervise the delivery of healthcare to inmates, of failing to treat Hepatitis C, and of violating the minimum standards of care with regard to segregation assessments, chronic care clinics, special treatment plans, medication administration, and counseling regarding missed appointments. *Id*. at 15.

Naphcare argues that Plaintiff's expert's opinion that the nurses failed to counsel Cassady regarding his three missed doses of medication is not substantiated by the evidence. (Doc. 222, p. 9.) Dr. Greifinger simply assumes that there was no counseling since there is no documentation in Cassady's medical chart. (*See* Doc. 222, Exhibit W, pp. 324-25.) However, even if the nurses failed to counsel Cassady, Ms. Pierce has not shown that such a failure led to Cassady's injuries and subsequent death.

At best, Plaintiff's arguments amount to no more than a claim for respondeat superior. They do not prove that an entity such as Naphcare acted with deliberate indifference towards Cassady's serious medical needs.

As RN Nichols states in his reply brief, although Plaintiff discusses claims against him for failure to train and supervise under Section 1983, Plaintiff did not include him in her list of defendants under Count II of her complaint.  (Doc. 128, pp. 21-24.)

(b)    Failure to Fund.

Plaintiff has alleged that Naphcare violated Cassady's constitutional rights by failing or refusing to fund the medical necessities of the inmates within its care.  Ms. Pierce must show that Naphcare had the "deliberate intent" to inadequately fund the care provided at the Bibb County facility. *See McDowell v. Brown*, 392 F.3d 1283, 1291 (11th Cir. 2004) (holding that the plaintiff must show that the county had a "deliberate intent" to under staff the jail).  Plaintiff has not provided any evidence to show that Naphcare was the "moving force" behind the alleged violations of Cassady's constitutional rights, or that Naphcare was deliberately indifferent to a "strong likelihood, rather than a mere possibility," that injury or death would result from Naphcare's failure to fund.  *Cagle*, 334 F.3d at 987.  In addition to a lack of evidence from which a finder of fact could determine that Naphcare or its employees acted with deliberate indifference towards

Cassady's serious medical needs, there is no evidence that any alleged failure to fund deprived Cassady of any necessary medical care.   Dr. Greifinger criticized Naphcare for not testing Cassady to determine whether he was a candidate for treatment of Hepatitis C.   (Doc. 222, Exhibit E, pp. 134-35.)   However, the evidence establishes that as of March 1, 2001, Cassady was, in fact, not a candidate for antiviral treatment of Hepatitis C. Dr. Lapidus testified that based upon the objective evidence, such as Cassady's liver disease and having thrombocytopenia, as well as evidence of Cassady's contraindications to a successful course of treatment, such as drug abuse, psychological condition, and his noncompliance with medications and appointments, that Cassady was not a candidate for antiviral treatment from March 1, 2001, until October 7, 2001.   (Doc. 222, Exhibit G, pp. 21-37.) Therefore, any alleged failure to fund the testing and treatment of Cassady's Hepatitis C could not be the "moving force" behind the alleged violation of his constitutional rights, as Cassady does not appear to have even been a candidate for antiviral treatment.

2.    Unconstitutional Supervisory Liability.

Plaintiff alleges that defendants Huynh, Ifediba, and Lyrene acted with deliberate indifference to Cassady's serious medical needs through their role as supervisors.[12]  Naphcare's supervisory personnel simply cannot be held liable under § 1983 for the actions of their subordinates under a theory of respondeat superior.  *See Monell*, 436 U.S. at 691; *Greason v. Kemp*, 891 F.2d 829, 836 (11th Cir. 1990).  The Court may, however, impose liability on Drs. Huynh, Ifediba, and Lyrene, if Ms. Pierce can demonstrate that they either personally participated in the acts comprising the alleged constitutional violations or instigated or adopted a policy that violated Cassady's constitutional rights.  *Hill*, 40 F.3d 1176, 1192 (11th Cir. 1994). The Eleventh Circuit applies a three-prong test to determine supervisory liability under § 1983:

> (1) whether the supervisor's failure to adequately train and supervise subordinates constituted deliberate indifference to an inmate's medical needs[;]

_____

[12]As Nichols states in his reply brief, although Plaintiff discusses claims against RN Nichols for unconstitutional supervisory liability under Section 1983, she did not include him in her exhaustive list of defendants under Count IV of her complaint.  (Doc. 128, p. 26.)

(2) whether a reasonable person in the supervisor's position would understand that the failure to train and supervise constituted deliberate indifference; and
(3) whether the supervisor's conduct was causally related to the subordinate's constitutional violation.

*Adams v. Poag*, 61 F.3d at 1544 (citing *Greason*, 891 F.2d at 837); *see also*

*Raby v. Baptist Medical Center*, 21 F. Supp. 2d 1341, 1355 (M.D. Ala. 1998).

> a.   Huynh and Ifediba.

Drs. Huynh and Ifediba provide that they did not have a duty to

supervise the staff as plead in plaintiff's complaint.  (Docs. 223, p. 22; 225,

p. 39.)  Plaintiff contends that Huynh and Ifediba failed to implement or

establish any procedures or systems which were designed to insure that

inmates/patients at the Bibb County facility received the minimum standard

of care required in correctional healthcare.  (Doc. 242, p. 35.)  Their failure

to implement and enforce established policies and standards of care in a

correctional facility, according to Plaintiff, was deliberately indifferent to

the serious medical needs of all inmates.  *Id*. at 36.  Ms. Pierce concludes

that Huynh and Ifediba's failure to establish and enforce standards of care

in a correctional facility resulted in Naphcare's inability to detect systemic

failures in healthcare - systemic failures which Plaintiff believes were the proximate cause of Cassady's death.  *Id*.

However, the job responsibilities of the On-Site Medical Director simply do not include a duty to implement or establish the procedures or policies described by Plaintiff.  (Doc. 256, Exhibit 2, § 24.00.)  The responsibilities do include the duty to "[a]nnually *review* and *approve* clinical protocols, clinical policies and procedures and medical disaster plan."  *Id*. (emphasis added).  To be required to review and approve the policies and procedures that are already in place does not mean that Huynh and Ifediba also had a duty to develop and implement new policies and procedures as proposed by Plaintiff.

Plaintiff also claims that Defendants failed to adequately train and supervise the facility's medical staff to ensure that they followed established standards of care with respect to the treatment of the inmates at the facility.  (Doc. 242, p. 36.)  However, the duties for the Onsite Medical Director do not include a duty to train Naphcare's employees nor does it state a general duty to supervise health care providers.  Instead, as Defendants note in their reply, the policy states that the On-site Medical

Director had a duty to supervise the clinical "services" provided by the staff. (Doc. 256, Exhibit 2, § 24.00.)  Plaintiff has not shown that Drs. Ifediba and Huynh failed to supervise the "services" that were provided to Cassady.  In fact, the evidence as set forth in detail in the previous sections shows that Ifediba and Huynh were actively involved in Cassady's treatment and care. Naphcare had a chain of command in place to ensure that the staff was adequately supervised.  For example, the nurses were supervised by the Director of Nursing, and the Regional Administrator would supervise the Director of Nursing.  Neither Dr. Ifediba nor Dr. Huynh had a general duty to supervise and train the personnel at the facility.

> b.    Lyrene.

Dr. Lyrene contends that the evidence clearly shows that he did not fail to adequately train or supervise subordinates which constituted deliberate indifference to Cassady's serious medical needs.  (Doc. 228, p. 35.)  He testified at his deposition that he reviewed patients' files to gain an understanding of the quality of care being given in the institutions, as well as the ability of the individual doctors to provide care and make clinical assessments.  (Doc. 228, pp. 35-36.)  Plaintiff responds by stating that Dr.

Lyrene failed to implement or establish any procedures to ensure that inmates/patients at the Bibb County facility received the minimum standard of care required in correctional healthcare.  (Doc. 244, p. 30.)  She alleges that Dr. Lyrene failed to review and enforce policies and NCCHC guidelines regarding inmate complaints, Chronic Care Clinics, special treatment plans, hospital and infirmary care, and specialized care.  *Id*.  Ms. Pierce contends that Dr. Lyrene's failure to implement and enforce established policies and standards of care in a correctional facility was deliberately indifferent to the serious medical needs of all inmates.

The Court is simply not satisfied that Plaintiff has met her burden of proving the first prong of the test set out in *Adams v. Poag*.  61 F.3d at 1544.  It has not been established through evidence presented to the Court that Lyrene failed to adequately train and supervise those who worked under him.  However, even if the Court found that he did not adequately train and supervise his staff, the Court must also find that Ms. Pierce has shown that his failure constituted deliberate indifference to an inmate's medical needs. *Id*. Plaintiff's allegations support, at best, a contention that Dr. Lyrene could have developed more standards, spent more time in the facility, or

done more to ensure that his staff was familiar with Naphcare's policies and procedures.   This is simply not enough to show that he was deliberately indifferent to an inmate's serious medical needs through his failure to adequately train and supervise his staff.   Even if Ms. Pierce had met the first and second prongs of the test, because the Court has found that none of the individual defendants remaining in this action are liable for deliberate indifference to Cassady's serious medical needs, she would be required to show that Lyrene's conduct was causally related to some other subordinate's constitutional violation.  *Adams*, 61 F.3d at 1544.

Plaintiff simply has not met the test for supervisory liability under § 1983.  Also, the Court has not held that any of the individual defendants acted with deliberate indifference towards Cassady's serious medical needs, and, therefore, Plaintiff has not shown that the conduct of these three defendants was causally related to any subordinate's constitutional violation.

V.    Conclusion.

For the reasons stated above, Defendants' Motions for Summary Judgment are due to be granted in all respects.   A separate order in conformity with this opinion will be entered.

Done this 5th day of May 2006.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
124153